## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ROBIN D. BRUTON                            *

    *Plaintiff,*                          *

v.                                        *          Civil Action No.:  1:06CV01874
                                        JDB
                               *

MEDSTAR-GEORGETOWN
MEDICAL CENTER INC., *ET AL.*            *

    *Defendants.*                        *

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### DEFENDANTS' MOTION TO STRIKE, OR ALTERNATIVELY,
### OPPOSITION TO PLAINTIFF'S MOTION FOR LEAVE TO
### FILE FIRST AMENDED VERIFIED COMPLAINT

Defendants, MedStar Georgetown Medical Center, Inc., Amy Lu, M.D., and Lynt Johnson, M.D. (collectively "Defendants"), by and through undersigned counsel, hereby file this Motion to Strike, or Alternatively, Opposition to Plaintiff's Motion for Leave to File First Amended Verified Complaint, and state as follows:

### I.  STATEMENT OF FACTS

Plaintiff's Complaint was originally filed with this Court on November 2, 2006.  Plaintiff's Complaint asserted claims against The Georgetown University, MedStar Health Inc., MedStar Georgetown Medical Center, Inc., The Georgetown University Hospital, Amy Lu, M.D., Lynt Johnson, M.D., and twenty fictitious named defendants ("John Does 1-20").  Plaintiff's Complaint asserted two (2) causes of action, both sounding in negligence.  The first was a claim for medical

malpractice regarding the surgical placement of a peritoneal dialysis catheter on August 19, 2004 at MedStar Georgetown Medical Center that was alleged to have been negligently placed resulting in a perforation of Plaintiff's colon. The second cause of action was premised on negligent credentialing of Dr. Amy Lu, Dr. Lynt Johnson, and unnamed doctors, interns, residents and nurses involved in Ms. Bruton's care.

In response to Plaintiff's Complaint, Defendants filed a Motion to Dismiss. In their motion, Defendants sought dismissal of Plaintiff's Complaint because Plaintiff is a resident of Maryland and Defendant MedStar Health, Inc. is a Maryland corporation; thus the Court lacked subject matter jurisdiction under 28 U.S.C. §1332. In addition, Defendants sought dismissal of Plaintiff's negligent credentialing claims asserted against The Georgetown University, The Georgetown University Hospital, a/k/a MedStar Georgetown Medical Center, Inc. and MedStar Health, Inc. because the District of Columbia has not and would not recognize negligent credentialing or hiring as a cause of action.

On December 20, 2006, Plaintiff filed a motion to dismiss her claims against The Georgetown University, The Georgetown University Hospital and MedStar Health, Inc. As grounds for her motion, Plaintiff stated that The Georgetown University is not a proper party because it no longer has an ownership interest in MedStar Georgetown Medical Center, Inc. In addition, The Georgetown University Hospital was not a proper party because it was not an

actual entity. Also, MedStar Health Inc. was not a proper party because this Court did not have jurisdiction over it in that MedStar Health Inc. and Plaintiff were both citizens of Maryland.

On December 21, 2006, this Court granted Plaintiff's motion to dismiss. In addition, this Court denied Defendants' motion to dismiss as moot because dismissing all three entities preserved diversity jurisdiction and disposed of Plaintiff's negligent credentialing claim because it was asserted only against the dismissed defendants.

On January 30, 2007, this Court issued the first of several Scheduling Orders. Pursuant to the January 30, 2007 Order, the parties were to, inter alia, join additional parties by April 24, 2007.

Before filing suit, presumably plaintiff had obtained her hospital records from MedStar-Georgetown Medical Center. Those records plainly record the names of physicians who participated in the surgery (See Exhibit 1, perioperative record produced by Plaintiff to Defendants on July 10, 2007 listing Dr. Amy Lu and Dr. Crago as surgeons who performed the catheter placement) and physicians who participated in her post-operative care, including each of the doctors now attempted to be joined as Defendants. (See Exhibit 2, progress notes and physician orders from Robin Bruton's August 19, 2004 hospital admission, produced by Plaintiff in her document production on July 10, 2007). For example, orders of 9/2/04-9/4/04 evidence Dr. Aarti Mathur's name printed under her

written signature that appears numerous times in the progress notes. On the progress note of 8/23/04 Dr. Schwartz's name is printed under his signature and corresponds to an order of that date legibly referring to his name. Further, there are numerous references to Dr. Tessema's and Dr. Doff's names in the nursing notes and orders that are plainly legible.

April 24, 2007 came and went, and no additional parties were added as required by the initial Scheduling Order.

On August 1, 2007, Plaintiff filed a motion requesting that the Court's Scheduling Order be modified to allow Plaintiff to name experts and conduct discovery.[1] Plaintiff stated in her motion that Defendants consented to Plaintiff's request for an extension. Defendants, however, had not consented to the dates proposed. In response to Plaintiff's request for an extension, however, Defendants conferred with Plaintiff's counsel and the parties filed a joint request to amend the scheduling Order.

On August 17, 2007, upon consideration of the joint request to alter the Scheduling Order, the court entered an amended pretrial Scheduling Order to allow Plaintiff until September 10, 2007 to join additional parties without further leave of the Court.

---

[1] As of that date Plaintiff had not identified experts, despite the Scheduling Order deadline of May 24, 2007. Plaintiff also had made no attempt to obtain depositions of any of the Defendants or individuals whose names were identified in the chart. While Plaintiff had attempted to propound Interrogatories on June 7, 2007 and July 14 2007, she propounded three sets of interrogatories to each Defendant asking over 200 questions. Plaintiff's counsel agreed to withdraw the improper discovery and to re-propound interrogatories conforming to the Rules, but did not do so until August 30, 2007. (See Exhibit 3).

On September 10, 2007, while Plaintiff named her only expert, Richard Steven Nitzberg, M.D., no additional parties were added.

At the request of defense counsel, this Court held a telephone conference on October 29, 2007 occasioned by Plaintiff's failure to appear for deposition or produce her expert for deposition. Pursuant to that conference the Court Ordered Plaintiff to appear for deposition prior to November 22, 2007, and the parties to arrange for Dr. Nitzberg's deposition to occur prior to December 14, 2007. While Ms. Bruton's deposition took place, Dr. Nitzberg's deposition did not.

On December 17, 2007, the court held a status conference. At the conference, the Court declined to strike Plaintiff's expert witness as sanction for failing to produce him for deposition as ordered. At Plaintiff's request, moreover, the Court again extended the discovery schedule to permit Plaintiff the opportunity to conduct discovery Plaintiff had not undertaken over the preceding year.[2] Upon being advised that Plaintiff wished to amend her Complaint to add three new Defendants and to add causes of action for lack of informed consent and failure to diagnose, the Court directed that any Motion for Leave to Amend be filed no later than December 31, 2007. The Court's Order concluded: "absent truly exceptional circumstances there will be no deviations from this schedule."

---

[2] After the October 29, 2007 telephone conference, defense counsel offered dates for the depositions of Dr. Lu, Dr. Johnson, and each of Defendants' expert witnesses, that could have been completed within the existing discovery schedule. (See Exhibit 4). Plaintiff never responded to the offers.

5

Plaintiff yet again ignored a Court ordered deadline and failed to file her Motion for Leave to Amend until the day after it was due, January 1, 2008.[3]

Plaintiff's Motion for Leave to File First Amended Verified Complaint ("Motion to Amend the Complaint") seeks to: 1) voluntarily dismiss her claims against Defendant Lynt Johnson, M.D; 2) join five individual physicians, Aimee Crago, M.D., Michael D. Doff, M.D., Tedla Tessema, M.D., Jaime Schwartz, M.D. and Aarti Mathur, M.D., as new defendants; and 3) add three additional causes of actions:[4]  (a) lack of informed consent, (b) negligent supervision and hiring, and; (c) failure to diagnose and treat.[5]

While Defendants do not oppose Plaintiff's voluntary dismissal of Lynt Johnson, M.D., the appropriate means by which his dismissal should be

---

[3] Plaintiff's counsel represented in the Certificate of Service that the Motion to Amend the Complaint was served on 12/31/08, however, according to the court docket and the time stamped copy to undersigned counsel the Motion to Amend the Complaint was not filed or served until 11:45 a.m. on 1/1/08. (See Exhibit 5)

[4] Plaintiff failed to redline the amended Complaint as instructed by the Court. Defendants, however, compared the original Complaint with the amended Complaint (totaling over 77 combined pages) and to the best of their ability attempted to document Plaintiff's amendments/alterations.

[5] Plaintiff's Motion to Amend the Complaint states that she seeks to add only two causes of action: Failure to diagnose and lack of informed consent. However, upon careful analysis of Plaintiff's Amended Complaint it appears that Plaintiff is attempting to add three new causes of action. The third cause of action is a Negligent Credentialing claim asserted against MedStar-Georgetown Medical Center, Inc. It appears that Plaintiff's Counsel may have simply worked off of her original Complaint in drafting the amended Complaint. In doing so, Plaintiff my have accidentally failed to remove those causes of action that were dismissed from the original complaint. Nevertheless, Defendants will address Plaintiff's Negligent Credentialing claim as if Plaintiff is attempting to re-assert it now.

accomplished is by stipulation under F.R.C.P. 41(a).[6]  Defendants do oppose, however, the attempt to add five new defendants and to add three new causes of action at this late stage of the proceeding.    The amendments should be denied under Fed. F.R.C.P. 15(a)(2) and 15(c)(1) because any amendment would be futile, would unduly prejudice the existing and new defendants and was filed after undue delay.

In light of the above, and as more fully discussed below, Defendants respectfully request this Court Strike Plaintiff's Motion to Amend the Complaint, or Alternatively, deny Plaintiff's Motion to Amend the Complaint.

## II.  ARGUMENT

### A.    Plaintiff's Motion to Amend the Complaint Should be Stricken as Untimely Filed.

Plaintiff filed her Motion for Leave to File First Amendment Verified Complaint ("Motion to Amend the Complaint") on January 1, 2008 at 11:45 a.m. (See Exhibit 5).  This Court, however, had ordered that Plaintiff file her Motion "no later than 12/31/07." As Plaintiff's Motion was untimely it should be stricken.

---

[6] Plaintiff's sole expert witness declined to render any opinion at deposition that Dr. Johnson breached the standard of care.  Immediately after his deposition, therefore, Defendant submitted a stipulation to Plaintiff's counsel pursuant to F.R.C.P. 41(a) requesting that Dr. Johnson be dismissed with prejudice.  Counsel has declined to sign it.

**B.    Should the Court Consider the Plaintiff's Motion to Amend the Complaint, the Motion Should be Denied Pursuant to Fed. R. Civ. Proc. 15.**

**1.    Standard of Review**

Under F.R.C.P. 15(a)(2), leave to amend should be freely granted unless the Court finds "undue delay, bad faith or dilatory motive ..., undue prejudice to the opposing party ... [or] futility of amendment." Foman v. Davis, 371 U.S. 178, 182 (1962); see also James Madison Ltd. by Hecht v. Ludwig, 82 F.3d 1085, 1099 (D.C. Cir.1996) (upholding denial of motion to amend a complaint because it would have been futile), cert. denied, 519 U.S. 1077 (1997); Robertson v. White, 111 F.R.D. 607, 609 (W.D. Ark. 1986) (denying the plaintiff's motion to amend the complaint for undue delay); Williams v. Little Rock Municipal Water Works, 21 F.3d 218, 224-26 (8th Cir. 1994) (denying plaintiff's motion to amend the complaint to join new defendants and new allegations for undue delay and where plaintiff was dilatory throughout pendency of action and presented no justification for delays); Frank v. U.S. West, Inc., 3 F.3d 1357, 1366 (10th Cir. 1993) (denying plaintiff's leave to amend to add defendant when the motion was untimely, and plaintiff knew or should have known long before that date of the possible defendant).  Plaintiff's proposed amendments violate each of the above proscriptions.

8

2.    **The Motion to Amend to Add Five New Defendants Should be Denied.**

a.  <u>Joining New Defendants Is Futile</u>.

First, the addition of five additional physicians, all of whom were employees of MedStar-Georgetown Medical Center at the time of the events,[7] would be completely futile because Plaintiff admitted these individuals did not breach standards of care or cause injury.

On November 28, 2007, Requests for Admissions were propounded to Plaintiff requesting that she admit that "no agent employee, servant of MedStar-Georgetown Medical Center breached the standard of care." Ms. Bruton also was asked to admit that "no alleged breach of the standard of care by an agent, servant or employee of MedStar-Georgetown caused damage to Robin Bruton." (<u>See</u> Exhibit 7, Request for Admissions propounded). Plaintiff never responded to the requests, and, therefore, pursuant to Fed. R Civ. Proc. 36, the request for admissions are deemed admitted. The matters admitted, moreover, are "conclusively established" and have binding effect, unless the court on Motion permits withdrawal or amendment. As of the filing of this Opposition, Plaintiff has made no motion to amend her admissions. The requests are, therefore, deemed admitted and Defendants have the right to rely on their binding effect. <u>See</u> <u>Rain Bolt v. Johnson</u>, 669 F.2d 767, 768 (D.C. Cir. 1981); <u>Liuck v. Gray Bar Electric Company</u>, 473 F.2d 1360, 1362 (8th Cir. 1973); <u>Jackson v. Riley Stoker</u>

---

[7] <u>See</u> MedStar-Georgetown's Answer to Interrogatory No. 2 and 5 (Exhibit 6).

9

Corporation, 57 F.R.D. 120, 121 (E.D. Pa. 1972); As there is no basis to establish the elements of a medical malpractice claim or claim for lack of informed consent against these Defendants, they would be subject to dismissal if joined. Any amendment, therefore, is futile.

Second, the Plaintiff's attempt to join the additional physicians is futile because the statute of limitations had expired with regard to all claims against the new Defendants no later than September 20, 2007, over three months prior to the filing of the Motion for Leave to Amend. By that date, three years had elapsed from the time that Plaintiff knew or should have known of her causes of action, having learned on September 20, 2004 that her colon had been perforated by placement of the peritoneal dialysis catheter a month before, and having undergone surgery to repair the injury. See Hardi v. Mezzanotte, 818 A.2d 974, 981 (D.C. 2003)(Plaintiff knew or should have known that her failure to diagnose cause of action accrued when her surgeon discovered that the Plaintiff's condition was diverticulitis, not a gynecological condition, and informed her of this condition). In seeking to add the additional five physicians as Defendants, Plaintiff does not dispute that the statute of limitations had already expired before the filing of her motion.[8] Rather, she argues that the proposed amendment relates

---

[8] Nor could Plaintiff dispute this fact. One need only look at the allegations in her originally filed Complaint which unequivocally demonstrate that she was placed on inquiry notice of her claims when she learned that a hole had been placed in her colon necessitating reparative surgery. Plaintiff asserted in her initial Complaint that after the peritoneal dialysis catheter placement, she suffered continuously from severe pain, depression and mental anguish the entire three weeks she was admitted and hospitalized at Defendant hospital. (Para. 33). Indeed, Ms. Bruton was

back to the date of the filing of the original Complaint pursuant to F.R.C.P. 15(c).

Rule 15, however, does not save the amendment from the bar of limitations.

Plaintiff's amendment to join new defendants, or in the alternative, substitute real parties for fictitious defendants, does not relate back to the original Complaint unless all of the requirements of Federal Rule of Civil Procedure ("F.R.C.P.") 15(c) are met. See Alexander v. Beech Aircraft Corp., 952 F.2d 1215, 1226-27 (10th Cir.1991); see also Juzwin v. Asbestos Corp., Ltd., 900 F.2d 686, 690 n. 4 (3d Cir. 1990), cert. denied, 498 U.S. 896, 111 S.Ct. 246, 112 L.Ed.2d 204 (1990).

F.R.C.P 15 (c)(1) only allows an amendment to a pleading to relate back to the date of the original pleading when:

> *(A) the law that provides the applicable statute of limitations allows relation back;*
>
> *(B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out--or attempted to be set out--in the original pleading; or*

---

unequivocal that the three week illness necessitating her hospitalization after the placement of the catheter was completely unexpected and about which she allegedly continually asked for explanation without satisfactory response until learning of the hole in her bowel. (See Exhibit 8, Plaintiff's deposition, at 90-109). Two days after her discharge, she was informed by Defendant Lu that there was a "communication" between the catheter and Plaintiff's bowel and that Plaintiff "would need to have surgery as soon as possible." (para. 37). Plaintiff alleged in paragraph 40, that she was "mortified, angry and confused by Defendant Lu's informed diagnosis and statement" and asked "How did it happen? It was supposed to be a simple routine, in and out 45 minute procedure. I was supposed to be home before rush hour, and able to use my catheter in two weeks." (para. 41). Further, she alleged that she was "leery about going back to Defendant hospital to let them perform another operation." (para. 43). At deposition, Plaintiff asserted she was not told that there was any risk involved in the catheter placement, much less told that a hole could be placed in her colon. (See Exhibit 8, Robin Bruton deposition at 84). She was advised after the second surgery on September 20, 2004 that the hole in her colon had been repaired, and part of her colon had been taken out as well as the catheter. (See Exhibit 8 at 114).

> *(C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint [within 120 days of filing the original complaint], the party to be brought in by amendment:*
>
> *(i) received such notice of the action that it will not be prejudiced in defending on the merits; <u>and</u>*
>
> *(ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.*

<u>See</u> F.R.C.P. 15 (c). The instant case does not satisfy subsection (c)(1)(A) or subsection (c)(1)(C) of the Rule.

     i.     <u>The applicable statute of limitations does not allow relation back.</u>

There can be no dispute that the statute of limitations applicable to this action and to the proposed amendment is the statute of limitations applicable to civil actions in the District of Columbia. This statute does not allow relation back. The statute requires that Plaintiff's causes of action be filed within three (3) years from the date Plaintiff either knew, or should have known, of a cause of action. <u>See</u> DC ST § 12-301(8); <u>Canterbury v. Spence</u>, 464 F.2d 772, 793, 150 U.S.App.D.C. 263 (C.A. D.C. 1972).

Therefore, because the statute of limitation does not provide for a more lenient relation back, Plaintiff must satisfy F.R.C..P 15 (c)(1)(C).

ii.    Plaintiff's amendment does not relate back because the additional
       physicians did not receive notice of Plaintiff's claims within 120
       days of the date Plaintiff filed her Complaint.

Rule 15(c)(1)(C) requires a new party receive notice within the time prescribed by Rule 4(M) of service of the Summons and Complaint or within one hundred twenty (120) days after filing of the Complaint. In this case the Complaint was filed November 2, 2006, requiring requisite notice by March 2, 2007. None of the New Defendants received notice (actual or constructive) about this claim within the requisite time. Further, Plaintiff's assertion that the new Defendants were "on notice" of the claim because she assumes they have cooperated in the defense of the case is factually unsupported.

Indeed, Dr. Doff and Dr. Tessema of the New Defendants have been gone from MedStar-Georgetown since 2005 and undersigned counsel does not even know where they are located. No contact has yet been made with Dr. Schwartz. Dr. Mathur was contacted in response to Plaintiff's Motion.[9] Dr. Crago was not contacted by counsel until August 2007. Moreover, since Plaintiff herself asserts in her motion that she only discovered a basis for her new claims in the thirty (30) days prior to her proposed amendment, one wonders how or why these doctors would have received notice of the claims now sought to be brought.

However, even assuming for the sake of argument that these additional defendants had notice of Plaintiff's claim, it is of no moment, because Plaintiff did

---

[9] Dr. Mathur is a resident of Maryland, as is Plaintiff. Adding her to the case will destroy diversity of citizenship, rendering the case dismissible, yet another reason the amendment is futile. Frank v. U.S. West, Inc., 3 F.3d 1357, 1366 (10th Cir. 1993).

13

not commit a "mistake" concerning a proper party's identity that would allow relation back.

    iii.    <u>Plaintiff did not commit a "mistake" in failing to join the additional physicians</u>.

Plaintiff's failure to discover the specific identity of the John Doe defendants or names of the new defendants is not a "mistake" as defined under F.R.C.P. 15 (c)(1)(C).  As such, Plaintiff's amendment will not relate back to the filing of the original Complaint.  Cases from this Circuit conclude a "mistake" regarding an individual's identity occurs under the Rule where there is a complete lack of knowledge of the existence of a party or of events giving rise to the need for joinder or a misnomer or misidentification of a party already before the Court. See <u>Rendall-Speranza v. Nassim</u>, 107 F.3d 913, 918 (D.C. Cir. 1997); <u>In re Greater Southeast Community Hosp. Corp. I</u>, 341 B.R. 91 (Bankr. D.C. 2006). Similarly, other Circuits have found mistake and allowed relation back where a Plaintiff is unable to discover the identity of a party because the opposing party has purposefully withheld the information, See <u>Byrd v. Abate</u>, 964 F.Supp. 140, 146 (S.D.N.Y. 1997)(before the statute of limitations ran, the attorney representing a mentally ill inmate repeatedly requested information necessary to identify proper parties that was uniquely within the knowledge of defense counsel who did not comply with these requests until after limitations had run) or the Plaintiff would have named a proper party but for a mistake of law. See <u>Donald v. Cook County Sheriff's Department</u>, 95 F.3d 548, 557 (7th Cir. 1996)(*pro se* prisoner who sued

14

Sheriff's Department under the mistaken belief that by doing so he was suing the individual deputies who injured him was allowed to join individual deputies after the statute of limitations had run).

Plaintiff's failure to determine the specific identities of the "John Doe" Defendants, however, does not constitute a mistake permitting relation back. Here, as in all "John Doe" cases, the Plaintiff knew of the existence of alleged tortfeasors prior to the running of the statute of limitations but not the specific party who should be sued. As stated by the Court of Appeals for the District of Columbia, "[i]n the adversarial system of litigation the plaintiff is responsible for determining who is liable for her injury and for doing so before the statute of limitations run out." Rendall-Speranza v. Nassim, supra, 107 F.3d at 919. She may not invoke Rule 15(c) to avoid the consequences of failing to investigate and determine the specific names of the "John Doe" she knows to exist, e.g., Jacobsem v. Osborne, 133 F.3d 315, 320-21 (5th Cir. 1998)(substitution of John Doe defendants does not relate back); Barrow v. Weatherfield's Police Department, 66 F.3d 466, 469 (2nd Cir. 1995)(failure of Plaintiff to identify individual "John Doe" Defendants when Plaintiff knows that such Defendants must be named, cannot be characterized as a mistake); Worthington v. Wilson, 8 F.3d 1253, 1257 (7th Cir. 1993)(failure to identify John Doe not a mistake under Rule 15(c)); Wood v. Worachek, 618 F.2d 1225, 1230 (7th Cir. 1980)(failure to identify John Doe not mistake). As stated in Greater Southeast Community Hospital Corp., I, supra, 341

15

B.R. at 103 n.13 articulating why failure to identify "John Doe" defendants does not constitute mistake, "the Plaintiff understood the need to ascertain the perpetrator's identities and…simply lost the race against time by failing to do so before the statute of limitations expired."

Plainly here, Plaintiff knew of the existence of parties who may have been proper Defendants in the initial Complaint filed, yet failed to conduct the necessary investigation to determine their specific identities prior to the expiration of the statute of limitations. In addition, Plaintiff was not precluded from identifying the proper parties to this action. Defendants never obstructed the Plaintiff's access to information. Indeed, Defendant was not the keeper of unique knowledge. Plaintiff and Defendant both had access to Plaintiff's medical records, and Plaintiff could have asked Defendants to help identify providers in those records at any time or have conducted discovery of MedStar-Georgetown Medical Center prior to the expiration of limitations to determine it. She did not.

Further, Plaintiff is not arguing that she would have named the additional physicians but for a mistake in the law, nor is she arguing that subsequent events, which she could in no way have known, arose that precluded her from naming the proper parties.

In light of the above, Plaintiff cannot join the new defendants because all of the specifications of F.R.C.P. 15(c) have not been met. Therefore, Plaintiff's attempts to join the New Defendants to this action are futile because the

amendment will not relate back to the original Complaint. Accordingly, if joined, these defendants would be entitled to a dismissal of all the Plaintiff's claims. See Rendall-Speranza v. Nassim, 107 F.3d 913, 918 (D.C. Cir.1997) (since the statute of limitations has run on Plaintiff's claims, any new defendants are entitled to repose).

### b. **Joining New Defendants To This Action Is The Result Of Undue Delay.**

Plaintiff asserts that "as the result of reviewing discovery and conducting an extensive investigation Plaintiff has recently (within the last 30 days)" discovered that Defendants are liable under new causes of action ... and that new defendants should be added. Further, Plaintiff asserts that she "filed this motion within two months of being provided information during discovery." (See Motion to Amend the Complaint ¶¶ 3 & 4; see also Plaintiff's Memorandum in Support of her Motion to Amend the Complaint p. 8).

Plaintiff's assertions are half-truths intended to mislead the court into believing that Defendants somehow precluded Plaintiff from discovering who treated Ms. Bruton – Nothing could be further from the truth.

First, presumably Plaintiff had the medical records before filing her Complaint in which the names of the New Defendants are plainly written. Certainly, Plaintiff was required to exercise due diligence to investigate her claims to determine who were the physicians who performed her surgery and rendered post-operative care. At any time during the pendency of the case, Plaintiff could

17

have asked Defendant Hospital to identify the names of providers listed in the record. She did not. Plaintiff did not even attempt to propound discovery until August 30, 2007, nine months after filing her claim (and nearly four months after Defendants propounded discovery). Also, unlike Plaintiff, Defendants answered her discovery shortly after it was received. As part of their response, Defendants included a detailed list of all those who treated Ms. Bruton, as well as a proffer to help identify any specific healthcare provider listed in Plaintiff's medical records upon request. In fact, Defendant MedStar-Georgetown Medical Center, Inc.'s responses to Plaintiff's interrogatories identified each of the New Defendants on October 4, 2007. Plainly, Plaintiff knew or should have known the identity of the New Defendants long before the Motion to Amend was filed, but took no steps to add these Defendants when she herself acknowledges she knew of the additional causes of action in January or February 2007. (See Memorandum in Support of Motion to Amend at 5).

In Williams v. Little Rock Municipal Water Works, the trial court did not abuse its discretion in denying plaintiff's motion to amend the complaint to join new defendants and new allegations where plaintiff sought amendment fourteen months after filing the original complaint, six days after the discovery cutoff, less than three weeks before trial and where the case had been extended on two occasions and discovery had been continued on one occasions. Also, plaintiff offered no valid explanation for failure to seek amendment earlier, and plaintiff

18

was dilatory throughout pendency of the action and presented no justification for the delay. Williams v. Little Rock Municipal Water Works, 21 F.3d 218, 224-25 (8th Cir. 1994); see also Frank v. U.S. West, Inc., 3 F.3d 1357, 1366 (10th Cir. 1993) (federal court did not abuse its discretion in denying plaintiff's leave to amend to add defendant when the motion was untimely, and plaintiff knew or should have known long before that date of the possible defendant).

Similar to Williams and Frank, Plaintiff knew or should have known of the New Defendants and joined them earlier. Indeed, Plaintiff had almost a year to join new defendants. Plaintiff, however, waited until after both she and her only expert had been deposed before attempting to join them. Moreover, the deadline to join new parties had been twice extended to accommodate Plaintiff. In fact, the Court's latest deadline to join additional parties was set for September 10, 2007 – ten days before the statute of limitations expired. Accordingly, Plaintiff cannot in good faith argue that her failure to join the New Defendants was an oversight or excusable neglect.

### c. Joining New Defendants Is Prejudicial.

Plaintiff's argument that the new parties will not be prejudiced because Defendants' counsel will likely be the new parties' counsel in this action is without merit. If joined, the New Defendants would be prejudiced because they were unable to participate in this action from its inception. The New Defendants will stand accused of professional malpractice; their reputations and careers will

19

be impugned. Yet, they were unable to participate in the discovery process, from its inception including consulting with counsel concerning selection of witnesses, making decisions concerning tactical issues, offering their advice to shape the conduct and development of the case, propounding discovery and attending depositions. Further, it has been over three years since the events, causing their, and other witnesses' memories to have faded. Indeed, witnesses who might have been able to corroborate their compliance with standard of care may no longer be available.[10]

Moreover, Plaintiff's expert did not even identify or name all of these new parties during his deposition[11] in which he outlined all his opinions regarding the alleged breaches in the standard of care. As such, most of the New Defendants do not know how or in what manner they allegedly breached the standard of care. Accordingly, to allow Plaintiff to join the New Defendants now would be substantially prejudicial, as well as further prolong discovery and the final adjudication of this case.

---

[10]  Indeed the locations of Dr. Doff and Dr. Tessema are currently unknown, having left the employ of MedStar-Georgetown several years ago.

[11] Dr. Nitzberg named only Dr. Doff as having breached standards of care for failing to entertain the diagnosis of a perforated bowel the night of surgery. (See Exhibit 9, deposition of Dr. Nitzberg, at pp. 53-54; 85). While he claimed he could not read the name of any other physician, even though Dr. Schwartz, Dr. Tessema and Dr. Mathur's names are clearly legible in the chart, his opinions were limited to those who treated Ms. Bruton the night after surgery. Id. at 85.

### 3. The Motion to Add New Causes of Actions Should Be Denied.

In addition to joining the New Defendants, Plaintiff attempts to add three new causes of action:    1) Informed Consent claim (See Proposed Amended Complaint ¶¶ 25, 114-119); 2) Negligent Credentialing (See Proposed Amended Complaint ¶¶ 91, 97, 98, 99, 100, 101, & 102); and 3) Failure to Diagnose (See Proposed Amended Complaint ¶¶ 35, 81, and 103-113).

Here, Plaintiff's attempts to add new causes of action should be precluded because these amendments too are futile and substantially prejudicial to the new and existing Defendants.  Further, Plaintiff's failure to amend the Complaint is the result of undue delay.

### a. **Plaintiff's attempt to add a cause of action for Informed Consent is futile.**

Plaintiff's motion to add a lack of informed consent count should be denied because she cannot succeed on this claim.  First, Plaintiff lacks expert testimony to support her claim.  Second, under the law of the District, Ms. Bruton was given informed consent as a matter of law.

To recover on a claim of lack of informed consent against a physician, a plaintiff must prove: (1) that there was an undisclosed risk that was material; (2) that the risk materialized causing injury; and (3) that plaintiff would not have consented to the procedure if she had been informed of the risk.  Hill v. Medlantic Health Care Group, 933 A.2d 314, 329-30 (D.C. 2007).  A material risk, for purposes of an informed consent claim against a physician, is a risk which a

21

reasonable person would consider significant in deciding whether to undergo a particular medical treatment. Id. at 330.

Expert testimony is not necessary on all elements of a claim for lack of informed consent; however, expert testimony is required to establish the nature of the risks inherent in a particular treatment, the probabilities of therapeutic success, the frequency of the occurrence of particular risks, the nature of available alternatives to treatment and whether or not disclosure of particular risks would be detrimental to a patient. Id.

Here, when asked, Plaintiff's expert was not able to provide any information that would support Plaintiff's Informed Consent claim. Specifically, Dr. Nitzberg did not know the incidence of bowel injury or pelvic abscess associated with the placement of a peritoneal catheter. (Exhibit 9, Deposition of Dr. Nitzberg, at pp. 18; 48; 60). Accordingly, Plaintiff cannot successfully assert a claim for informed consent because she lacks expert testimony to establish a critical aspect of whether the risks encountered could be considered material.

In addition, Plaintiff's Informed Consent claim is futile because Plaintiff signed a consent form that acknowledged she rendered her informed consent. (See Exhibit 10, August 19, 2004 Consent Form). In signing the consent form, Plaintiff acknowledged that Dr. Lu informed her of the nature of the procedure, the significant complications and risks associated with the procedure, the possible alternatives to the treatment, including no treatment at all, as well as the

22

significant complications and risks associated with such alternatives.  Therefore, because the consent form signed by Plaintiff adequately disclosed the nature of the treatment, the associated risks and benefits, as well as alternative treatments Plaintiff's Informed Consent claim is futile. See  Hill v. Medlantic Health Care Group, 933 A.2d 314, 330 (D.C. 2007) (stating that "at a minimum, a physician must disclose the nature of the condition, the nature of the proposed treatment, any alternate treatment procedures, and the nature and degree of risks and benefits inherent in undergoing and in abstaining from the proposed treatment."); see also Canterbury v. Spence,  464 F.2d 772, 788 (U.S. App. D.C. 1972).

In Hill, the plaintiff contended that he was not given sufficient information to choose an internal fixation versus external fixation procedure because he was not informed that there was a greater risk of infection with an internal fixation. The trial court concluded that informed consent had been established as a matter of law and there was no issue for the jury because Mr. Hill signed a consent form that was nearly identical to the form signed by Ms. Bruton here.  In relevant part, the consent form provided: "I have explained to the patient ... the nature of his/her condition, the nature of the operation or procedure to be done, the nature and the degree of risks and benefits associated with undergoing and in abstaining from the operation or procedure, alternatives to the operation or procedure to be performed, and the nature and degree of risks and benefits associated with each of those alternatives."  Hill v. Medlantic Health Care, supra, 933 A.2d at 331 n.15.

On appeal, the trial court's entry of judgment was affirmed. In addition, the appellate court noted that Mr. Hill's signature and hand-written modification to the form were strong evidence that Mr. Hill rendered his informed consent. See id. at 331 citing, Graff v. Malawer, 592 A.2d 1038, 1041 (D.C.1991) (finding judgment as a matter of law appropriate "because the testimonial and documentary evidence in the record, particularly the consent form that bore what he admitted was his signature, is so overwhelmingly contrary to [appellant's] position [that he lacked informed consent.]").

Here, the consent for signed by Plaintiff is nearly identical to the form in Hill. Further, similar to Hill, Plaintiff signature on the consent form is strong evidence that she rendered her informed consent. In addition, the fact that Plaintiff was a former radiation technician with a master's degree in health education and public health is strong evidence that she knew what she was signing and understood it. (See Exhibit 8, Plaintiff's Deposition, p. 9-12)

### b. **Plaintiff's attempt to add a Negligent Credentialing claim is futile, prejudicial and the result of undue delay.**

Plaintiff's Motion to Amend the Complaint re-alleges her Negligent Credentialing claim from the original Complaint. This count was the subject of Defendants' previously filed Motion to Dismiss. Ultimately, the court ruled that Defendants' Motion to Dismiss was moot because Plaintiff essentially dismissed this cause of action.

It would be futile to permit leave to allow Plaintiff to assert Count II, Negligent Credentialing and Hiring, because Plaintiff's only expert rendered no opinions that MedStar-Georgetown negligently hired or credentialed any physician. Indeed, in supplemental Answers to Interrogatories just provided by Plaintiff on January 7, 2008, she does not set forth any claim against MedStar-Georgetown based on negligent credentialing or hiring. (See Exhibit 11, Answer to Interrogatory No. 23). Given the complete absence of information in her discovery responses to support this claim, defendant submits there is no good faith basis to seek the amendment.

Plaintiff's Negligent Credentialing Claim is also futile because the District of Columbia does not recognize this cause of action. The District of Columbia's courts have never issued an opinion establishing, sanctioning, or acknowledging a claim for negligent credentialing. Further, not a single statute can be cited that establishes the vitality of such a claim.

Absent judicial or legislative precedent, it is beyond the province of this Court to establish a new cause of action in the District of Columbia. See Day and Zimmermann, Inc. v. Challoner, 423 U.S. 3, 4, 96 S.Ct. 167, 168, 46 L.Ed.2d 3 (1975) (As the Supreme Court has made clear, "[a] federal court in a diversity case is not free to engraft onto those state rules exceptions or modifications that may commend themselves to the federal court, but which have not commended themselves to the State in which the federal court sits."); see also Cantwell v.

25

University of Massachusetts, 551 F.2d 879, 880 (1st Cir.1977) (noting that federal courts take the law of the appropriate jurisdiction as they find it, and leave it undisturbed).

Therefore, there is no basis for this Court to even consider Plaintiff's negligent credentialing claim.

Furthermore, the District of Columbia would not recognize a negligent credentialing claim because public policy, embodied by statute, requires that facts concerning how or why a physician is credentialed or hired remain confidential, not discoverable and not admissible at trial. The peer review process enables hospitals and physicians to evaluate, discuss and improve upon their treatment of patients without fear or threat of litigation. See Report of the Committee on Consumer and Regulatory Affairs on Bill 9-355, The Health Care Peer Review Act of 1992 (October 27, 1992) (The committee report accompanying the act declared that the act was intended "to expand, strengthen and clarify the immunity and confidentiality provisions" of the existing peer review statute and to enhance "the willingness of both health care providers and consumers to participate in the work of peer review entities."). Id. note 6, at 2.

To further the peer review process, the District of Columbia Counsel enacted § 44-801 et seq. Section 44-801 et seq. exists solely to promote candid and meaningful discussion between health care providers by protecting medical peer

review discussions and materials from disclosure.  See D.C. Code §44-805(a).

Section 44-805(a) provides in relevant part:

> (1)    the    files,    records,    findings,    opinions,
> recommendations, evaluations and reports of a *peer
> review body*, information provided to or obtained by a
> *peer review body*, the identity of persons providing
> information to a *peer review body*, and reports or
> information provided pursuant to Section 44-802 or
> federal District of Columbia law shall be confidential
> and shall neither be discoverable nor admissible into
> evidence and any civil, criminal, legislative or
> administrative proceedings.

See D.C. Code §44-805(a) (emphasis added).[12]

Under the above statute, the peer review committee's files, records, findings,

opinions and evaluations are deemed confidential, not discoverable and not

admissible in a court of law or administrative proceeding.  Here, in order for Plaintiff

to establish her case in chief, it is essential that she has access to the Health Care

Providers' credentialing files, and its evaluation in making credentialing decisions

and that these files and evaluations be admissible into evidence.  Absent the

credentialing files or evaluations, Plaintiff cannot prove that the credentialing

committee was negligent in its decision.  Similarly, the Health Care Providers would

also need to disclose these files in order to adequately defend their decisions.  If the

---

[12]   A "peer review body" is "a committee, board, hearing panel or officer ... of a health-care
facility or agency, group practice or health care professional association that engages in peer
review.  See D.C. Code §44-801.  Peer review includes, but is not limited to, the "grant,
delineation, renewal, denial, modification, limitation, or suspension of clinical privileges to
provide health-care services at a health-care facility or agency..." See id.  Therefore, a medical
peer review committee or credentialing committee is a peer review body, and is files are deemed
privilege and confidential. Id.

credentialing materials can be discovered and if courts were to start judging the peer review process, the public policy behind a peer review would be completely frustrated. Any future discussions between physicians and hospitals regarding patient care would be guarded, and legal consequences would hover over every word.

This result was clearly contemplated and rejected when the City Council enacted § 44-801 *et seq*. The Council determined that the need for open discussion and critique within the medical community far outweighs the need for civil litigants to have access to credentialing information, notwithstanding a claim that such material is relevant to a plaintiff's claim. These confidentiality provisions, therefore, preclude potential plaintiffs from bringing a claim of negligent credentialing.

Here, Plaintiff's Proposed Negligent Credentialing claim is in direct conflict with the District of Columbia's public policy of promoting the peer review process, a process that the District of Columbia has deemed crucial in providing competent medical care to its citizens. Therefore, this Court should not recognize a claim for negligent credentialing. Because Plaintiff fails to state a cause of action recognized in the District of Columbia, the Motion for Leave to include such an action must be denied.

Finally, allowing Plaintiff to reassert this cause of action now is prejudicial because it was once dismissed, and Defendant has been allowed absolutely no discovery on the subject. Defendant would need to propound new written

28

discovery to determine what documents, facts or witnesses support Plaintiff's claim. Assuming there is some factual basis to make this claim, numerous depositions would need to be taken and new experts retained by Defendants. Plainly, to allow Plaintiff to add this cause of action now will only greatly prolong the adjudication of this matter that would have been completed by now, but for Plaintiff's delay.

### c. **Plaintiff's attempt to add a cause of action for Failure to Diagnose is futile, untimely, prejudicial and the result of undue delay.**

Plaintiff's attempt to add a cause of action for Failure to Diagnose is futile because Plaintiff, in failing to respond to Defendants' Requests for Admissions, admitted that the Defendants did not breach the standard of care or cause injury. (See Exhibit 7).

Further, all of Plaintiff's amendments are untimely and prejudicial. She asserts she informed defense counsel of her new claims in January and February 2007 in an attempt to prove notice to the newly added Defendants (an assertion that is just not true), but claims she did not discover her new causes of action until thirty (30) days before filing her Motion. It cannot be both. In his deposition of December 28, 2007, Dr. Nitzberg testified that standards of care were breached by failing to diagnose the perforation. Yet, he was designated as a witness on September 10, 2007, and the claim was not asserted until over three months later. Had the Complaint been amended earlier, Defendants would have had opportunity to defend against these claims by propounding more focused written discovery and

preparing more adequately for Plaintiff's deposition, as well as that of her expert witness.

Plaintiff's delay in adding these causes of action is in no way excusable neglect. Plaintiff's assertion that these new causes of action "suddenly appeared" after intense investigation might be true. However, it is not the Defendant's fault that Plaintiff waited so long to fully investigate her claim.

In <u>Robertson v. White</u>, 111 F.R.D. 607 (D.C. Ark. 1986) the court did not abuse its discretion in denying the plaintiff's motion to amend the complaint which sought to add new causes of action. The court determined that the plaintiff could have discovered the cause of action at least six months before filing the motion, and that plaintiff delayed filing the motion for more than one month after becoming aware that the cause of action in order to sandbag defendants at depositions.

Here, Plaintiff admits she knew of these claims since January 1, 2007. (<u>See</u> Memorandum of Points and Authorities in Support of Plaintiff's Motion for Leave to File First Amended Verified Complaint p. 5). Yet, Plaintiff waited an entire year before asserting these claims. In addition, Plaintiff waited until both she and her only expert had been deposed and approximately two months before the close of discovery before she filed her Motion to Amend the Complaint, Plaintiff's attempt to add this new cause of action at this stage in the litigation runs afoul to the general spirit of the federal rules and liberal amendment policy of Federal Rule

of Civil Procedure 15 (c), which are designed to avoid the "old sporting theory of justice." See <u>Florida Evergreen Foliage v. E.I. DuPont de Nemours & Co.</u>, 470 F.3d 1036, 1042 (11th Cir. 2006).

## CONCLUSION

Defendants respectfully request this Court to Strike Plaintiff's Motion for Leave to File a First Amended Complaint, or in the alternative, that Plaintiff's Motion for Leave to File a First Amended Verified Complaint be denied.

Respectfully submitted,

Susan T. Preston (Bar #419950)
Craig S. Brodsky (Bar #454924)
Goodell, DeVries, Leech & Dann, LLP
One South Street, 20th Floor
Baltimore, Maryland 21202
(410) 783-4000

Attorneys for the Defendants

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 14th day of January, 2008, a copy of the aforegoing Motion to Strike and Opposition to Plaintiff's Motion for Leave to File First Amended Verified Complaint, Request for Hearing, and proposed Order,

31

were sent via email (sfcargle.esq@qmail.com) and first class mail, postage prepaid

to:

Spencer S. Cargle, Esquire
Cargle & Associates
566 Edison Drive
E. Windsor, New Jersey  08520


_____
Susan T. Preston (Bar No.:  419950)


4817-6845-6450

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ROBIN D. BRUTON                         *

     Plaintiff,                         *

v.                                      *       Civil Action No.:  1:06CV01874
                                                                JDB
                                        *

MEDSTAR-GEORGETOWN
MEDICAL CENTER INC., *ET AL*.           *

     Defendants.                        *

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## REQUEST FOR HEARING

Defendants respectfully request a hearing on their Motion to Strike and

Opposition to Plaintiff's Motion for Leave to File First Amended Verified

Complaint.

Respectfully submitted,

Susan T. Preston, Esquire (Bar# 419950)
Goodell, DeVries, Leech & Dann, LLP
One South Street, 20th Floor
Baltimore, Maryland  21202
(410) 783-4000

Attorneys for Defendants

4817-6845-6450

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ROBIN D. BRUTON                              *

     *Plaintiff,*                           *

v.                                           *        Civil Action No.:  1:06CV01874
                                                       JDB
                                             *

MEDSTAR-GEORGETOWN
MEDICAL CENTER INC., *ET AL.*                *

     *Defendants.*                          *

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### ORDER

Upon consideration of Plaintiff's Motion for Leave to File First Amended

Verified Complaint and having considered the opposition and reply thereto, and

any oral argument thereon, it is this _____ day of _____, 2008

ORDERED that Plaintiff's Motion is hereby DENIED.

                          _____
                          The Honorable John D. Bates
                          Judge, United States District Court for
                          the District of Columbia

cc:    All Counsel

4817-6845-6450

_Bruton. v. MedStar-Georgetown Medical Center, Inc., et al._
Civil Action No.:  1:06CV01874

## EXHIBIT LIST
(Defendants' Motion to Strike and Opposition
to Plaintiff's Motion to Amend)

| No. | Description |
|-----|-------------|
| 1 | Perioperative record produced by Plaintiff to Defendants on July 10, 2007 listing Dr. Amy Lu and Dr. Crago as surgeons who performed the catheter placement. |
| 2 | Progress notes and physician orders from Robin Bruton's August 19, 2004 hospital admission, produced by Plaintiff in her document production on July 10, 2007. |
| 3 | Re-propounded Interrogatories to Defendants by Plaintiff of August 30, 2007. |
| 4 | Correspondence of November 6, 2007 from Defense Counsel offering deposition dates for Dr. Lu, Dr. Johnson and defense experts. |
| 5 | Electronic notification of Plaintiff's Motion for Leave to File First Amendment Verified Complaint ("Motion to Amend the Complaint") filed on January 1, 2008 at 11:45 a.m. |
| 6 | MedStar-Georgetown's Answer to Interrogatory Nos. 2 and 5. |
| 7 | Request for Admissions propounded to Plaintiff by Defendants. |
| 8 | Plaintiff's Deposition at 9-12; 48; 53-54; 84-85; 90-109; 114. |
| 9 | Deposition of Dr. Nitzberg at 18; 48; 53-54; 60-61. |
| 10 | August 19, 2004 Consent Form. |
| 11 | Plaintiff's Supplemental Answer to Interrogatory No. 23, filed January 8, 2008. |
|  |  |

4844-7614-2338

EXHIBIT 1

**PERI-OPERATIVE RECORD**

SURGERY DATE 8/19/04  III ASA

G.O.R. RM. # 7 ☐ IP

SDS RM. # ☐ TRAUMA ☐ AM

CYSTO RM. # ☐ SD

```
5050848 BRUTON ,ROBIN D
LU, AMY D      BAP F- 39
2600 VALLEY WA HYATTSVILL MD
08/19/04
          DOB
```

PRE-OP DX: *End Stage Renal Disease*

POST-OP DX: *Same*

BLOOD    T.S. ☐
☑ N/A    T.C. ☐

RM. OPEN: 14:10   PT. IN: 14:30   PT. OUT: 16:31   COMMENTS:

ALLERGIES: ☐ NKDA ☑ Yes *Bactrim, Erythromycin, Dilaudid, Compazine*

ANES. TYPE: ☑ Gen ☐ MAC ☐ Local ☐ EPI ☐ CAU ☐ Ax ☐ Other

PROCEDURE #1: Start 14:50 End 15:24

PROCEDURE PERFORMED: *Peritoneal Dialysis Catheter Placement*

Surgeon #1: *Dr. Amy Lu*   Resident #1/SA: *Dr. Crago*   Med Student:

PROCEDURE #2: Start ____ End ____

PROCEDURE PERFORMED:

Surgeon #2: ____   Resident #2/SA:

PROCEDURE #3: Start ____ End ____

PROCEDURE PERFORMED: *N/A*

Surgeon #3:

Resident #3/SA:

**LATERALITY:** ☑ No ☐ Yes, If Yes Follow
Instructions on back of Consent Form

**Laterality Form Signed** ☐ Yes ☑ NA

Right (site) ____

Left (site) ____

X Rays Available in Room ☑ N/A ☐ No ☐ Yes

**ISOLATION:** ☑ N/A ☐ Yes (If yes, type)

**Anesthesia**

Anes #1: *Dr. Lee*   Anes #2:

Anes. Resident/CRNA *Dr. Hoefling*   SRNA/Med Student:

| | INITIALS | TIME IN | TIME OUT |
|---|---|---|---|
| Circ. R.N. #1: *Vessel Galvan, RN* | VC | 14:10 | |
| Circ. R.N. #2: *Roxita Deregla, RN* | RD | 14:10 | 4:20 |
| Circ. R.N. #3: *Colleen Corcoran RN* | CC | 15:20 | 16:31 |
| Circ. R.N. #4: | | | |
| Scrub #1: *Mary Anne Adonay RN* | MA | 14:10 | 15:05 |
| Scrub #2: *Brian Phillips CST* | BP | 15:05 | 16:31 |
| Scrub #3: | | | |
| Scrub #4: | | | |
| Laser R.N. #1: | | | |
| Laser R.N. #2: | | | |
| Perf. #1: | | | |
| Perf. #2: | | | |
| ESI Tech #1 | | | |
| ESI Tech #2 | | | |

**INITIAL COUNT:**
SHARPS . . . . ☑ Done ☐ N/A
SPONGES . . . . ☑ Done ☐ N/A
INSTRUMENTS ☑ Done ☐ N/A
CIRC. RD   SCRUB MA

**FIRST COUNT:**
SHARPS . . . . . ☑ Correct ☐ Unresolved ☐ N/A
SPONGES . . . . ☑ Correct ☐ Unresolved ☐ N/A
INSTRUMENTS . ☑ Correct ☐ Unresolved ☐ N/A
CIRC. ____   SCRUB BP

**CHANGE OF SHIFT:**
SHARPS . . . . . ☐ Correct ☐ Unresolved ☐ N/A
SPONGES . . . . ☐ Correct ☐ Unresolved ☐ N/A
INSTRUMENTS . ☐ Correct ☐ Unresolved ☐ N/A
CIRC. ____   SCRUB ____

**FINAL COUNT:**
SHARPS . . . . ☑ Correct ☐ Unresolved ☐ N/A
SPONGES . . . . ☑ Correct ☐ Unresolved ☐ N/A
INSTRUMENTS . ☑ Correct ☐ Unresolved ☐ N/A
CIRC. CC   SCRUB BP

**FOR UNRESOLVED COUNTS:** ☐ Physician Notified
☐ X-ray Taken  Result: ____
Signature: ____ M.D.

**Position of Patient:** SAFETY Strap Secured ☑ Yes ☐ N/A *MA/RD/SS/CC/BP*

☑ Supine ☐ Prone ☐ Rt. Side Up ☐ Jackknife ☐ Other

☐ Lithotomy ☐ Genitalia Checked ☐ Lt. Side Up

☐ Breasts Checked

LEFT ARM: ☐ At Side ☑ Armboard ☐ Other   *Eggcrate mattress*   RIGHT ARM: ☐ At Side ☑ Armboard ☐ Other

LEGS / FEET UNCROSSED: ☑ Yes ☐ SCD setting *14 mmHg* Unit # *FCO 0620* By: *VC* ☐ N/A

PRESSURE POINTS PADDED: ☐ N/A ☐ Heels ☑ Knees ☐ Elbows ☑ Head ☐ Other / Comment:

**POSITIONAL AIDS:**

☐ N/A ☐ FX Table ☐ Wilson Frame ☐ Lateral Positioner ☐ Earplugs Placed
☐ Mayfield Headrest / Pins ☐ Shoulder Roll / Axillary Roll ☐ Voss Foam Leg Support
*under the knees* ☑ Pillow X ☐ Horseshoe Headrest ☐ Stirrups
☐ Bean Bag ☐ Prone Headrest ☐ Chest Rolls ☐ Comments
☐ Jackson Table ☐ Toboggans

LASER USED: ☑ No ☐ Yes TYPE: C-ARM/MINI: ☑ No ☐ Yes X-RAYS TAKEN: ☑ No ☐ Yes TECH:

MR 080020 (6/02)  PG. 1 OF 2   Georgetown University Hospital • 3800 Reservoir Rd

EXHIBIT 2

1:06CV01874 JDB

# POST ANESTHESIA CARE UNIT RECORD

Georgetown University Hospital
MedStar Health

**PATIENT TEACHING:**
- ☑ Oriented to PACU Equipment, Routine, Time, Procedures Explained
- ☐ Encourage Cough/Deep Breathing
- ☐ Post-op Pain Expectations (i.e., Pain Scale, PCA Use)
- ☐ Other ___

**LOCATION OF PAIN:**
- ☐ N/A
- ☑ Operative Site
- ☐ Other ___

**VAS Pain Scale:**
0 – 10 (none – most intense)

**MODIFIED RAMSEY SEDATION SCALE:**
1 – ANXIOUS AND AGITATED OR RESTLESS OR BOTH
2 – COOPERATIVE, ORIENTED AND TRANQUIL
3 – RESPONDING TO COMMANDS ONLY
4 – ASLEEP BUT RESPONDS TO PHYSICAL OR AUDITORY STIMULI
5 – ASLEEP BUT SLUGGISH RESPONSE TO PHYSICAL OR AUDITORY STIMULI
6 – NO RESPONSE

## MEDICATIONS

| Time | VAS | Medications (Drug, Dosage, Route) | SL | RN | Time | VAS | Medications (Drug, Dosage, Route) | SL | RN |
|------|-----|-----------------------------------|----|----|------|-----|-----------------------------------|----|----|
| Adm. | 9 | none | 1 | NB | 2035 | 4 | morning none | 2 | NB |
| 1800 | 9 | Dilaudid 2mg | 1 | NB | 2110 first | | Morphine 2mg IV | 2 | RC |
| 1815 | 4 | none | 2 | NB | 2125 | 4 | 5° Asleep | 4 | RC |
| 1830 | 4 | none | 2 | NB | | | | | |
| 1845 | 4 | none | 2 | NB | | | | | |
| 1900 | 4 | none | 2 | NB | | | | | |
| 1915 | 4 | none | 2 | NB | | | | | |
| 1920 | 4 | none | 2 | NB | | | | | |
| 2000 | 4.5 | ~~none~~ Morphine 2mg | 2 | NB | | | | | |

**PCA:** ☐ No ☐ Yes – See PCA Flow Sheet — IVPO

## NURSING INTERVENTIONS/ONGOING ASSESSMENT

| Time | |
|------|--|
| 1800 | pt admitted to phase I recovery from phase II. placed on cont. ECG monitor, FIO2 5L per nasal cannula – pt in severe pain. Dilaudid 2mg given. ~ pt tolerated well, pain ↓ to 4 prn/iv |
| 1830 | resident called notified that pts pain increasing and cont to be tense & guarding abdomen. ⊕ BS audible. Dr. Doff notified & stated he will be down to see pt. Dr. Gregg and Doff ___ diam. scheduled. Informed them of pt allergy to Dilaudid. Pain med changed to morphine. ___ Nancy Bradshaw con't to page #2 |

**ADMIT/DISCHARGED BY (R.N.)** ___

## DISCHARGE CRITERIA
- ☑ Respirations Even and Unlabored
- ☑ O₂ Sats WNL on Room Air
- ☐ Order for Oxygen Obtained
- ☑ Orientation to Time, Place, Person, Situation or Baseline Mentation Returned
- ☑ VS Stable: B/P ± 20% of Pre-Op
- ☐ Other ___
- ☐ Pain Score is Less Than (<) 5 and/or Patient is Satisfied with Pain Relief

**Surgical Site/Dressing**
- ☐ Dry and Intact
- ☐ No Active Bleeding
- ☐ Other ___
- ☐ Nausea/Emesis Controlled
- ☐ T° ≥ 36 C
- ☑ Able to Move Extremities x 4

**Comments:** ___

- ☑ Post Anes. Nursing Stds. of Care Met
- To Room __ Bypss 6011
- ☐ Waiting Room Notified ...... ☐ N/A
- Report Given to __ Jan __ R.N.
- * Boarding for Intensive Care ☐ N/A

## PACU ORDERS

| Date/Time | PACU ORDERS |
|-----------|-------------|
| | 1. Routine PACU vital sign monitoring. |
| | 2. Oxygen via FT/NC/blow-by to maintain SpO₂ ≥ 95. Wean patient to room air to maintain SaO₂ >90. |
| | 3. Pain Relief: <br> ☐ Morphine Sulfate 1-4 mg IV every 5 minutes prn for pain. Notify anesthesiologist when dose reaches 0.2 mg/kg (calculated total dose for weight of ___ kg is ___ mg) <br> ☐ Fentanyl 25-50 mcg (0.025 – 0.050 mg) every 10 minutes prn for pain. Notify anesthesiologist when total dose reaches 3 mcg (0.003 mg)/kg (calculated dose for weight of ___ kg is ___ mcg) <br> Do not administer narcotic if respiratory rate is <12/minute. |
| | 4. Nausea and Vomiting: <br> ☐ Ondansetron 4 mg IV for nausea and vomiting prn. May repeat x 1. <br> ☐ |
| | 5. Forced air warming unit for temp <35.5° C. |
| | 6. Discharged from PACU when: <br> ☐ Discharge criteria met <br> ☑ Only on order from anesthesiologist |
| | 7. Additional orders: (for PACU only) |

CRNA/MD Signature ___

Georgetown
University
Hospital ✠          **POST ANESTHESIA**
                    **CARE UNIT RECORD**
*MedStar Health*    **Page 2**

```
************************************
5050848
BRUTON, ROBIN D
DR LU, AMY D
        09/19/04
************************************
```

| | Time Adm. ► | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 220 | | | | | | | | | |
| V | 200 | | | | | | | | | |
| I | 180 | | | | | | | | | |
| T | **Blood Pressure** | | | | | | | | | |
| A | 160 | | | | | | | | | |
| L | V = Non-Invasive | | | | | | | | | |
| | ∧ | 140 | | | | | | | | |
| S | 120 | | | | | | | | | |
| I | T = Intra-Arterial | | | | | | | | | |
| G | ⊥ 100 | | | | | | | | | |
| N | • = Pulse | | | | | | | | | |
| S | 80 | | | | | | | | | |
| | O = Resp | | | | | | | | | |
| F | 60 | | | | | | | | | |
| L | 40 | | | | | | | | | |
| O | 20 | | | | | | | | | |
| W | Rhythm | | | | | | | | | |
| C | FiO₂ | | | | | | | | | |
| H | SpO₂ | | | | | | | | | |
| A R T | Temp | | | | | | | | | |

**NURSES' NOTES:** Morphine given. IVP - pt taking ice chips well. Cont. to have pain in ① Abdomen. report called to ⓒ Bress. pt care transfered to Rebecca Chaudry ln. 2045: VSS. Pt. asleep on ∅ off. Still c/o pain. awaiting room. 2100: Still very uncomfortible. Resident Dr. Doff paged. Additional dose of IV morphine ordered & administered. 2125: awaiting transport

f. Clare

MR 080.030 P2 (11/01)    Georgetown University Hospital • 3800 Reservoir Road, NW • Washington, DC 20007-2197

LU, AMY D    BAP F-39
2600 VALLEY WA HYATTSVILL MD
08/19/04
DOB

**Georgetown University Hospital**
MedStar Health

**PROGRESS NOTES**

| Date | |
|---|---|
| 8/20/04 | |

Blue Surgery

K⁺ to 6.1 O/N. Continuer to do pain
1 X c D50/insulin

Med
Clonidine 0.1³          Vs: 36² 157/92 85 20 98%
Toprol XL 100           PE: RRR
Irbesartan 150¹              CTA Ⓑ
MSO4 prn                Abdomen soft c tenderness
Percocet prn
Phenergan prn      A/P: S/P peritoneal dialysis cath.
                            — HD

                            McCrag MD

08/20/04 08:50 pt transfered to floor accompanied by transport
Nurse. pt oriented to room call Bell within reach. IV line
noted c infiltration. new IV placed. pt c/o abd pain
states "gas pain c it is dull" VAS 7/10. Dr. Crago
notified. medicated c MSO4 2mg IV as ordered.
pt c/o itching after MSO4 is given. pt states "I am
not allergic. I just itch all the time after I get
pain meds". when asked if she is allergic. BP 168/103,
manually 158/100. Dr Crago notified. asked if it was okay
to give BP meds since pt is going to dialysis. Dr Crago
as per Dr Crago hold all meds c notify when SBP > 180
Dr. Thbin notified. clonidine 0.2mg P given as per Dr Thbin
order will follow up              Hard Klegros



**Georgetown University Hospital**

*MedStar Health*

## PROGRESS NOTES

5050843 BRIDGE ROBINSON
BAF F-39
50S DP48

| Date | |
|------|---|
| | (nursing cont.) @1130, will come up to reassess pt. |
| | ———— JKinger |
| 1440 | Dr Iessema up to evaluate pt, orders received, fleets enema x1 given c̄ minimal results, fleets enema x1 given c̄ small BM, pt states she feels a little better p̄ 2nd enema. Ambulated c̄ assistance in hall @1740, still c̄ moderate to severe pain, c/o feeling dizzy, orthostatics standing 120/92 100  0-130/93 97, Dr Iessema paged @ 1745 ———— JKinger |

MR 050,010
(6/02)

**GEORGETOWN UNIVERSITY HOSPITAL**
**PROGRESS NOTES** (continued)

5050848  BRUTOK ,ROBIN B

| Date | |
|------|---|
| 8/21 | Blue Surgery |
| | Patient s̄ acute events |
| | ₸ 37⁹  124/64  103  20  95% |
| | HD yesterday |
| | Abdomen c̄ localized tenderness at incision site. No erythema or induration |
| | A/P:  Improved pain control |
| | Tolerating POs. |
| | Pain Ad c̄ Percocet |
| | Home HD regime. |
| | ___ MD |
| 8/21/04  1340 | (nursing) pt awake, alert OX3, VSS, c/o severe gas pain in shoulder & abdomen & ache ⊕ abdomen. C08/5 maalox & percocet given c̄ minimal relief. Explained to pt. need to get up walking to help move gas & relieve stiffness, pt v/u but wanted to try later. D/C home orders noted c̄ 1100, attempted to ambulate pt, pt walked to door but was doubled over in pain, Dr Issema notified |

**P R O G R E S S   N O T E S**     1:06CV01874 JDB

**GEORGETOWN UNIVERSITY HOSPITAL**
**PROGRESS NOTES** (continued)

```
5050848  BRUTON ,ROBIN D
LU, AMY D              BAP  F- 39
2600 VALLEY WA HYATTSVILL MD
08/19/04              [illegible]
M43  M4306A  DOB
```

| Date | |
|------|---|
| | *Nursing Notes* |
| 8/23/04 2000 | Patient off unit for abdominal film. ~ E. Fisher |
| 0000 | Patient alert, oriented x3, complained of pain in abdomen which she stated is improving. NGT to LCWS draining brownish / secretion. Patient up to bathroom. Enema given, small well formed bowel movement. ~ E. Fisher |
| 8/24/04 9a | S abd pain - slightly improving, no flatus, no hard BM |
| | O  36.3  91  148/91   98%  RA   1200 / 540 (NGT 450) |
| | NGT, [illegible], [illegible] |
| | CBC          139   108   89   [illegible] |
| |              4.7   23   12.1   105 |
| | [illegible] |
| | AXR ↓ air [illegible], [illegible] |
| | A  Ileus [illegible] |
| | P  AXR , CBC [illegible] |
| | N/O |
| | Tx [illegible] |
| | [signature] |

**PROGRESS NOTES**    1:06CV01874 JDB



Georgetown
University
Hospital

MedStar Health

**PROGRESS NOTES**

5050848 BRUTON, ROBIN D
LU, AMY D                    BAP  F- 39
2600 VALLEY WA HYATTSVILL MD
08/19/04  ███ 7701753893
M43  M4306A   DOB  ██/██/196█

| Date | |
|---|---|
| 8/9/█ | Renal attending note ⊕ |
| | Patient (illegible) abdomen improving daily |
| | (illegible) and (illegible) — (illegible) |
| | At present receiving HD therapy — no events |
| | (illegible) s̄ renal team |
| | (illegible) BP 150/100  80 a (illegible) chloride 96.3  K 20 |
| | (illegible) 8.00  UF 280  Thy 220 |
| | (illegible) ⊕ renal c̄ UF |

| | R: Blue Surgery |
| 8/24 8/25/04 555 | ∅ acute events.  Pt unhappy c̄ NGT. ⊕ flatus. "squirts of BM" ⊗ recorded |
| | 37°/37°  157/101  105  20  96% RA  I/O = 734/600 ↓ |
| | | UOP=300cc  NGT=300cc |
| | Gen: A & O x3 |
| | RRR |
| | CTA B |
| | Abd - less distended, soft. TTP in LLQ. ∅ Rebound |
| | ∅ guarding  ⊕ BS. |
| | Ext - ∅ cyanosis/edema. |
| | Abd x-ray P |
| | Labs P |
| | A/P  39 y/o ♀ ESRD s/p PD catheter placement now c̄ |
| | partial SBO clinically improving. |
| | → Consider cont conservative mgt - rx Abd x-ray & Clamp NGT? |
| | → PD |
| | → NPO/IVF |

**GEORGETOWN UNIVERSITY HOSPITAL**
**PROGRESS NOTES** *(continued)*

5050848 BRUTON, ROBIN D

| Date | |
|------|---|
| 8/25 | Sy |
| | Afc |
| | Abd mildly distended |
| | (+) BS |
| | NGT on grounds |
| | X-ray anything → by report |
| | |
| | |
| 8/26/04 | R, Blue Surgery |
| 545 | 24° NGT d/c'ed @ midnight. Ø emesis since |
| | Ø nausea ⊕ BM ⊕ flatus |
| | 37² / 36⁶  113/81  89  18  97% RA  1360/1190 |
| | A & O x 3 |
| | RRR |
| | CTA (B) |
| | soft! min. distended ⊕ BS |
| | |
| | A/P  39 y/o ♀ s/p PD catheter placement c̄ partial |
| | SBO clinically resolving. |
| | → Repeat Abd x-ray this AM |
| | → if cont to improve, consider starting |
| | clears |
| | → Encourage Ambulation  07/07 |

**P R O G R E S S    N O T E S**

1:06CV01874 JDB

**GEORGETOWN UNIVERSITY HOSPITAL**
**PROGRESS NOTES** (continued)

| Date | |
|------|---|
| 8/31/04 5am | R1 Addendum |
| | As above Attempted aspiration from PD Cather |
| | c̄ results, ⊕BM @ Plates Tol c̄ D. |
| | Tm= 38⁴     wt ↓ (53.2→52.2) |
| | Abd-Distended(↑) firmer |
| | Labs Ⓟ    WBC yest 13.9 |
| | → CT guided aspiration of pelvic fluid today |
| | → F/u Pan Cx |
| | → Cont Cipro/flagyl.  |
| | _A. Mathur_ |
| 8/31/04 5:50AM | GT3 Addendum |
| | U/A: ⊖ Nitrates, Leukocyte Esterase ,⊖ |
| | 2+ bacteria, 4 WBCS |
| | _Stephanie Coquia GT3/_ |
| | As above.  _John KTM_ |
| | fever  ⊕ diarrhea.  ⊕ UA. |
| | abd - soft + distended ⊖ |
| | A/P - 10111 d/w IR for pelvic fluid drainage |
| | Cont antibx for now.  |
| | _John KTM_ |



**Georgetown University Hospital**
MedStar Health

**PROGRESS NOTES**

| Date | |
|------|--|
| 9/1/04 5⁴⁵ | R: Addendum |
| | As above. 150cc aspirated yesterday. Pelvic drain in place |
| | T$_m$ 38°   VSS .  Drain: Ø        BMx5 |
| | RRR |
| | CTA ② |
| | Distended (↓ from before) soft ⊕ BS  Pelvic drain in place |
| | Labs Ⓟ   Cx Ⓟ → Gram Stain = few GNR, Many WBC |
| | → ADAT |
| | → Cont Cipro Flagyl |
| | → Flu Cx & Cont Ator    A Mathur |
| | → Monitor BP. |
| | |
| | GT3 Addendum: |
| | Gram stain: Moderate G+ rods, moderate G+ cocci, WBCs, rare gram ⊖ |
| | Gram stain: few pelvic rods  pelvic |
| | ⊖ C. diff. |
| | UCx, BCx Ⓟ |
| | R: addendum.    Stephanie Coquia GT3 |
| | Tmax 38          Φ drain output |
| | abd- soft.  ↓ distension Ø |
| | A/P - Stable.    Kim |
| |     Adv  diet |
| |     Cont  antibx |

**GEORGETOWN UNIVERSITY HOSPITAL**
**PROGRESS NOTES** (continued)

| Date | |
|---|---|
| 9/2/04 5:20 AM | GT3 Blue Surgery PN |
| | 24° events: Abdominal X-Ray – Few Air Fluid Levels, Dilated Loops of Bowel. |
| Reglan 5 mg IV TID | Advanced diet to solids, but placed back on clear diet. |
| | S: Ate oatmeal, soup - did not cause any nausea & vomiting. Complains of |
| Cipro 200 mg IV q12° | Churning pain in her abdomen. ↓ Diarrhea |
| Flagyl 500 mg IV Q8 | O: 37³  37  93  109/71  16  99°6 RA   no weight |
| Toprol XL 100 mg TODAY ↳ Hold | 400 oral           3 urine |
| | INS: 1900 cc             OTS: 9 diarrhea |
| Avapro 150 mg PO QD | EXAM: awake, alert, oriented |
| Protonix 40 mg IV QD | CV: RRR  Resp: CTA Ⓑ   Abdomen: NABS, distended |
| Clonidine 0.3 mg PO TID ↳ Held | Extremities: ∅ edema |
| Colace | LABS: BCx Ⓟ 8/30/04  UCx Ⓟ 8/30/04 |
| PRN: - Maalox 20 cc PO x2 | A: 39 year old female s/p PD catheter placement c̄ SBO ø |
| | P: ① Continue Abx - Cipro Flagyl |
| - Phenergan 25 mg IV x3 | ② HD today - blood drawn there |
| - Morphine 2 mg IV x3 | ③ ✓ Cxs |
| | ④ Clears for now |
| | |
| | Stephanie Coquia GT3 / |
| | R₁  Addendum |
| | As Above. Abd xray c̄ air fluid levels & dilated loops |
| | ∅ol CLD |
| | VSS AF |
| | Abd - Distended, soft ⊕ BS |
| | Pelvic Fluid: GNR ⓈPending .  Blood Cx Ⓟ Urine Cx Ⓟ |
| | A/P: 39 y/o ♀ s/p PD Catheter c̄ unresolving SBO |
| | → Cont Abx |
| | → HD today |
| | → f/u Cx |
| | → Possible OR?. for Exploration? |

GEORGETOWN UNIVERSITY HOSPITAL
**PROGRESS NOTES** (continued)

5050848 BRUTON, ROBIN D.

| Date | |
|------|--|
| 9/3/04 5³⁰ | R, Addendum |
| | As Above. Pt states she feels better ⊘ h/u.  ⊕ BM since |
| | 11pm last night |
| | AF VSS     Drain: ∅ output. |
| | A&0x3 |
| | RRR |
| | CTA Ⓑ |
| | Distended. (Refused palpation) |
| | ⊘ cyanosis/ edema. |
| | CT Scan yest – ↓ fluid collection  Amy = 153 |
| | dilated SB    Lipase = 80 |
| | A/P: 39 y/o ♀ ESRD s/p PD Catheter placement s/p drainage |
| | of Pelvic Abscess ē multiresistant E. coli & partial SBO unresolving |
| | → PICC line for TPN |
| | → ID input for Pelvic Abscess |
| | → Possible OR today for Ex laparoscopy poss |
| | laparotomy. poss ℞ B resection. |
| | As above. |
| | AFVSS   .  ⊕ diarrhea |
| | abd soft, distended |
| | A/P- Stable. |
| | Will review CT scan |
| | IV antibx |

Georgetown
University
Hospital

**GEORGETOWN UNIVERSITY HOSPITAL**
3800 Reservoir Road NW, Washington, DC 20007

MedStar Health

**PHYSICIANS' ORDERS**

Drug Allergies ▶

BRUTA Robin

USE BLACK INK BALLPOINT PEN – PRESS FIRMLY; CANCELLATION OF ORDER SHOULD BE WRITTEN AS A SPECIFIC NEW ORDER, INDICATE DURATION OF ORDER AS WELL AS DOSE AND INTERVAL. WHEN DURATION OF ORDER IS NOT INDICATED, THE HOSPITAL'S STOP ORDER POLICY WILL BE APPLIED. AUTHORIZATION IS GIVEN TO DISPENSE A GENERICALLY EQUIVALENT DRUG UNLESS IT IS WRITTEN THAT NO OTHER BRAND IS ACCEPTABLE.

| Date | Time | ORDERS |
|------|------|--------|
| 8/17/04 | | Admit to Blue Surgery - 23° Observation |
| | 6⁵⁰ pm | Diagnosis s/p peritoneal dialysis Catheter |
| | | Condition: Stable |
| | | Vitals: Q4h |
| | | All: Codeine, Erythromycin, Bactrim |
| | | Activity: OOB, ambulate |
| | | Nursing: Is and Os |
| | | IS to BS and teach |
| | | SCDs in bed |
| | | Diet: Clears to regular as tolerated |
| | | HLIV |
| | | Meds: Clonidine 0.1mg PO TID |
| | | Toprol XL 100mg PO QD |
| | | Avapro 150mg PO QD |
| | | Dilaudid 2mg IV Q2h prn (SIC) |
| | 1230/2mg | Morphine 2mg IV Q2° prn pain |
| | | Percocet (5/325) two PO Q4° prn pain |
| | | Phenergan 12.5mg IV Q6° prn N/V |
| | | Labs: CBC c diff, Chem 10 in Am |
| | | Call H.O. for T>38.5°, HR >120/<60, SBP >180/<90, |
| | | SB RR>30/<12     Am Cragon |
| | | 668-1865 |
| | | |
| 8/19/04 | 2110 | Morphine 2mg IV x1 now prn pain. |
| | | V.O. Dr. Doff / R Chaudhry RN |
| | | |
| | | in call Dr. |
| | | 668-0436 |

MR 170.030 (12/00)                    MEDICAL RECORD COPY                    1:06CV01874 JDB

Georgetown
University
Hospital    **GEORGETOWN UNIVERSITY HOSPITAL**
            3800 Reservoir Road NW, Washington, DC 20007

*MedStar Health*    **PHYSICIANS' ORDERS**

**Drug Allergies ▶**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
5050848                    770175
BRUTON ,ROBIN D
DR: LU, AMY D        03-201
        08/20/04
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

USE BLACK INK BALLPOINT PEN – PRESS FIRMLY; CANCELLATION OF ORDER SHOULD BE WRITTEN AS A SPECIFIC NEW ORDER, INDICATE DURATION OF ORDER AS WELL AS DOSE AND INTERVAL. WHEN DURATION OF ORDER IS NOT INDICATED, THE HOSPITAL'S STOP ORDER POLICY WILL BE APPLIED. AUTHORIZATION IS GIVEN TO DISPENSE A GENERICALLY EQUIVALENT DRUG UNLESS IT IS WRITTEN THAT NO OTHER BRAND IS ACCEPTABLE.

| Date | Time | ORDERS |
|------|------|--------|
| 8 20 04 | 5:15 pm | ① D/C MSO₄ IV. |
| | | ② Diet (Renal) as tolerated — CLARIFY. |
| | | ③ Call HO when patient to floor p̄ HD. |
| | | Amy Crago MD |
| | | 668-9865 |
| 8/20 | | v.o. from Dr Crago to F.Lein; RN 6:30 PM |
| | 19:00 | 1) Benadryl 25mg prn po q6° R/itching |
| | | 2) Hold the Clonidine dose |
| | | RS * Amy Crago MD |
| | | S/Jn |
| | | F.Lein /RN |
| | | 12° Chart ✓ F.Lein /RN |
| 8/20/04 | 20:45 | OK to have no IV access. May D/C IVF |
| | | T.O. Crago #668-1885 |
| | | Amy Crago MD |
| | | Until 0800 AKA Hosp. |
| 8/20/04 | 23:55 | Hold tonights dose of Clonidine   T.O. Crago #668-1885 |

**DO NOT USE THIS SHEET UNLESS A RED NUMBER SHOWS ➤**

MR 170.030 (12/00)        MEDICAL RECORD COPY

Georgetown
University
Hospital

MedStar Health

**GEORGETOWN UNIVERSITY HOSPITAL**
3800 Reservoir Road NW, Washington, DC 20007

**PHYSICIANS' ORDERS**

Drug Allergies ▶

```
5050948
BRUTON ,ROBIN D                    F 39
DR: LU, AMY D
08/20/04
```

USE BLACK INK BALLPOINT PEN – PRESS FIRMLY; CANCELLATION OF ORDER SHOULD BE WRITTEN AS A SPECIFIC NEW ORDER, INDICATE DURATION OF ORDER AS WELL AS DOSE AND INTERVAL. WHEN DURATION OF ORDER IS NOT INDICATED, THE HOSPITAL'S STOP ORDER POLICY WILL BE APPLIED. AUTHORIZATION IS GIVEN TO DISPENSE A GENERICALLY EQUIVALENT DRUG UNLESS IT IS WRITTEN THAT NO OTHER BRAND IS ACCEPTABLE.

| Date | Time | ORDERS |
|------|------|--------|
| 8/21/04 | | D/C home |
| | | Flu in 1 week |
| | | c̄ Dr. Lu. _(illegible signature)_ 668-1865 |
| | | OK to |
| 8/21 | | Fleet Enema X 1 |
| | | & then D/C Home _(illegible signature)_ |
| 8/21 | 1455 | may repeat Fleets enema X 1 until BM |
| | | V.O.R.B Dr Jefferson / Klinger |
| | | Klinger @ 1820 |

DO NOT USE THIS SHEET UNLESS A RED NUMBER SHOWS ➤

MR 170.030 (12/00)                    MEDICAL RECORD COPY                    1:06CV01874 JDB

505 0848

**Georgetown University Hospital**
**GEORGETOWN UNIVERSITY HOSPITAL**
3800 Reservoir Road NW, Washington, DC 20007

*MedStar Health*

## PHYSICIANS' ORDERS

**Drug Allergies ▶**

USE BLACK INK BALLPOINT PEN – PRESS FIRMLY; CANCELLATION OF ORDER SHOULD BE WRITTEN AS A SPECIFIC NEW ORDER, INDICATE DURATION OF ORDER AS WELL AS DOSE AND INTERVAL. WHEN DURATION OF ORDER IS NOT INDICATED, THE HOSPITAL'S STOP ORDER POLICY WILL BE APPLIED. AUTHORIZATION IS GIVEN TO DISPENSE A GENERICALLY EQUIVALENT DRUG UNLESS IT IS WRITTEN THAT NO OTHER BRAND IS ACCEPTABLE.

| Date | Time | ORDERS |
|------|------|--------|
| 8/21 | 7:30 pm | - Hold D/c order. |
| | | - D5½ NS 50 ml IV /hr |
| | | - NPO |
| | | - STAT Abdominal Film erect supine lateral, r/o ileus |
| | | - STAT CBC w/ diff c̄ chem-10 |
| | | _____ 668-1622 |
| | | A Reisinger RN |
| 8/21 | 9:15 pm | - NGT c̄ to LWS. |
| | | _____ |
| | | A Reisinger RN |
| 8/21/04 | 9:30 AM | T.O. Dr Tessema 668-1622 please D/C po percocet; give 2mg. IV morphine q4° PRN pain, ↑ protonix to 40 mcg IV QD c̄ hold po Toprol. Cont all other meds. Received by Amy Reisinger RN/ please sign |
| | | V.O.R.B. |

**DO NOT USE THIS SHEET UNLESS A RED NUMBER SHOWS ▶**

MR 179.080 (12/00)

MEDICAL RECORD COPY

1:06CV01874 JDB

Georgetown
University
Hospital ⚕   **GEORGETOWN UNIVERSITY HOSPITAL**
3800 Reservoir Road NW, Washington, DC 20007

*MedStar Health*   **PHYSICIANS' ORDERS**

**Drug Allergies ▶**

5050848  BRUTON, ROBIN D
LU, AMY D          BAP  F-39
2600 VALLEY WA HYATTSVILL MD
08/19/04   ____ 7701753603 _
M43  M4306A    DOB  03/01/1965

USE BLACK INK BALLPOINT PEN – PRESS FIRMLY; CANCELLATION OF ORDER SHOULD BE WRITTEN AS A SPECIFIC NEW ORDER, INDICATE DURATION OF ORDER AS WELL AS DOSE AND INTERVAL. WHEN DURATION OF ORDER IS NOT INDICATED, THE HOSPITAL'S STOP ORDER POLICY WILL BE APPLIED. AUTHORIZATION IS GIVEN TO DISPENSE A GENERICALLY EQUIVALENT DRUG UNLESS IT IS WRITTEN THAT NO OTHER BRAND IS ACCEPTABLE.

| Date | Time | ORDERS |
|------|------|--------|
| 8/22/04 | 0140 | Stat p CXR to eval NGT placement please. |
| | | Hurricaine Spray to BS to use prn sore throat |
| | | 668-0413 |
| | | A Peisinger RN |
| 8/22/04 | 03:00 | T.O. Dr. Tessema 668-1622 received by Amy Peisinger RN (V.O.R.B) please √ a CBC c̄ diff & chem 10 this a.m. c̄ Abd film + erect, supine + lateral, R/O ileus pleas sign √ ~~COMPLETED~~ |
| | | A Peisinger RN  JKay RN |
| 8/22/04 | 1030 | strict NPO |
| | | hold BP meds if Sys <120 |
| | | V.O.R.B. Dr Tessema JKing RN |

DO NOT USE THIS SHEET UNLESS A RED NUMBER SHOWS ▶

JKing RN

MR 170.030 (12/00)            MEDICAL RECORD COPY

1:06CV01874 JDB

5050848  BRUTON  ROBIN D
LU, AMY D                BAP  F- 39
2600 VALLEY WA HYATTSVILL MD
08/19/04            SUR  7701753801
M43  M43Q6A  DOB  03/01/1926

Georgetown
University    **GEORGETOWN UNIVERSITY HOSPITAL**
Hospital     3800 Reservoir Road NW, Washington, DC 20007

*MedStar Health*        **PHYSICIANS' ORDERS**

**Drug Allergies ▶**

USE BLACK INK BALLPOINT PEN – PRESS FIRMLY; CANCELLATION OF ORDER SHOULD BE WRITTEN AS A SPECIFIC NEW ORDER, INDICATE DURATION OF ORDER AS WELL AS DOSE AND INTERVAL. WHEN DURATION OF ORDER IS NOT INDICATED, THE HOSPITAL'S STOP ORDER POLICY WILL BE APPLIED. AUTHORIZATION IS GIVEN TO DISPENSE A GENERICALLY EQUIVALENT DRUG UNLESS IT IS WRITTEN THAT NO OTHER BRAND IS ACCEPTABLE.

| Date | Time | ORDERS |
|------|------|--------|
| 8/22 | 1535 | ↑ morphine to 2mg IV q2-4° prn pain |
|      |      | V.O.R.B Dr. Doff / Gilinger RN |
|      |      | Dr Doff |
|      |      | G Ilinger RN @ 1610 |
| 8/22 | 1635 | hold all po BP meds notify MD for sys 7/60 |
|      |      | V.O.R.B Dr. Doff / Gilinger RN |
|      |      | Dr Doff |
|      |      | G Ilinger RN @ 1650 |
| 8/22 |      | 12° Chart / G Ilinger RN @ 1921 |
| 8/22/04 21°° | | ① d/c morphine |
|      |      | ① Abdominal film Upright now re: obstruction    COMPLETED |
|      |      | 8/22/04 2100 / Dr Doff |
| 8/22/04 | | 12 Hour Chart Check Dr. Fisher RN |

**DO NOT USE THIS SHEET UNLESS A RED NUMBER SHOWS ➤**

MR 170.030 (12/00)          MEDICAL RECORD COPY          1:06CV01874 JDB

Georgetown
University      **GEORGETOWN UNIVERSITY HOSPITAL**
Hospital        3800 Reservoir Road NW, Washington, DC 20007

*MedStar Health*            **PHYSICIANS' ORDERS**

**Drug Allergies ▶**

5050848  BRUTON, ROBIN D
LU, AMY D          BAP F-39
2600 VALLEY WA HYATTSVILL MD
08/19/04
M43  M4306A  DOB

USE BLACK INK BALLPOINT PEN – PRESS FIRMLY; CANCELLATION OF ORDER SHOULD BE WRITTEN AS A SPECIFIC NEW ORDER, INDICATE DURATION OF ORDER AS WELL AS DOSE AND INTERVAL. WHEN DURATION OF ORDER IS NOT INDICATED, THE HOSPITAL'S STOP ORDER POLICY WILL BE APPLIED. AUTHORIZATION IS GIVEN TO DISPENSE A GENERICALLY EQUIVALENT DRUG UNLESS IT IS WRITTEN THAT NO OTHER BRAND IS ACCEPTABLE.

| Date | Time | ORDERS |
|------|------|--------|
| | | C62, M61, M63 |
| 12:00 | | Transfer to C61, Blue Surgery |
| 8/23/04 | | Dx: Renal Failure, s/p Peritoneal Catheter Placement, |
| | | Hyperkalemia |
| | | Condition: stable |
| | | Vitals: q4h |
| | | Activity: out of bed as tolerated |
| | | Allergies: ~~Cardizem~~ Bactrim, Dilaudid, Erythromycin, Compazine, |
| | | Codeine |
| | | Nursing: I's and O's |
| | | Diet: NPO |
| | | IVF: D5 ½NS 50 mL IV/hr |
| | | Meds: hold all PO BP meds, Percocet PRN, Phenergan PRN, |
| | | Labs: Chem 10 QAM          Protonix 40 mg |
| | | Call H.O. if Sys >160 |
| | | |
| | | Abdominal Film Supine, Erect |
| ③ | | M ADI 5D QAM.    F/U X-R |
| | | for SBO |
| | | |
| 8/23/04 | 2355 | Telephone Order Dr. Schwartz 668-1225 |
| | | Dulcolax suppository 1 PR BID until bowel |
| | | movement then hold |
| | | Give fleet enema now XT /R/1 |
| | | P. Fisher |
| | | P. Fisher 8/23/04 |

**DO NOT USE THIS SHEET UNLESS A RED NUMBER SHOWS ▶**

MR 170.030 (12/00)                    **MEDICAL RECORD COPY**

1:06CV01874 JDB

Georgetown
University    **GEORGETOWN UNIVERSITY HOSPITAL**
Hospital    3800 Reservoir Road NW, Washington, DC 20007

MedStar Health

## PHYSICIANS' ORDERS

**Drug Allergies ▶**

USE BLACK INK BALLPOINT PEN – PRESS FIRMLY; CANCELLATION OF ORDER SHOULD BE WRITTEN AS A SPECIFIC NEW ORDER, INDICATE DURATION OF ORDER AS WELL AS DOSE AND INTERVAL. WHEN DURATION OF ORDER IS NOT INDICATED, THE HOSPITAL'S STOP ORDER POLICY WILL BE APPLIED. AUTHORIZATION IS GIVEN TO DISPENSE A GENERICALLY EQUIVALENT DRUG UNLESS IT IS WRITTEN THAT NO OTHER BRAND IS ACCEPTABLE.

| Date | Time | ORDERS |
|------|------|--------|
| 8/26/4 | 1130 | Cf order |
| 8/26/4 | 1415 | 8° order |
| 8/26/4 | 4m | ↑ tol 100 c/o |
| | | Clears in AM |
| 8/26/14 | | |
| 8/26/04 | | |
| 8/26/4 | 1900 | 12° order |
| 8/26/04 | 1930 | 17° |
| 8/26/04 | 2400 | 16° |
| 8/27/04 | 0030 | TO Dr Schwartz |
| | | Dulolax Supp Ⅰ x. |

**DO NOT USE THIS SHEET UNLESS A RED NUMBER SHOWS ➤**

MR 170.030 (12/00)

MEDICAL RECORD COPY

1:06CV01874 JDB

Georgetown
University
Hospital ⚕

**GEORGETOWN UNIVERSITY HOSPITAL**
3800 Reservoir Road NW, Washington, DC 20007

MedStar Health

**PHYSICIANS' ORDERS**

Drug Allergies ▶

5050848  BRUTON, ROBIN D
LU, AMY D           BAP F- 39
2600 VALLEY WA HYATTSVILL MD
08/19/04          UR 770170 9803
M43  M4306A    709  03/01/1945

USE BLACK INK BALLPOINT PEN – PRESS FIRMLY; CANCELLATION OF ORDER SHOULD BE WRITTEN AS A SPECIFIC NEW ORDER, INDICATE DURATION OF ORDER AS WELL AS DOSE AND INTERVAL. WHEN DURATION OF ORDER IS NOT INDICATED, THE HOSPITAL'S STOP ORDER POLICY WILL BE APPLIED. AUTHORIZATION IS GIVEN TO DISPENSE A GENERICALLY EQUIVALENT DRUG UNLESS IT IS WRITTEN THAT NO OTHER BRAND IS ACCEPTABLE.

| Date | Time | ORDERS |
|------|------|--------|
| 8/27 | | D/C Home ✓ |
| 6⁵⁵ pm | | Noted M Ramsey RN 8/27/04 Kim |
| 8/27 | 2015 | Cancel D/C please CBC & Chem 10 AM V.O. Dr. Tessema / M. Giarretta, RN |
| 8/28 | | Phenergan 25 mg IM q6° prn. T.O. Dr. Tessema / M. Giarretta, CN |
| 8/28 | | Cancel CBC & Chem 10 T.O. Dr. Tessema / M. Giarretta, RN |
| 8/28 | | 24° - chart ✓ KAJ, BSN, Head Tech |
| 8/28 | 0715 | EOS chart M Giarretta, RN KAJ, BSN, Head Tech |
| 8/28/04 | | T.O. Dr. Mathur / M Ramsey RN ① Continue all previous medications please. Repeated and confirmed M Ramsey RN |

**DO NOT USE THIS SHEET UNLESS A RED NUMBER SHOWS ➤**

**Georgetown University Hospital**
MedStar Health

**GEORGETOWN UNIVERSITY HOSPITAL**
3800 Reservoir Road NW, Washington, DC 20007

**PHYSICIANS' ORDERS**

Drug Allergies ▶

USE BLACK INK BALLPOINT PEN – PRESS FIRMLY; CANCELLATION OF ORDER SHOULD BE WRITTEN AS A SPECIFIC NEW ORDER, INDICATE DURATION OF ORDER AS WELL AS DOSE AND INTERVAL. WHEN DURATION OF ORDER IS NOT INDICATED, THE HOSPITAL'S STOP ORDER POLICY WILL BE APPLIED. AUTHORIZATION IS GIVEN TO DISPENSE A GENERICALLY EQUIVALENT DRUG UNLESS IT IS WRITTEN THAT NO OTHER BRAND IS ACCEPTABLE.

| Date | Time | ORDERS |
|------|------|--------|
| 8/29/04 | 9am | Abd Xray Flat & Upright (COMPLETED) √ C. diff x 2 |
| | | |
| 8/29/04 | 1300 | T.O Dr. Schwartz / Erika Jay STAT CT c̄ po contrast to R/O obstruction |
| 8/29/04 | 1300 | Erika Jay |
| 8/29/04 | 1305 | |
| 8/29/04 | 9p | Reglan 10mg PO/IV QID x 10 days → 10mg PO QID |

DO NOT USE THIS SHEET UNLESS A RED NUMBER SHOWS ➤

MR 170.030 (12/00)          MEDICAL RECORD COPY          1:06CV01874 JDB

Georgetown
University      **GEORGETOWN UNIVERSITY HOSPITAL**
Hospital        3800 Reservoir Road NW, Washington, DC 20007

*MedStar Health*               **PHYSICIANS' ORDERS**

**Drug Allergies ▶**

USE BLACK INK BALLPOINT PEN – PRESS FIRMLY; CANCELLATION OF ORDER SHOULD BE WRITTEN AS A SPECIFIC NEW ORDER, INDICATE DURATION OF ORDER AS WELL AS DOSE AND INTERVAL. WHEN DURATION OF ORDER IS NOT INDICATED, THE HOSPITAL'S STOP ORDER POLICY WILL BE APPLIED. AUTHORIZATION IS GIVEN TO DISPENSE A GENERICALLY EQUIVALENT DRUG UNLESS IT IS WRITTEN THAT NO OTHER BRAND IS ACCEPTABLE.

| Date | Time | ORDERS |
|------|------|--------|
| 8/30/04 | 4:25 pm | ① Clear liquid now — ⓘⓒ |
| | | ② NPO p̄ MN ⓘⓒ |
| | | ③ IR for pelvic fluid drainage *Kim* |
| | | *[signature]* 8/30/04 1820 |
| | | 72° chart tech 8/30/04 1820 *[signature]* |
| 8/30 2100 | | Tylenol 650 mg PO q4-6° prn fever T.O. Dr. Tessema / M. Garrette, RN *[signature]* |
| 8/31/04 | 0330 | 24° chart M. Garrette, RN |

**DO NOT USE THIS SHEET UNLESS A RED NUMBER SHOWS ►**

MR 170.030 (12/00)                    MEDICAL RECORD COPY                    1:06CV01874 JDB

Burton, Rob

**Georgetown University Hospital**
MedStar Health

**GEORGETOWN UNIVERSITY MEDICAL CENTER**
**DEPARTMENT OF PHARMACY**
**PARENTERAL NUTRITION ORDER**

*See Reverse Side for General Ordering Guidelines*

- **Orders must be written daily and are DUE IN PHARMACY BY 11:00 AM**
- **If TPN not available or runs out,** hang $D_{10}$ at _____ ml/hr. and notify MD.
- **Indication for TPN/PPN** (check all applicable)
  - ☐ Failed T.F.
  - ☐ Ileus          ☐ Fistula
  - ☐ Obstruction    ☐ Malabsorption/Diarrhea
  - ☐ Pancreatitis   ☐ Other _____

- **Patient - weight:** _____ Kg
- **BAG NO.** _____ (one bag/day)

**CURRENT LABS:**

| 136 | 103 | 50 / 100 |
|-----|-----|----------|
| 4.1 | 23  | 12.4     |

ALB _____
Ca 7.5
mg 2.7
Po4 6.1
Trig _____

**FORMULATION:** *(check one)*

**PERIPHERAL LINE:** (Peripheral Parenteral Nutrition)
☐ **PPN:** 4% Amino Acids, 7% Dextrose, 40g Protein/L. 0.4 Kcal/ml

**CENTRAL LINE ONLY:** (Total Parenteral Nutrition - TPN)
☑ **A. Initial/Transitional:**
4% Amino Acids, 15% Dextrose, 40g Protein/L. 0.7 Kcal/ml
*For patients starting TPN and/or transitioning to other feeding modalities.*

☐ **B. Standard:**
5% Amino Acids, 20% Dextrose, 50g Protein/L. 0.9 Kcal/ml
*For patients on maintenance TPN.*

☐ **C. High Concentration:**
5.5% Amino Acids, 25% Dextrose, 55g Protein/L. 1.1 Kcal/ml
*For patients needing concentrated nutrition support*

☐ **D. Special Formulation:**
_____ % Amino Acids, max. 6%
_____ % Dextrose, max. 35%
*Note: % Amino Acid, % Dextrose (Based on PPN/PPN Volume).*

**ELECTROLYTES/ADDITIVES:**
*(order per day)*

| | | |
|---|---|---|
| Na+ Chloride | 60 | mEq/d |
| K+ Chloride | | mEq/d |
| K+ Phosphate | | mMol/d |
| Na+ Phosphate | | mMol/d |
| Mg++ Sulfate | | mEq/d |
| Ca++ Gluconate | 10 | mEq/d |
| Na+ Acetate | | mEq/d |
| K+ Acetate | | mEq/d |
| Multi-vitamins | 10 | ml/d |
| Trace Elements | 1 | ml/d |
| Insulin-Humulin-R | 0 | units/d |
| Other | | |

**RECOMMENDATIONS**
*(for DAILY infusion)*
**TOTAL:**

| | Suggested Initial | Range (Based on Lab Value) |
|---|---|---|
| | Na + 60 | (0-230) mEq/d |
| | K + 20 | (0-120) mEq/d |
| | Po4 -- 15 | (0-45) mMol/d |
| | Mg + + 8 | (0-24) mEq/d |
| | Ca + + 4.5 | (0-15) mEq/d |
| | 10 ml/d | |
| | 1 ml/d | |

**VOLUME:**

TPN/PPN .................. 1800 ml
                          200
20% LIPID .................. _____ ml
(1 ml = 2 Kcal: 0.2g Fat)
(Lipid will be added to TPN bag)
Final Volume ................ 2000 ml
                    (TPN + LIPID)

**ADMINISTRATION: (Standard hang time is between 6pm-8pm)**

☑ **Continuous:** Infuse Over 24 Hours
Rate: 83 ml/hr. (final volume - 24 hours)

☐ **Cyclic:** Infuse Final Volume Over _____ Hours
Start Time: _____ ☐ a.m. ☐ p.m.
Rate: Infuse _____ ml/hr. x _____ hrs.
then _____ ml/hr. x _____ hrs.
then _____ ml/hr. x _____ hrs.

**MONITORING:**
Upon *starting* parenteral nutrition, please order the following laboratory tests.
- Basic Metabolic Panel (*Plus Ca, P, Mg to be performed daily except Monday and Thursday*)—re-evaluate when patient is stable.
- Comprehensive Metabolic Panel (*Plus Trig, P, Mg, and Prealbumin to be performed every Monday and Thursday*).
- 24 hour urine collection for UUN and creatinine clearance every Sunday.

**SIGNATURE:**
Date: 9/3/04    Time 9 AM
Dr.'s Signature _____
Print Name ☎ ☎ AARTI MATHUR
Pager No. 665-0415

☎ **PHARMACY EXT.:** 4-3774

MR 180-120 (4/01)        WHITE - CHART        CANARY - PHARMACY

Georgetown
University
Hospital
*MedStar Health*

**PHYSICIANS' ORDERS**
**CT/IVP REQUEST FORM**

Clinical history and indication for study: _39 year old female w/ESRD, small bowel obstruction, s/p_
_drainage of pelvic abscess_

Examination requested: _CT Abdomen/Pelvis c̄ PO, IV Rectal contrast_     Weight: _____ Kg
                                                                                 (PEDS ONLY)

☐ With IV contrast     ☐ Without IV contrast

---

## EMERGENCY STUDIES

In my clinical judgment, the need for CT with IV contrast is emergent for this patient.
The patient's clinical status does not allow delay in order to obtain current BUN and Creatinine levels.

_____ M.D.

---

If IV contrast is requested, please answer the following questions: . . . . . . . . . . . . . . . . . . . . . . . . .     **Yes  No**

**A.  1.** Does the patient have a known history of allergy to IV contrast?  If yes, describe type of reaction? . . .     ☐   ☒

   **2.** Does the patient have asthma or other allergies? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     ☐   ☒

   **3.** Has the patient received steroid pretreatment? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     ☐   ☒

**B.  1.** Has the patient received intravenous contrast within the past 24 hrs (CT, Angiogram, IVP, etc.) . . . . .     ☒   ☒

   **2.** Does the patient have a history of Diabetes Mellitus? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     ☐   ☒

   **3.** Is the patient currently receiving Glucophage or Glucovance?  If yes, this medication **must** be . . . . . .     ☒   ☒
   discontinued for 48 hrs. after IV contrast administration.  Renal function **must** be tested before
   restarting medication.

   **4.** Does the patient have a history of renal failure? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     ☒   ☐

   **5.** Does the patient have a history of contrast induced nephropathy? . . . . . . . . . . . . . . . . . . . . . . . . . .     ☐   ☒

   **6.** Is the patient on Dialysis? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     ☒   ☐

**If there are special instructions or consideration you wish to communicate regarding the performance
of this study, please describe:**

_____

_____

SIGNATURE OF ORDERING PHYSICIAN

AARTI MATHUR
PRINTED NAME OF ORDERING PHYSICIAN

668-0415
PAGER/PHONE NUMBER

| Technologist: | |
|---|---|
| BUN: _50_ | Creatinine: _12.4_ |
| Date/Time Drawn: _9/2/04  8:15 AM_ | |
| Comments: _dialysis 9-3-04_ | |
| Tech. Signature: | |

TMR 100.075 (4/02)     Georgetown University Hospital • 3800 Reservoir Road, NW

BRUTON

**Georgetown University Hospital**
MedStar Health

**GEORGETOWN UNIVERSITY MEDICAL CENTER**
**DEPARTMENT OF PHARMACY**
**PARENTERAL NUTRITION ORDER**

*See Reverse Side for General Ordering Guidelines*

- Orders must be written daily and are **DUE IN PHARMACY BY 11:00 AM**
- If TPN not available or runs out, hang D_10 at _____ ml/hr. and notify MD.
- Indication for TPN/PPN (check all applicable)
  - ☐ Failed T.F.
  - ☐ Ileus        ☐ Fistula
  - ☐ Obstruction  ☐ Malabsorption/Diarrhea
  - ☐ Pancreatitis ☐ Other _____

- Patient - weight: _____ Kg
- BAG NO. _____ (one bag/day)

**CURRENT LABS:**

| 133 | 100 | 39 | |
|-----|-----|-----|---|
| 35 | 24 | 9.3 | 118 |

ALB _____
Ca _____
mg _____
Po4 _____
Trig _____

**FORMULATION:** *(check one)*

**PERIPHERAL LINE: (Peripheral Parenteral Nutrition)**
- ☐ **PPN:** 4% Amino Acids, 7% Dextrose, 40g Protein/L. 0.4 Kcal/ml

**CENTRAL LINE ONLY: (Total Parenteral Nutrition - TPN)**
- ☐ **A. Initial/Transitional:**
  4% Amino Acids, 15% Dextrose, 40g Protein/L. 0.7 Kcal/ml
  *For patients starting TPN and/or transitioning to other feeding modalities.*

- ☒ **B. Standard:**
  5% Amino Acids, 20% Dextrose, 50g Protein/L. 0.9 Kcal/ml
  *For patients on maintenance TPN.*

- ☐ **C. High Concentration:**
  5.5% Amino Acids, 25% Dextrose, 55g Protein/L. 1.1 Kcal/ml
  *For patients needing concentrated nutrition support*

- ☐ **D. Special Formulation:**
  _____ % Amino Acids, max. 6%
  _____ % Dextrose, max. 35%
  *Note: % Amino Acid, % Dextrose (Based on TPN/PPN Volume).*

**ELECTROLYTES/ADDITIVES:** *(order per day)*

| | | |
|---|---|---|
| Na+ Chloride | 70 | mEq/d |
| K+ Chloride | 10 | mEq/d |
| K+ Phosphate | | mMol/d |
| Na+ Phosphate | | mMol/d |
| Mg++ Sulfate | | mEq/d |
| Ca++ Gluconate | 10 | mEq/d |
| Na+ Acetate | | mEq/d |
| K+ Acetate | | mEq/d |
| Multi-vitamins | 10 | ml/d |
| Trace Elements | 1 | ml/d |
| Insulin-Humulin-R | 0 | units/d |
| Other | | |

**RECOMMENDATIONS** *(for DAILY infusion)* **TOTAL:**

| Suggested Initial | Range (Based on Lab Value) |
|---|---|
| Na + 60 | (0-230) mEq/d |
| K + 20 | (0-120) mEq/d |
| Po4 -- 15 | (0-45) mMol/d |
| Mg ++ 8 | (0-24) mEq/d |
| Ca ++ 4.5 | (0-15) mEq/d |
| 10 ml/d | |
| 1 ml/d | |

**VOLUME:**

| | | |
|---|---|---|
| TPN/PPN | 1800 | ml |
| 20% LIPID | 200 | ml |
| (1 ml = 2 Kcal: 0.2g Fat) (Lipid will be added to TPN bag) | | |
| Final Volume | 2000 | ml |
| | (TPN + LIPID) | |

**ADMINISTRATION: (Standard hang time is between 6pm-8pm)**

- ☒ Continuous: Infuse Over 24 Hours
  Rate: 85 ml/hr. (final volume - 24 hours)

- ☐ Cyclic: Infuse Final Volume Over _____ Hours
  Start Time: _____ ☐ a.m. ☐ p.m.
  Rate: Infuse _____ ml/hr. x _____ hrs.
  then _____ ml/hr. x _____ hrs.
  then _____ ml/hr. x _____ hrs.

**MONITORING:**

Upon *starting* parenteral nutrition, please order the following laboratory tests.
- Basic Metabolic Panel *(Plus Ca, P, Mg to be performed daily except Monday and Thursday)*—re-evaluate when patient is stable.
- Comprehensive Metabolic Panel *(Plus Trig, P, Mg, and Prealbumin to be performed every Monday and Thursday).*
- 24 hour urine collection for UUN and creatinine clearance every Sunday.

**SIGNATURE:**
Date: 9/4/04    Time: 850
Dr.'s Signature: *A Mathur*
Print Name: AARTI MATHUR
Pager No. 668-0415

☎ **PHARMACY EXT.: 4-3774**

MR 180-120 (4/01)

WHITE - CHART        CANARY - PHARMACY

1:06CV01874 JDB

EXHIBIT 3

## Craig Brodsky

| | |
|---|---|
| **From:** | SF Cargle [sfcargle.esq@gmail.com] |
| **Sent:** | Thursday, August 30, 2007 11:12 PM |
| **To:** | Craig Brodsky |
| **Cc:** | sfcargle.esq@gmail.com |
| **Subject:** | Bruton v. MedStar Georgetown Hospital et al. |
| **Attachments:** | CASE # 06CV01874 PLAINTIFF INTERROGATORIES TO DEFENDANT DR JOHNSTON Revison.pdf; Case # 06CV01874 PLAINTIFF INTERROGATORIES TO DEFENDANT DR LU Revision.pdf; Case # 06CV01874 PLAINTIFF INTERROGATORIES TO DEFENDANT HOSPITAL Revision.pdf; Case #06CV1874 PLAINTIFF SUPPLEMENTAL ANSWERS TO DEFENDANTS INTERROGATORIES.pdf |

Good Evening!

Attached are the revised Plaintiff's First Set of Interrogatories to all Defendants, and Plaintiff's Supplemental Answers to Defendant's First Set of Interrogatories
Have a good holiday. Please give me a call. 646.234.6251

Regards
--
Spencer F. Cargle, Esq.
Cargle & Associates
Attorneys at Law
67 Wall Street, 22nd Floor
New York, New York 10005

_____

Telephone No. 212.709.8045
Cell Phone No. 646.234.6251
Direct Fax No. 609.371.0585

This e-mail and any files transmitted with it are confidential and may be
subject to the attorney-client privilege. Use or disclosure of this e-mail or
any such files by anyone other than a designated addressee is unauthorized. If
you are not an intended recipient, please notify the sender by e-mail and delete
this e-mail without making a copy.

1:06CV01874 JDB

EXHIBIT 4

## GOODELL, DeVRIES, LEECH & DANN, LLP

ATTORNEYS AT LAW
ONE SOUTH STREET, 20TH FLOOR
BALTIMORE, MARYLAND 21202

———

TELEPHONE (410) 783-4000

———

FACSIMILE (410) 783-4040

SUSAN T. PRESTON
STP@GDLDLAW.COM
WRITER'S DIRECT NUMBER
410-783-4025

1351-14

November 6, 2007

**_VIA EMAIL: SFCARGLE.ESQ@GMAIL.com_**
Spencer S. Cargle, Esquire
Cargle & Associates
566 Edison Drive
E. Windsor, New Jersey  08520

Re:    **Bruton v. MedStar-Georgetown Medical Center, Inc.**

Dear Mr. Cargle:

I am merely writing to follow-up on Ms. Bruton's deposition. We have not heard from you concerning a date on which she might be deposed before November 22, 2007. As we advised, we are willing to take her deposition in her home or a location nearby if more convenient for her. We need to receive dates from you promptly as our calendars are fast filling up.

Additionally, as we discussed, we do want to take Dr. Nitzberg's deposition. As you know, the Court ordered that we should cooperate on scheduling this deposition to take place before December 14, 2007. We would be more than willing to go to Dr. Nitzberg's office, or, if he prefers it not to be in his office, we can arrange for a place in Summit, New Jersey. It is customary to start with the dates on which the doctor is available so that we can coordinate our calendars. For your reference, we are available November 23, 28, 29 and 30, and December 3, 12 and 13. If the doctor has other dates which I have not listed, we can work with our calendars. We will reimburse Dr. Nitzberg a reasonable hourly fee for appearance, not to exceed $500 per hour.

You have not requested a date on which Dr. Lu or Dr. Johnson can be deposed. Nonetheless, anticipating that you may want to depose them, Dr. Lu is available to be deposed the morning of December 6 or the afternoon of December 7. Dr. Johnson is available also on December 7 and December 11. The physicians cannot hold these dates long. Hence, I would ask that if you wish to take their depositions that you let me know

*Spencer Cargle, Esquire*
*November 6, 2007*
*Page 2*

whether one of these dates works for you.  If I do not hear from you by Wednesday, November 14, 2007, I will presume that you do not want to take the depositions and advise the doctors not to hold these dates any longer.

Finally, while you have not requested the depositions of defense experts, Dr. Karp is available to be deposed in Boston at his office December 19, 20 or 21.  Dr. Klassen is available to be deposed in our offices in Baltimore 1-4 p.m., December 10, 11 or 12, and Dr. Bowers is available for deposition on December 11, 2007 at 5:00 p.m. in his office in Bowie, Maryland.  Should you choose to depose these witnesses, you will be responsible for reimbursing them for their time.

Please advise whether you wish to depose these witnesses as they cannot hold dates for deposition indefinitely.

Very truly yours,

Susan T. Preston

STP/cmk

902897

1:06CV01874 JDB

EXHIBIT 5

## Susan Preston

| | |
|---|---|
| **From:** | DCD_ECFNotice@dcd.uscourts.gov |
| **Sent:** | Tuesday, January 01, 2008 11:46 AM |
| **To:** | DCD_ECFNotice@dcd.uscourts.gov |
| **Subject:** | Activity in Case 1:06-cv-01874-JDB BRUTON v. GEORGETOWN UNIVERISTY et al Motion to Amend/Correct |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.**

### U.S. District Court

### District of Columbia

## Notice of Electronic Filing

The following transaction was entered by Cargle, Spencer on 1/1/2008 at 11:45 AM EDT and filed on 1/1/2008

| | |
|---|---|
| **Case Name:** | BRUTON v. GEORGETOWN UNIVERISTY et al |
| **Case Number:** | 1:06-cv-1874 |
| **Filer:** | ROBIN D. BRUTON |
| **Document Number:** | 30 |

**Docket Text:**
First MOTION to Amend/Correct *Verfied Complaint* by ROBIN D. BRUTON (Attachments: # (1) Exhibit Proposed Amended Verfied Complaint)(Cargle, Spencer)


**1:06-cv-1874 Notice has been electronically mailed to:**

Craig Stephen Brodsky      csb@gdldlaw.com, dxd@gdldlaw.com

Spencer Frederic Cargle      sfcargle.esq@gmail.com

Susan T. Preston      stp@gdldlaw.com

**1:06-cv-1874 Notice will be delivered by other means to::**

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** H:\CASE # 06CV01874 PLAINTIFF MOTION FOR LEAVE TO AMEND VERFIED COMPLAINT.pdf
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=973800458 [Date=1/1/2008] [FileNumber=1654132-0]
[4b4f0a5f8848b348c7d8f91a231de695384c54c8984ddabd8b58e3289e4427f83b698

**1:06CV01874 JDB**

d39af1440e219eebc43adeee887600848716f3a9d31295504d744ea5e74]]
**Document description:**Exhibit Proposed Amended Verfied Complaint
**Original filename:**H:\Case No. 06CV01874 Exhibit A Amended Verified Complaint.pdf
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=973800458 [Date=1/1/2008] [FileNumber=1654132-1]
[61c20b480bbb6eb0346634c954cc09616fd14287f71901b390adacb132aad98848916
e85bfc0a11ea366f2033eea2aadfc733f2764859dd53d50fc39c22c9a4b]]

EXHIBIT 6

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ROBIN D. BRUTON                              *

     *Plaintiff,*                          *

v.                                           *

                          Civil Action No.:  CV01874 JDB

                        *

MEDSTAR-GEORGETOWN
MEDICAL CENTER INC., *et al.*                 *

     *Defendants.*                         *

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## NOTICE OF SERVICE OF DISCOVERY MATERIALS

**I HEREBY CERTIFY**, that on this 4th day of October 2007, copies of the aforegoing Answers to Interrogatories of MedStar Georgetown Medical Center, Inc. was sent to the following via first-class mail, postage prepaid:

Spencer F. Cargle, Esquire
Cargle & Associates
Attorneys at Law
566 Edison Drive
E. Windsor, New Jersey  08520

The original of the above-described discovery documents shall be kept in the file of undersigned counsel until the conclusion of this action.

Susan T. Preston
Goodell, DeVries, Leech & Dann, LLP
One South Street, 20th Floor
Baltimore, Maryland  21202
(410) 783-4000
*Attorneys for Defendants*

- 14 -

**1:06CV01874 JDB**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ROBIN D. BRUTON                              *

    *Plaintiff,*                              *

v.                                           *

                              Civil Action No.:  CV01874 JDB

                           *

MEDSTAR-GEORGETOWN
MEDICAL CENTER INC., *et al.*              *

    *Defendants.*                             *

    *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

## ANSWERS TO INTERROGATORIES

TO:       Robin D. Bruton, Plaintiff

FROM:    MedStar Georgetown Medical Center, Inc.

Defendant MedStar Georgetown Medical Center, Inc., by and through its counsel, answers the Interrogatories propounded by Plaintiff as follows:

(a)    The information supplied in these Answers is not based solely on the knowledge of the executing party, but includes the knowledge of the party's agents, representatives and attorneys, unless privileged.

(b)    The word usage and sentence structure is that of the attorney and does not purport to be the exact language of the executing party.

(c)    This Defendant objects to and refuses to be bound by the instructions preceding the Interrogatories as the instructions render the Interrogatories overly broad, unduly burdensome, potentially infringe on the attorney/client privilege, work-product privilege and privilege attaching to materials prepared in anticipation of litigation.

(d)    The entity answering these Interrogatories is a corporation and, accordingly, the information contained herein does not purport to be within the personal knowledge of the individual signing these answers on behalf of the

corporation, but represents the information of the corporation's agents, employees, and attorneys unless privileged.

(e)   This Defendant incorporates its previous Objections to the Interrogatories propounded by Plaintiff as if stated herein.

**INTERROGATORY NO. 1:**  With respect to the person answering these interrogatories on behalf of the defendant, state your name, business address, occupation, and job title, starting when you first began employment with this defendant and each position you have held through the present.

**ANSWER**:  Suzi Brenner, Clinical Risk Manager for MedStar-Georgetown

Medical Center, Inc.  My business address is 3800 Reservoir Road, NW,

Washington, D.C. 20007-2197.

**INTERROGATORY NO. 2:**  List in chronological order the names, last known addresses, and telephone numbers of any and all health care providers including, but not limited to, physicians, surgeons, residents, interns, supervising nurses, nurses, and nursing assistants, who cared for, consulted, and provided medical treatment for [Plaintiff], in any way, between the [sic] August 1, 2004 and February 2005.

**ANSWER**:  The following health care providers are believed to have

treated the Plaintiff: Amy Lu, M.D.; Lynt Johnston, M.D.; Aarti Mathur, M.D.;

Francisco Llach, M.D.; Laurence Balter, M.D.; Aimee Crago, M.D.; Michael D.

Doff, M.D.; Tedla Tessema, M.D.; Loudana Cunningham; Shakil Aslam, M.D.;

Pouneh Nouri, M.D.; Cal Matsumoto, M.D.; Tamara Ellis; Jason G. Umans, M.D.;

Thibin D. Santha, M.D.; Jaime Schwartz, M.D.; Anuradha Boddeti, M.D.; Julie

Raggio, M.D.; James G. Kane. M.D.; Mark Abruzzese, M.D. ; Matthew Hawkins,

M.D.; Pranay Parikh, M.D.; Mark Clemens, II, M.D.; William A. Davis, M.D.;

and Javed Rahmat, M.D.  Pursuant to Federal Rule of Civil Procedure 33(d), other

- 2 -

health care providers may be ascertained or derived from the medical records,

which have previously been produced.  In further answer to this Interrogatory,

Plaintiff is directed to Defendants' Motion for a Qualified Protective Order

Permitting *Ex Parte* Contacts with Treating Physicians.  Providers identified in

that motion are not employees of this Defendant.  If there are specific identities of

individuals that Plaintiff cannot ascertain from the record, Defendant will

endeavor to provide a supplemental Answer with the information available.

**INTERROGATORY NO. 3:**  State the last known names, addresses, and telephone numbers of any and all health care providers including, but, not limited to, physicians, residents, interns, supervising nurses, nurses and nursing assistants, who were present:

a.  in the operating room at any time and involved in the care and medical treatment, and the catheterization surgical procedure on or about August 2004, and the care, and medical treatment, and the catheterization surgical procedure on or about September 2004.

b.  in the recovery room on or about August 2004, and in September 2004, and involved in the care of plaintiff on both dates of the catheterization surgical procedures; and

c.    who were on the unit to where plaintiff was transferred from the recovery room on August 2004, and in September 2004, and involved in her care up until the day Plaintiff was discharged.

**ANSWER:**  Attached is a copy of the Operative Records, and below is a

list of healthcare providers that can be readily identified from those records.  If

there are specific identities of individuals that Plaintiff cannot ascertain from the

attached record, Defendant will endeavor to provide a supplemental Answer with

the information available.  The following health care providers are believed to

- 3 -

patient was then discharged home without further complaints. Pursuant to Federal Rule of Civil Procedure 33(d), additional information relevant to the answer to this Interrogatory may be ascertained or derived from the medical records of MedStar-Georgetown, which have been produced. Plaintiff is therefore referred to those records for further information. In addition, see Answers to Interrogatories Nos. 2 and 3.

**INTERROGATORY NO. 5**: As to each physician listed in Interrogatories 1-4, state whether he or she was an employee of [defendant hospital] on the date and time listed in the Interrogatories 1-4.

**ANSWER**: The following providers were employees of this Defendant:

Amy Lu, M.D.; Lynt Johnston, M.D.; Aarti Mathur, M.D.; Francisco Llach, M.D.; Aimee Crago, M.D.; Michael D. Doff, M.D.; Tedla Tessema, M.D.; Loudana Cunningham; Shakil Aslam, M.D.; Pouneh Nouri, M.D.; Cal Matsumoto, M.D.; Tamara Ellis; Jason G. Umans, M.D.; Thibin D. Santha, M.D.; Jaime Schwartz, M.D.; Anuradha Boddeti, M.D.; Julie Raggio, M.D.; Matthew Hawkins, M.D.; Pranay Parikh, M.D.; and Mark Clemens, II, M.D.

**INTERROGATORY NO. 6**: List the names and addresses of all other persons (other than defendant hospital and persons heretofore listed or specifically excluded in Interrogatories 1-6) who have knowledge of the facts of said occurrence or plaintiff's injuries and damages following therefrom.

**ANSWER**: Plaintiff, Plaintiff's treating physicians, and health care providers as set forth in the medical records are believed to have knowledge of facts material to the issues in the case.

EXHIBIT 7

## Discovery Documents
1:06-cv-01874-JDB BRUTON v. GEORGETOWN UNIVERISTY et al
JURY, TYPE-B

### U.S. District Court

### District of Columbia

## Notice of Electronic Filing

The following transaction was entered by Brodsky, Craig on 11/28/2007 at 4:01 PM EDT and filed on 11/28/2007
**Case Name:**       BRUTON v. GEORGETOWN UNIVERITY et al
**Case Number:**    1:06-cv-1874
**Filer:**              MEDSTAR GEORGETOWN MEDICAL CENTER, INC.
                       AMY LU
                       LYNT JOHNSON
**Document Number:** 28

**Docket Text:**
REQUEST for Admissions by MEDSTAR GEORGETOWN MEDICAL CENTER, INC., AMY LU, LYNT JOHNSON.(Brodsky, Craig)

**1:06-cv-1874 Notice has been electronically mailed to:**

Craig Stephen Brodsky      csb@gdldlaw.com, dxd@gdldlaw.com

Spencer Frederic Cargle      sfcargle.esq@gmail.com

Susan T. Preston     stp@gdldlaw.com

**1:06-cv-1874 Notice will be delivered by other means to::**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**C:\Temp\Defendants' Request for Admissions to Plaintiff Robin Bruton.pdf
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=973800458 [Date=11/28/2007] [FileNumber=1623350-0
] [1c143a4e7e3f4297fc196d89ea6d92ac9ab720f606392a5755a38d984637f2573ae
333eb37d16b97fdb36907d123a9e3ad2d7a1cca062bfe451b722788839755]]

**1:06CV01874 JDB**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ROBIN D. BRUTON       *

   *Plaintiff,*      *

v.            *

             *  Civil Action No.:  CV01874 JDB

MEDSTAR-GEORGETOWN    *
MEDICAL CENTER INC., *et al.*   *

   *Defendants.*      *

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## DEFENDANTS' REQUEST FOR ADMISSIONS
## TO PLAINTIFF ROBIN BRUTON

   Defendants, MedStar Georgetown Medical Center, Inc., Amy Lu, M.D. and Lynt Johnson, M.D., by and through its counsel, pursuant to Federal Rule of Civil Procedure 36, request that Plaintiff admit the following:

   <u>Request No. 1</u>:  No agent, employee or servant of MedStar Georgetown Medical Center, Inc. breached the standard of care.

   <u>Response</u>:

   <u>Request No. 2</u>:  Dr. Lynt Johnson did not breach the standard of care.

   <u>Response</u>:

   <u>Request No. 3</u>:  Dr. Amy Lu did not breach the standard of care.

   <u>Response</u>:

<u>Request No. 4</u>:  No alleged breach of the standard of care by an agent, servant or employee of MedStar Georgetown Medical Center, Inc. caused damage to Robin Bruton.

<u>Response</u>:

<u>Request No. 5</u>:  No alleged breach of the standard of care by Lynt Johnson, M.D. caused damage to Robin Bruton.

<u>Response</u>:

<u>Request No. 6</u>:  No alleged breach of the standard of care by Amy Lu, M.D. caused damage to Robin Bruton.

<u>Response</u>:

<u>Request No. 7</u>:  Robin Bruton signed the consent form attached hereto as Exhibit A.

<u>Response</u>:

<u>Request No. 8</u>:  A physician does not breach the standard of care by perforating the transverse colon during the placement of a peritoneal dialysis cathether.

<u>Response</u>:

<u>Request No. 9</u>:  A physician does not breach the standard of care by perforating the transverse colon during the placement of a peritoneal dialysis cathether if the complication is recognized in a reasonable period of time.

<u>Response</u>:

Request No. 43: Admit that on October 22, 2004 you told Dr. Roberson that you felt ok.

Response:

Request No. 44: Admit that on February 21, 2005 you told Dr. Roberson that you felt pretty good.

Response:

Respectfully submitted,

_____/s/ Craig S. Brodsky_____
Susan T. Preston (D.C. Bar No.: 419950)
Craig S. Brodsky (D.C. Bar No: 454924)
Goodell, DeVries, Leech & Dann, LLP
One South Street, 20th Floor
Baltimore, Maryland 21202
(410) 783-4000
*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that on this 28th day of November 2007, Defendants Request for Admissions was sent via ECF and first class mail to:

Spencer F. Cargle, Esquire
Cargle & Associates
Attorneys at Law
67 Wall Street, 22nd Floor
New York, New York 10005

_____/s/ Craig S. Brodsky_____
Craig S. Brodsky (D.C. Bar No: 454924)

- 8 -

1:06CV01874 JDB

EXHIBIT 8

DEPOSITION OF ROBIN D. BRUTON
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

1 (Pages 1 to 4)

1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF COLUMBIA

3

4    ROBIN D. BRUTON,          *

5        Plaintiff,   *

6    vs.        * Civil Action

7    MEDSTAR-GEORGETOWN MEDICAL  * No. CV 01874 JDB

8    CENTER, INC., et al.,      *

9        Defendants.  *

10

11

12    Oral Deposition of ROBIN D. BRUTON

13        Washington, D.C.

14    Wednesday, November 14, 2007

15        1:20 p.m.

16

17

18

19    Job No.: 2-116261

20    Pages 1 - 162

21    Reported by: Vicki L. Forman

22

---

2

1        Oral Deposition of ROBIN D. BRUTON, held

2    at the offices of:

3

4        L.A.D. Reporting Company, Inc.

5        1100 Connecticut Avenue, Northwest, Suite 850

6        Washington, D.C. 20036

7        (202) 861-3410

8

9

10

11        Pursuant to agreement, before Vicki L.

12    Forman, Court Reporter and Notary Public in and for the

13    District of Columbia.

14

15

16

17

18

19

20

21

22

---

3

1        A P P E A R A N C E S

2

3    ON BEHALF OF THE PLAINTIFF:

4        SPENCER S. CARGLE, ESQUIRE

5        Cargle & Associates

6        566 Edison Drive

7        East Windsor, New Jersey 08520

8        (646) 234-6251

9

10

11

12    ON BEHALF OF THE DEFENDANTS:

13        SUSAN T. PRESTON, ESQUIRE

14        Goodell, DeVries, Leech & Dann, LLP

15        One South Street, 20th Floor

16        Baltimore, Maryland 21202

17        (410) 783-4000

18

19

20

21

22

---

4

1        C O N T E N T S

2    EXAMINATION OF ROBIN D. BRUTON        PAGE

3        By Ms. Preston            5

4

5

6

7        E X H I B I T S

8        (Attached to the Transcript)

9    BRUTON DEPOSITION EXHIBIT            PAGE

10    No. 1  Second Amended Notice to Take Deposition   62

11    No. 2  Robin D. Bruton (SLE History)        62

12    No. 3  Robin D. Bruton History From Dr. Brown    63

13    No. 4  8/19/04 Georgetown Consent for Surgery   78

14    No. 5  9/7/04 Patient Discharge Information   100

15    No. 6  9/28/04 Patient Discharge Information   116

16    No. 7  Plaintiff's Supplemental Responses to   131

17        Defendant's Interrogatories

18    No. 8  Plaintiff's Responses to Defendant   135

19        Interrogatories

20

21

22                    1:06CV01874 JDB

DEPOSITION OF ROBIN D. BRUTON
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

3 (Pages 9 to 12)

9

1    A    Yes.
2    Q    And when did you last live with him?
3    A    1989.
4    Q    Any other children other than Autumn?
5    A    No.
6    Q    I have your educational background in your
7    answers to interrogatories and I just have a couple of
8    questions.
9         You have a master's in health education?
10   A    Yes.
11   Q    What is that? What does it entail?
12   A    What does it entail in what sense? Can you
13   explain what you would like to --
14   Q    What did you actually study and learn in
15   getting your master's in health education?
16   A    In health education?
17   Q    Right.
18   A    Preventive healthcare such as -- well, do you
19   need that?
20   Q    Sure.
21   A    Such as -- I actually studied in maternal and
22   child health so that's what I was -- women's health,

10

1    lupus, other health issues.
2    Q    And what --
3    A    Women and children.
4    Q    With that degree what would you be able to
5    do? If you were able to work, what would you be able to
6    do vocationally with that kind of degree?
7    A    I can -- I could teach. I could contract
8    myself out as a contractor. I can get a job at NIH or
9    any of the organizations dealing in anything that has to
10   do with health education or health in general.
11   Q    So that degree was a two-year degree?
12   A    Yes.
13   Q    And it was an advance degree so that you
14   learned about health maintenance and how to teach other
15   people how to stay healthy essentially, is that fair?
16   A    Fair.
17        MR. CARGLE: Objection to that last question.
18   BY MS. PRESTON:
19   Q    And I take it that before you obtained your
20   master's in health education, you were a healthcare
21   provider yourself, is that correct, as a radiology --
22   radiation technician?

11

1    A    No, I wasn't a radiation technician.
2    Q    What was your position before you got your
3    master's?
4    A    Radiation therapist.
5    Q    Therapist, excuse me.
6         What does a radiation therapist do?
7    A    Treat cancer patients.
8    Q    And how do you do -- how did you do that?
9    A    With a simulator and with a machine.
10   Q    So you would administer radiation to
11   patients?
12   A    Yes.
13   Q    And did you, as a radiation therapist,
14   provide an explanation to the patients of what procedure
15   they were undergoing and what the risks of those
16   procedures were and have them sign consent forms?
17   A    No.
18   Q    Were you present when other healthcare
19   providers did that in the course of your job?
20   A    No.
21   Q    You were familiar with that process I take it
22   though in connection with your job as a radiation

12

1    therapist?
2    A    Familiar with the process?
3    Q    Of obtaining consent and educating patients
4    about the nature of the procedure that they were going
5    to have.
6    A    Well, obtaining consent and all that, no.
7    The doctor did that.
8    Q    I understand they did it but you were
9    familiar with that process by virtue of --
10        MR. CARGLE: Objection, asked and answered.
11   BY MS. PRESTON:
12   Q    You were familiar with that process by virtue
13   of the fact that you were a healthcare provider who was
14   involved in administering therapy that had been ordered
15   by a physician, is that fair?
16   A    No, the process -- I didn't deal with the
17   process at all.
18   Q    What did you do?
19   A    Administer the radiation to the patients,
20   okay, so all that was done by the physician before they
21   even saw me.
22   Q    Did you, before you administered the

DEPOSITION OF ROBIN D. BRUTON
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

21 (Pages 81 to 84)

81

1       MR. CARGLE: No. Objection, compound.
2   Rephrase the question.
3   BY MS. PRESTON:
4       Q    You can answer my question, please.
5       MR. CARGLE: No. Rephrase the question.
6       MS. PRESTON: You're instructing her not to
7   answer? Are you instructing her not to answer?
8       MR. CARGLE: I'm instructing you to rephrase
9   the question, please.
10      MS. PRESTON: My question stands.
11      MR. CARGLE: It's compound. Go ahead.
12  BY MS. PRESTON:
13      Q    You can answer the question, please.
14      MR. CARGLE: Please don't instruct my client
15  to answer questions.
16      MS. PRESTON: Unless you're instructing her
17  not to answer the question, I'm entitled to ask the
18  question the way I --
19      MR. CARGLE: You're entitled to ask the
20  questions the way you want to ask the questions.
21      MS. PRESTON: That's exactly right.
22      MR. CARGLE: And I'm entitled to make an

82

1   objection.
2       MS. PRESTON: And your objection stands and
3   you can go to the court and get a ruling on it but
4   unless you instruct her not to answer --
5       MR. CARGLE: But normally you rephrase the
6   question.
7       MS. PRESTON: No, that's not what I'm doing.
8   I like my question the way it is. Unless you instruct
9   her not to answer --
10      MR. CARGLE: That's fine. I'm not going to
11  instruct her not to answer but --
12      MS. PRESTON: Answer the question.
13      MR. CARGLE: However, what I'm saying is that
14  please do not tell my client she can answer.
15      MS. PRESTON: I'm telling her she can answer
16  unless you instruct her not to answer. Those are the
17  rules of court so let me repeat the question.
18      THE WITNESS: Excuse me, I have to run to the
19  bathroom.
20      MS. PRESTON: Okay, go ahead.
21      (A brief recess was taken.)
22

83

1   BY MS. PRESTON:
2       Q    The question I had is you understood that a
3   consent form is the document that describes that you've
4   been told the risks, alternatives and benefits of
5   treatment, correct?
6       MR. CARGLE: Objection, compound.
7       A    No.
8   BY MS. PRESTON:
9       Q    You didn't understand that?
10      A    No.
11      Q    Have you ever read any of the many, many
12  consent forms that you've signed over the years?
13      A    What do you mean "read"? Yes, I read --
14      Q    The preprinted aspects of the form.
15          Did you ever read what the forms said that
16  you were signing?
17      A    Preprinted?
18      Q    Right.
19      A    I don't -- I don't recall. Preprinted?
20      Q    Right. This document states that the nature
21  of the procedure was described to you in terms which you
22  understood and have -- and all your questions have been

84

1   answered to your satisfaction so you signed this
2   document and that's not true; is that correct?
3       A    No.
4       Q    This document --
5       A    They didn't tell me they were going -- that
6   they could put a hole in my colon. No, they did not
7   tell me that.
8       Q    The document says, "The doctor has also
9   explained significant complications and risks that may
10  be associated with this procedure."
11          Is it your --
12      A    No.
13      Q    Wait a minute. Is it your testimony that no
14  one, not the PD nurse, not Dr. Osman, not Dr. Roberson,
15  not Dr. Lu described any risks, not just the hole in the
16  colon?
17      A    When Dr. Lu came in --
18      Q    The question is did anybody describe any
19  risks?
20      A    No.
21      Q    No risks at all?
22      A    No.

Case 1:06-cv-01874-JDB    Document 31-9    Filed 01/14/2008    Page 5 of 11
DEPOSITION OF ROBIN D. BRUTON
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

22 (Pages 85 to 88)

85

1    Q    So you thought it was a completely risk free
2  procedure; is that right?
3    A    I was told 45-minutes, in and out simple
4  procedure. I would be home before rush hour. I can use
5  it in two weeks. Simple procedure.
6    Q    So you weren't told about any risk of
7  infection; is that right?
8    A    No.
9    Q    You weren't told about a risk of injury to
10 adjacent organs?
11   A    No.
12   Q    You weren't told about a risk of peritonitis?
13   A    No.
14   Q    When you understood that this catheter -- the
15 catheter you understood goes --
16   A    Are you saying that says that there?
17   Q    The risks of the procedure and you're telling
18 me that you weren't told about any risks at all, right?
19   A    No. The nurse -- I told you the nurse came
20 in. She had that on a clipboard. Well, I don't know if
21 it was that. She had a piece of paper on the clipboard,
22 the consent and she said -- she showed me Amy Lu's name

86

1  and she showed me PD catheter placement and said sign
2  here. I signed there. When Dr. Lu came in we talked
3  about her shoes. We didn't talk anything about the --
4  she came in to say hi before the surgery. We talked
5  about her shoes.
6    Q    Did you see her before the day of surgery to
7  talk about the PD catheter placement?
8    A    No, no.
9    Q    Who did you see before surgery to talk about
10 PD catheter placement? Who was the doctor who referred
11 you to Dr. Lu?
12   A    No one referred me to Dr. Lu because Dr. Lu
13 talked to me about it I mean before.
14   Q    And at that time --
15   A    I said I would think about it.
16   Q    And at that time what risks did she tell you
17 about the procedure?
18   A    She didn't tell me any risks about it. She
19 said it was a simple -- I'll say it again. 45 minutes,
20 simple, in and out. She said it will be a small
21 incision where they put the tube and it sits down in the
22 pelvis. That's what she told me.

87

1    Q    So you understood that the tube was going
2  into the stomach where the intestines is, correct? Not
3  into the stomach. Into the peritoneum where the
4  intestines lie, correct?
5         MR. CARGLE: Objection, asked and answered.
6    A    I understood that the tube was going in my
7  stomach, yes.
8  BY MS. PRESTON:
9    Q    Did she draw you a picture to show you that?
10   A    I don't recall.
11   Q    And you knew that where the tube would be
12 would be going actually through the wall of the
13 stomach -- I'm going to say stomach. Through the wall
14 here which I say stomach but it's the abdomen --
15   A    What I know is that it was going to -- that
16 it would be a tube and that it will sit down in the
17 pelvis.
18   Q    Next to the intestines?
19   A    Simple. Simple is what I was told. Simple
20 procedure.
21   Q    Did you understand that it would be in the
22 neighborhood and in the area of where other organs are

88

1  located such as --
2    A    I have organs everywhere so I mean I don't
3  know how to answer that. It was going -- I knew it was
4  going in my body and I knew it was going to sit down in
5  my pelvis. What I didn't know is there was going to be
6  a hole, that they would put a hole in my colon. No, I
7  was not told that.
8    Q    If you had thought about it, would it be fair
9  to say that you would -- you would appreciate the fact
10 that one could injure adjacent organs in inserting a
11 tube into your abdomen?
12   A    If I thought they were going to put a hole in
13 my colon, no.
14   Q    The question is if you had thought about it,
15 you would know that adjacent organs could be injured
16 with a tube going into your abdomen, right?
17        MR. CARGLE: Objection.
18   A    No.
19        MR. CARGLE: Asking for expert.
20 BY MS. PRESTON:
21   Q    Did you do any independent reading about PD
22 dialysis?

89

1    A   No.
2    Q   None at all?  Didn't look it up on the
3  internet?
4    A   I talked to the nurse.
5         MR. CARGLE:  Objection, asked and answered.
6  BY MS. PRESTON:
7    Q   When you were in the hospital -- by the way,
8  who was with Dr. Lu when she came in to talk to you
9  about the procedure?  Anybody?
10   A   No.  She came in last after the bevy -- I had
11  a parade of doctors coming in.  I had med students
12  coming in, residents coming in, doctors coming in all
13  trying to take my history and they all took -- sat down
14  and talked to me about my history.
15        The one doctor came in and he was looking for
16  the consent form.  He couldn't find it.  I was talking
17  to one of the bevy of people.  So many people came in.
18  I was talking to one of them.  He asked her did she know
19  where it was.  She said no and so he looked out the
20  curtain.  He asked the nurse and the nurse said it was
21  in there.  He said it wasn't.  The nurse said it's in
22  there.  He said it's not then she finally came in a

90

1  little bit later and then she goes through and she
2  pointed to it and that was all that was -- that was it
3  for the consent form.
4         After that Dr. Lu came in.  She said she
5  wanted to say hi before the surgery.  We commented on
6  her shoes and she said okay, I'm going to go get ready
7  for the surgery.  I'll see you in a minute and that was
8  that.
9    Q   Were you conscious during the procedure?
10   A   No.
11   Q   What, if anything, occurred after the
12  procedure was over?
13   A   Pain.  That's all I remember is ex- -- just
14  pain, pain, pain and then --
15        MR. CARGLE:  Take your time.
16   A   That's all I remember is pain, pain and then
17  they -- then I was up -- the next thing I know I was up
18  in a room somewhere and I'm like why am I here.  What's
19  going on and I'm just why am I in so much pain.  I
20  just -- just crazy so -- and --
21  BY MS. PRESTON:
22   Q   Did anybody explain to you why you were

91

1  having pain?
2    A   When I -- well, the nurses were there.  At
3  that time they were just giving me pain medicine.
4  Nobody could explain anything to me.  It wasn't until
5  the next morning where I guess it was a resident came by
6  and I was like what's going on because it was late and
7  we don't know, and so they kept saying we don't know
8  until I guess Dr. Lu -- when she came in and I can't
9  give you the timeline with that.
10        I just -- she came in and she goes it looks
11  like -- I just remember her saying over and over and
12  over again as I kept saying what's going on is that I
13  had my -- my intestines looked twisted and I said, What
14  do you mean they look twisted?  They weren't twisted
15  when I came in here.  What's going on?  Why would they
16  be twisted?  I don't know.  We're just going to give it
17  time to untwist itself is what she said.  Just relax is
18  what she said so the days went on and every single
19  day -- every single day and any doctor that came in
20  there and the nurses, I kept saying why don't they do
21  something else.  Why don't they find out what's going on
22  because I was paining so badly and I'm just like this

92

1  doesn't make any sense.
2         I came in and I was fine.  I came in just
3  happy and I'm going to get the PD catheter and I've been
4  in this hospital for days now at that point and then --
5  then things just started going downhill from that.  I'm
6  throwing up all over the place, throwing up all this
7  green-brown bile stuff and then they're shoving this --
8  this nasal gastric tube -- I'm sorry.
9         MR. CARGLE:  You're okay.  Do you want to get
10  some water?
11   A   I'm sorry.
12         MR. CARGLE:  No, please, please.  Take your
13  time.
14   A   They're shoving that -- my nose and all this
15  stuff coming out.
16         MR. CARGLE:  Let's take a break.
17   A   I just want to get done with this.  I want
18  this to be done.
19         MR. CARGLE:  Take your time to gather
20  yourself.
21   A   Let me just get myself together.  I'm sorry.
22

Case 1:06-cv-01874-JDB    Document 31-9    Filed 01/14/2008    Page 7 of 11
DEPOSITION OF ROBIN D. BRUTON
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

24 (Pages 93 to 96)

**93**

1        MR. CARGLE: Take your time. You're okay.
2        MS. PRESTON: We can take a break if you want
3    to.
4        A    I just want to get this done.
5        MS. PRESTON: Okay.
6        A    I already had to run to the bathroom. I need
7    to get home.
8            So I'm throwing up all over the place and
9    missing my daughter's party that I was the one supposed
10   to give because she's getting ready to go to Spain for
11   the school year. She's coming in. I'm getting sicker
12   by the day and she's watching and crying and I'm
13   stressed and paining like crazy and keep asking them why
14   aren't you all doing something. Why aren't you doing
15   something? I couldn't eat. I couldn't go to the
16   bathroom and then they discovered now I have a pelvic
17   abscess.
18           I'm like what do you mean I have a pelvic
19   abscess? What is going on? We're trying to find out.
20   Your bowels are twisted. That's all they kept saying.
21   That was their mantra. That's all everybody who came in
22   there said. I'm like why are they twisted? They

**94**

1    weren't twisted when I came in here.
2    BY MS. PRESTON:
3        Q    Did anybody explain to you how the bowels can
4    get twisted after a procedure like the PD catheter being
5    inserted?
6        A    All Dr. Lu told me was the bowels were -- it
7    looks like the bowels are twisted or the -- I don't know
8    if she said intestines or bowels. The intestines are
9    twisted and I said why and she said she didn't know why,
10   and she said just give it a couple of days and maybe it
11   will settle and untwist itself so a couple of days go by
12   and it's still the same thing over and over. Over and
13   over the same thing. They just kept saying the same
14   thing and doing the same thing and I'm like why aren't
15   you all doing -- there's so many --
16           MR. CARGLE: Are you okay?
17       A    Yeah, I'm sorry. There's so many diagnostic
18   tests. Why aren't you all doing something? Do
19   something other than just taking an x-ray and --
20   BY MS. PRESTON:
21       Q    So did you understand that there were CT
22   scans done?

**95**

1        MR. CARGLE: Objection, leading.
2        A    No, I understand that they -- I understand
3    that they did -- when the pelvic abscess -- they did
4    something for that. I don't recall what it was.
5    BY MS. PRESTON:
6        Q    Do you recall there being any discussion
7    about potentially doing an exploratory surgery?
8        A    I don't recall. I don't recall.
9        Q    Do you recall telling anybody you didn't want
10   exploratory surgery?
11       A    I don't recall that, no.
12       Q    It's possible you did and you just don't
13   remember?
14       A    I don't recall.
15           MR. CARGLE: Objection, leading.
16   BY MS. PRESTON:
17       Q    And do you recall there was a time -- there
18   came a time that you were going to be discharged and
19   they canceled the discharge?
20       A    Yes.
21       Q    And do you recall why they -- what they told
22   you about why they canceled the discharge?

**96**

1        A    They canceled the discharge because I threw
2    up all over their nurses station and they brought me
3    back into my room and they stuck the nasal gastric tube
4    in my nose and all this green -- I threw up green bile,
5    green-brown stuff everywhere on the nurses station so
6    that's why.
7        Q    And do you remember a drain being placed in
8    your abdomen? Do you remember that?
9        A    You mean the pelvic drain? It wasn't placed
10   in my abdomen. It was placed in my buttocks. That's
11   where it was placed. Yes, I remember that.
12       Q    Now, you got dialysis through your AV graft,
13   right, while you were in the hospital?
14       A    Yes.
15       Q    And do you remember -- is it fair to say that
16   the PD graft or PD catheter was not used while you were
17   in the hospital?
18       A    They tried to -- no, it was not used for
19   PD -- for dialysis but they were supposed to, for lack
20   of a better word, rinse it.
21       Q    Aspirate it?
22       A    No, rinse it and then pull it out.

DEPOSITION OF ROBIN D. BRUTON
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

25 (Pages 97 to 100)

97

1    Q    Aspirate?
2    A    Put 10 cc's. That's what the nurse --
3    they're supposed to do that daily.
4    Q    And did they do that?
5    A    They tried to do that. Every time they put
6    the 10 cc's in, they couldn't get the 10 cc's out. I
7    asked them why was that. We don't know.
8    Q    Any other observations you had about the PD
9    graft or PD catheter when you were in the hospital or
10   the use of it?
11   A    What do you mean?
12   Q    Any other things that you recall them
13   attempting to do with the PD catheter other than rinsing
14   it with 10 cc's?
15   A    The PD catheter?
16   Q    Yes.
17   A    No, they didn't do anything but try to rinse
18   it and couldn't get the rinse back or pulled back out.
19   Q    Did anything happen to you when they tried to
20   rinse it?
21   A    In what sense? Happen to me like what? I
22   was already in excruciating pain the whole time.

98

1    Q    Anything else you remember that occurred when
2    they tried to rinse the catheter?
3    A    That they couldn't get the rinse back.
4    Q    Anything else?
5    A    Not that I can recall.
6    Q    The records reflect that you reported
7    ultimately less pain over time.
8       Is that --
9    A    Less pain of what?
10   Q    In your abdomen.
11      Is that inconsistent with your recollection?
12   A    Less pain over time?
13   Q    Right. Well, for example, on September 3rd
14   feels well. No complaint of pain. September 6th
15   ambulating. No complaint of pain.
16      Is that --
17   A    No, no.
18   Q    September 7th without complaints.
19   A    No.
20   Q    So if it's recorded in your medical record
21   contemporaneously, you're telling the jury in this case
22   that that's wrong, correct?

99

1    A    If it's reported that I'm without complaints,
2    yes, I'm telling them that's wrong.
3    Q    Okay. Did you have any --
4    A    Because --
5    Q    Excuse me. Did you have any other
6    discussions with Dr. Lu in that first hospitalization
7    other than what you've talked about?
8    A    Other than her saying that they're twisted
9    and that she's -- no. Oh, yes, I had a discussion about
10   eating.
11   Q    And what did you talk to her about that?
12   A    That I hadn't eaten in -- I didn't want to
13   eat.
14   Q    Were you being fed --
15   A    That I hadn't eaten in like 10 days or so,
16   11 days, something like that.
17   Q    Were you being fed through a tube?
18   A    No, and that was the question. That was my
19   question and my mother's question. That was the
20   question, and then she put me on TPN after that.
21   Q    Did you start eating by mouth at some time at
22   the end of September before you left the hospital?

100

1    A    At the end of September?
2    Q    End of August, I'm sorry.
3    A    Something I'm sure. I don't recall but I
4    just recall whatever I ate -- no, that was after. That
5    was after the second surgery. I don't recall but -- I
6    don't recall. It wasn't much if it was anything.
7    Q    When you left the hospital on the 7th of
8    September --
9    A    I don't recall.
10   Q    Yeah, that's the date that's reflected in the
11   record.
12      Let me show you what we're going to mark as
13   Exhibit 5.
14      (Bruton Deposition Exhibit Number 5 was
15   marked for identification and attached to the
16   transcript.)
17   BY MS. PRESTON:
18   Q    Do you recognize the discharge instructions
19   that you were given before leaving the hospital on the
20   7th of September?
21   A    No, I don't recognize those but --
22   Q    Do you recall that you were given discharge

DEPOSITION OF ROBIN D. BRUTON
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

27 (Pages 105 to 108)

---

**105**

1    Q    So they were taking care of the lines and
2    cleaning them?
3    A    Yes, and I was taking antibiotics twice or
4    three times a day, something like that.
5    Q    What, if anything, occurred between the two
6    hospitalizations with respect to your health that you
7    remember?
8    A    Just being sick as a dog. Just being sick,
9    weak and anything I ate came right out and just my
10   stomach was just always distended and irritable and
11   pain. Pain, that's all I remember.
12   Q    Do you recall any attempt by the nurse who
13   was coming in to flush the PD catheter?
14   A    Do I --
15   Q    Do you remember the nurse that came in to
16   help you trying to flush the PD catheter?
17   A    When?
18   Q    At any time between the two hospitalizations.
19   That is when you were discharged on the 7th of September
20   before you went back into the hospital on -- whenever it
21   was.
22        MR. CARGLE: September 20th I believe or

---

**106**

1    September 21st.
2    A    The nurse came in. Their job was to, I
3    think, do everything so I'm sure they tried to do
4    everything. I just don't recall.
5        MR. CARGLE: The question was in reference to
6    the PD catheter.
7    A    The PD catheter, yeah.
8    BY MS. PRESTON:
9    Q    Do you remember any time the nurse attempting
10   to flush the catheter in that period -- between the two
11   hospitalizations in reference to the events in this
12   case?
13   A    I believe the nurse tried to -- tried to put
14   the 10 -- just like the nurse in the hospital.
15   Q    Trying to put the 10 --
16   A    It seemed to be the same thing. I don't --
17   that's what I recall.
18   Q    And nothing was coming out?
19   A    They couldn't get anything out. That I
20   remember. They could push it in.
21   Q    But nothing -- but it was slow to come out as
22   reflected in Dr. --

---

**107**

1    A    I don't know. To come out? They couldn't
2    get it out. I mean if any -- I don't know if anything
3    or very little, if anything, came out so that's all I
4    recall.
5    Q    What do you remember about the events that
6    led up to you going back to the hospital?
7    A    I remember that day. My graft was clotted.
8    Q    Your graft in your arm?
9    A    My graft in my arm was clotted so Savetri who
10   is the PD nurse -- so I would have to go to the hospital
11   to get it unclotted and she said your -- your PD
12   catheter has been in now for almost five weeks. We can
13   use it because she still had to teach me. You have to
14   go through training. Anyway, she said let me put some
15   dialysate in you just for now and that will help so I
16   went in with her and --
17   Q    This is at your home?
18   A    No, this is at the dialysis center. She put
19   the dialysate in and she had it trying to drain it and
20   it wouldn't come out and so she was doing whatever she
21   does, you know, trying to get it to come out and within
22   five -- about five minutes I had to get up and rush to

---

**108**

1    the bathroom. I mean rush, run to the bathroom and I
2    couldn't even get any -- line the toilet seat. I didn't
3    even have time to do that and I -- before I even sat
4    down good just -- I'm sorry, water -- or the fluid
5    just -- I mean I don't even know how to -- gushed out.
6        MR. CARGLE: That's a good description.
7    A    I was like what? I remember just saying what
8    to myself like what was that. I said, No, that can't be
9    the fluid. Anyway, I went back and I told Savetri. I
10   think the fluid just came out of my rectum and she was
11   like no way, Robin and I said, I think so. I think that
12   was it. There was no -- I was feeling fine before but
13   anyway -- so she said let me put some more in. I'm
14   going to put a little more in and we're going to see.
15   So she put some more in and it was about two minutes
16   then I was running back to the bathroom. I said, No
17   way. This can't be. It can't be.
18        So she called Dr. Lu and told her what
19   happened and Dr. Lu -- I got on the phone and I said,
20   Dr. Lu, what is going on and she said it sounds like
21   there's a communication. That's the word. I'll never
22   forget that word in my life. A communication between

---

28 (Pages 109 to 112)

109

1 the PD catheter and your bowel and I said, What? You
2 mean you put a hole in my bowel? You mean you put a
3 hole in it? I said, A hole. Is that what you mean by a
4 communication? Excuse me.
5    MR. CARGLE: Take your time.
6    A   And she said -- she just kept saying
7 communication. I said, You mean a hole. Yes, I think
8 there's a communication between -- we need to get you in
9 here for I think it was called a barium enema, something
10 like that. You need to get in here and do the barium
11 enema right away so I think it was the next day that she
12 scheduled me.
13    I went in for the barium enema and they put
14 me on the table and put this tube up my rectum and they
15 put in fluid and they took pictures and they -- you
16 know, the table was --
17 BY MS. PRESTON:
18    Q   Different angles?
19    A   Turning different angles and they took
20 pictures and then they took pictures as they -- I had to
21 hold it in and they put a clamp there or whatever, and
22 then they took the clamp off and then they took pictures

110

1 as it came out and the tech is like there's -- yeah,
2 there it is and then -- I just remember him saying that
3 but anyway, then skip to Dr. Lu calling me telling me
4 yes, there's a communication between the PD catheter and
5 your colon or your bowel.
6    I don't know which word she used but -- and
7 we need to get you in here for surgery. I'm like what?
8 We have to take out -- she said she had to take out --
9 the PD catheter had to be taken out. I have to probably
10 take out part of my intestine because the intestine dies
11 or some part of it is probably -- I don't remember
12 exactly what she said about the dying part so you have
13 to take that part out or something, and you might have
14 to have -- she said that they might have to leave the
15 part where they put the PD catheter in. We may have to
16 leave that open and that I might have to have a
17 temporary colostomy and I said, Hell no. Are you
18 kidding me? I remember cursing. I was -- I couldn't
19 believe it. I just could not believe it and she said
20 yes, that they needed to get me in for surgery.
21    Then what do you want?
22    Q   So you went into the hospital to have the

111

1 catheter taken out and for surgery, right?
2    A   Yes.
3    Q   And you didn't ever have a colostomy, right?
4    A   And they gave me -- what?
5    Q   You never had a colostomy?
6    A   No.
7    MR. CARGLE: Just answer the question she's
8 asking.
9 BY MS. PRESTON:
10    Q   Let me back up to the first hospitalization.
11    Do you remember Dr. Johnson?
12    A   Yes.
13    Q   How many times do you remember seeing him
14 during that hospitalization?
15    A   I don't know how many times but I did see
16 him.
17    Q   And do you remember anything that Dr. Johnson
18 said to you about your condition?
19    A   Same. It was the same thing. Nobody told me
20 anything different.
21    Q   Do you remember having any discussion with
22 Dr. Johnson about potential surgery to just explore what

112

1 was going on?
2    A   I don't know. I don't recall.
3    Q   Are you continuing to see Dr. Lu?
4    A   I haven't seen her but I'm still on the list
5 there.
6    Q   Are you still a patient of Georgetown
7 MedStar -- MedStar Georgetown Medical Center?
8    A   Yes.
9    Q   And you're still receiving medical care in
10 connection with your kidney disease and your transplant
11 from MedStar Georgetown?
12    A   Medical care in what sense? That I send my
13 monthly blood -- they send me a --
14    Q   If a kidney should become available at
15 Georgetown, Dr. Lu or Dr. Johnson is going to be the one
16 that would give you the surgery that would give you a
17 new kidney?
18    A   Yes, if a kidney becomes available I will
19 be --
20    Q   Okay. What do you remember about your second
21 hospitalization?
22

Case 1:06-cv-01874-JDB    Document 31-9    Filed 01/14/2008    Page 11 of 11
DEPOSITION OF ROBIN D. BRUTON
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

29 (Pages 113 to 116)

---

**113**

1    MR. CARGLE: Objection; vague. Can you be
2  more specific, please?
3  BY MS. PRESTON:
4    Q    You can answer the question if you understand
5  it.
6    A    I would like you to be more specific.
7    Q    Is there anything that you remember that
8  stands out in your mind about that hospitalization?
9  What happened when you were there?
10    A    The first night when I came in?
11    Q    Tell me everything you recall about that
12  hospitalization.
13    A    I remember coming in and them being extremely
14  nice to me. I remember that. I remember them giving me
15  citrus stuff to drink.
16    Q    Do you remember anything else about --
17    A    What else do you want me to remember?
18    Q    Do you remember anything else about the
19  hospitalization and what happened while you were there?
20    A    After the surgery -- I don't remember the
21  surgery. After the surgery I remember that I had liquid
22  bowels. I mean if I went to the bathroom it was liquid.

---

**114**

1  It was liquid. I remember pain, stomach just huge,
2  cramping, pain. Just pain, pain, pain.
3    Q    Do you remember any discussions with Dr. Lu
4  about what she found at surgery?
5    A    I believe she told me what she took out.
6    Q    She told you what she took out?
7    A    Yes.
8    Q    And what did she tell you she took out?
9    A    She said they repaired the hole. They took
10  out part of the colon. They took out the PD catheter.
11  She took out some scar tissue.
12    Q    Anything else? Do you remember her saying
13  about what she did at surgery or found at surgery?
14    A    I don't understand "found at surgery."
15    Q    What she saw, what she discovered.
16    A    She discovered the part was dead. I'm not --
17  I guess I'm not understanding.
18    Q    You said she told you she repaired the hole.
19  She took out part of the colon and the PD catheter and
20  some scar tissue.
21    A    Right.
22    Q    Did she describe what she saw at surgery

---

**115**

1  other than that?
2    A    Describe what she saw?
3    Q    Yes.
4    MR. CARGLE: Objection, asked and answered.
5    A    No, I don't remember any -- I don't
6  understand describe what she saw, no. She told --
7  that's what she told me.
8  BY MS. PRESTON:
9    Q    Did she give you any explanation as to how
10  the catheter had made a hole in the colon or the bowel,
11  whatever word she used?
12    A    No, I've never gotten an explanation for that
13  from anybody.
14    Q    Was there any discussion with her about
15  whether that fact was likely to have any impact on your
16  gastrointestinal tract over the long-term?
17    A    Say that again.
18    Q    Did you have any discussion with her about --
19  the fact that she repaired your colon and took out part
20  of your colon, whether that would have any impact on how
21  your colon or bowel functioned?
22    A    I don't recall the way you're asking it. I

---

**116**

1  recall with all the loose stools and every time I ate it
2  kept coming out. Numerous times I asked her about that,
3  how long that was going to last. She said she didn't
4  know.
5    Q    Any other discussion with her about any
6  long-term consequences as a result of having to remove
7  part of the bowel and to repair it?
8    A    When?
9    Q    When you were still in the hospital.
10    MR. CARGLE: The second time?
11    MS. PRESTON: The second time, right.
12    A    Not that I recall. The second time? Not
13  that I recall when I was in the hospital, no.
14    MS. PRESTON: Let me show you the discharge
15  instructions that we're going to mark as Exhibit 6 from
16  your hospitalization when you were discharged on the
17  28th of September.
18    (Bruton Deposition Exhibit Number 6 was
19  marked for identification and attached to the
20  transcript.)
21  BY MS. PRESTON:
22    Q    Do you recall seeing the discharge

---

EXHIBIT 9

1

1    IN  THE  UNITED  STATES  DISTRICT  COURT

2    FOR  THE  DISTRICT  OF  COLUMBIA

3

4                                    :
                                     :
5    ROBIN  D.  BRUTON,              :  Civil  Action  No.:
                                     :  06-1874  (JDB)
6         Plaintiff,                 :
                                     :
7                                    :
                                     :      DEPOSITION  UPON
8    v                               :
                                     :    ORAL  EXAMINATION
9    MedStar-Georgetown              :           OF
     Medical  Center  Inc.,  et  al.,  :
10                                   :    RICHARD  NITZBERG,  MD
          Defendant.                 :
11   ------------------------------x

12

13

14

15        TRANSCRIPT  of  testimony  as  taken  by  and  before

16   MARK  SCHAFFER,  a  Certified  Shorthand  Reporter  and

17   Notary  Public  of  the  States  of  New  Jersey  and  New

18   York,  at  the  offices  of  Dr.  Richard  Nitzberg,  Summit

19   Medical  Group,  Summit,  New  Jersey,  on  Friday,

20   December  28,  2007,  commencing  at  9:05  in  the  forenoon.

21

22        REPORTING  SERVICES  ARRANGED  THROUGH:
          VERITEXT/NEW  JERSEY  REPORTING  COMPANY
23             25B  Vreeland  Road,  Suite  301
            Florham  Park,  New  Jersey  07932
24    Phone:   (973)  410-4040    Fax:   (973)  410-1313

25

18

```
 1    dialysis catheter in a patient who had lupus?
 2        A.  I -- yeah, I'm sure I have.  I can't tell you
 3    the percentage.
 4        Q.  Okay.
 5        A.  But it's not a common -- it's not an uncommon
 6    cause of renal insufficiency, which is the most common
 7    reason we place these catheters.
 8        Q.  Have you ever had the opportunity to treat a
 9    patient for injury to the bowel after peritoneal
10    dialysis catheter placement?
11        A.  Never.
12        Q.  Are you familiar with any specific literature
13    that has actually studied the question of the
14    incidence and the manifestation of bowel injury after
15    placement of a PD catheter?
16        A.  I'm not aware of any.  I haven't looked at
17    it.
18        Q.  When did you first start reviewing cases for
19    medical malpractice?
20        A.  I would say about six -- five, six years ago.
21        Q.  And so we are in 19 -- or 2007.  That would
22    have been 2001 or so?
23        A.  Probably more like 2002, 2003.
24        Q.  Okay.  And how many cases in total have you
25    reviewed, whether or not you could find them
```

19

```
 1    meritorious?
 2        A.  I'd probably say around a hundred or so.
 3        Q.  All right.  And what percentage of the cases
 4    in total that you have reviewed have been on behalf of
 5    the plaintiff?
 6        A.  It breaks down about 50-50.
 7        Q.  All right.  Do you receive cases from
 8    professional witness services?
 9        A.  What is a professional witness service?
10        Q.  A service that identifies witnesses and
11    refers them to lawyers?
12        A.  Oh, yes.
13        Q.  And how many such services have you received
14    cases from?
15        A.  From this current one I'm using -- that used
16    me on this one, Michael Lavinger from Medilex, and
17    another one called Medquest.
18            I'm trying to think if there is any others?
19    I can't think of any others.
20        Q.  Have you ever been associated with ALM
21    Experts?
22        A.  ALM?
23        Q.  Experts.
24        A.  I'm not sure what that means.
25        Q.  It's the name of a service.
```

20

```
 1        A.  I don't -- I may have.  I don't know.
 2        Q.  Okay.
 3        A.  They may have sent me cases, but I don't know
 4    that term or that name.
 5        Q.  All right.  What is your arrangement with
 6    Medilex?  It's Michael Lavinger?
 7        A.  Michael Lavinger, yes.
 8        Q.  Is he the owner of the organization?
 9        A.  Yes.
10        Q.  By the way, where are they located?
11        A.  In New York.
12        Q.  New York City?
13        A.  Yes.
14        Q.  Okay.  Do you know their address?
15        A.  I don't, no.
16        Q.  Do you have it handy?
17            MR. CARGLE: I can.  I can get that to you.
18            MS. PRESTON: Okay.
19        Q.  How long have you been affiliated with
20    Medilex?
21        A.  Probably about four or five years.
22        Q.  Okay.  And do you have a written contract
23    with them?
24        A.  I do not.
25        Q.  What is your understanding with them about
```

21

```
 1    the means by which you will obtain -- they will refer
 2    you cases, the arrangements by which you will do that?
 3        A.  Michael just calls me and says, "Rick, I have
 4    a case," and he tells me about it and I say either
 5    "send it" or "don't send it."
 6        Q.  So does he when he calls you give you a
 7    synopsis of the case factually?
 8        A.  Yes, he does.
 9        Q.  Is Mr. Lavinger a doctor?
10        A.  No.
11        Q.  Okay.  Does he have physicians on staff who
12    have pre screened the cases so that he identifies
13    issues for you?
14        A.  I think he is a one-man job.
15        Q.  Okay.  Does he tell you whether the case is
16    being referred to you by a plaintiff's lawyer or
17    defense lawyer?
18        A.  He does.
19        Q.  Okay.  And does he tell you what issues the
20    defense or plaintiff's lawyer has identified as those
21    he is interested in having you review?
22        A.  Sometimes.  Sometimes he doesn't.
23        Q.  Okay.  Does he send you any e-mails about the
24    case to confirm that you are going to review it?
25        A.  No, he just calls me up and says -- I don't
```

6 (Pages 18 to 21)

**1:06CV01874 JDB**

44

1

y

m

45

hts

**46**

1  appendectomy.
2      I also noted that surgery ends at around 3:45
3  p.m. in the afternoon of that date.
4      I noted on Page 18 of my numbering system
5  that her -- there was a note that her abdomen was
6  firm, that her pain was nine out of ten, and that the
7  resident was noted, and the time of those notes are
8  5:15 to 6:05 p.m.
9      I noted on a consultation note on 8/20, my
10  numbering system, Page 21, that they noted abdominal
11  pain; and that the next page, my Page 22, same
12  consultation note, they also noted tenderness.
13      Then I note on Page 24.
14      THE WITNESS: Is that me? Excuse me. It may
15  be my note.
16      (A discussion is held off the record.)
17  A.  I noted on my Page 24 that at 7:30 patient
18  had severe pain, the resident was called, the pain was
19  increasing. Dr. Duff was noticed -- notified.
20  Patient's exam was notable for abdominal guarding and
21  being tense.
22      Page 26, my Page 26, pain was manageable.
23  Page 27, continued to have pain.
24      Page 35, my numbering system, date of 8/21,
25  abdominal x-ray, significant free air.

**47**

1      And then I had -- then I list -- I have
2  circled the date, 9/20/04, which is just the date of
3  her second operation, just so I would know that date.
4  And then I listed what I thought were a number of
5  failures.
6  Q.  Okay. Before we get to that, let's mark that
7  document as Exhibit 3 so I don't forget to do that.
8  A.  Okay.
9      MR. CARGLE: Can you make a copy of that?
10      THE WITNESS: Yeah.
11      (Doctor's Notes marked Nitzberg-3 for
12  identification.)
13  Q.  We have marked as Deposition Exhibit 3 one
14  page of the doctor's notes which he indicated was made
15  in the last --
16  A.  24 hours.
17  Q.  -- 24 hours, and then we are going to mark as
18  Exhibit 4 the first page of the record that the doctor
19  has looked at. And I want Exhibit 4, however, to be
20  the entirety of the chart that he has reviewed.
21      (Chart Reviewed by Dr. Nitzberg marked
22  Nitzberg-4 for identification.)
23      (A discussion is held off the record.)
24  Q.  Before we get to your lists of failures, have
25  you consulted any literature in connection with your

**48**

1  review of this case?
2  A.  No, I have not.
3  Q.  Have you talked to any colleagues here or
4  elsewhere about the issues involved in this case?
5  A.  I have not.
6  Q.  I take it from your prior testimony you are
7  not aware of whether colon or bowel injury after PD
8  catheter placement has been studied and reported in
9  the literature?
10  A.  Correct.
11  Q.  Okay. And I take it you have not attended
12  any national meetings or seminars that specifically
13  address peritoneal dialysis catheter placement,
14  complications and manifestations?
15  A.  No, I haven't.
16  Q.  Okay. And what seminar have you attended?
17  A.  Well, there was a seminar probably about a
18  year and a half ago that was given -- I'm trying to
19  remember where it is. Actually I think it was given
20  in a restaurant, and I don't remember -- I don't
21  remember where it was given, but it was a guy who was
22  doing a lot of laparoscopic PD catheter placements
23  and --
24      I know what it was. One of my nephrology
25  colleagues here at the group heard about this lecture

**49**

1  and suggested that I check it out, which I did. And I
2  don't remember where it was, but it was an excellent
3  lecture about the different techniques of placement of
4  PD catheters and both laparoscopic and open
5  placements, the different types of catheters.
6  Q.  And other than that, is there any other
7  lecture you have attended?
8  A.  No.
9  Q.  And that was something local to --
10  A.  It was local.
11  Q.  Okay. I may have asked you this before, and
12  I apologize. Have you made any other notes that you
13  destroyed or didn't keep during your course of your
14  review of this case?
15  A.  None.
16  Q.  Okay. Have you asked to see any additional
17  information?
18  A.  I -- I said I would like to see if there is a
19  deposition from Dr. Lu, I would like to see that. And
20  I said I would like to see the deposition of the
21  plaintiff.
22  Q.  And why did you indicate you would like to
23  see the deposition of Dr. Lu?
24  A.  I would like to see what her thinking was
25  during the case.

13 (Pages 46 to 49)

50

1    Q.   Okay.  Do you feel that you have sufficient
2  information to render the opinions you are going to
3  render today without the benefit of Dr. Lu's
4  deposition?
5    A.   Well, I think I can -- give you an
6  opinion based on the record.  If there are different
7  things that come out in any deposition or any
8  additional information, that could potentially change
9  my opinion.
10    Q.   Okay.
11    A.   But based on the record that I've reviewed,
12  I'm able to give an opinion.
13    Q.   Okay.  If you do read Dr. Lu's deposition or
14  the plaintiff's deposition and you change your
15  opinions in any way, would you agree to let Mr. Cargle
16  know so that he could let me know so that I can
17  determine whether we need to reconvene your
18  deposition?
19    A.   Sure.
20    Q.   Okay.  Is there any published source of
21  information that you are aware of that you would
22  recognize as a reasonably reliable source of
23  information on the placement of PD catheters?
24    A.   I couldn't state any.
25    Q.   Is there any published source of information

51

1  that you are aware of that you would recognize as
2  reasonably reliable on the question of the
3  complications associated with the placement and their
4  manifestations?
5    A.   I mean all these things, placement,
6  complications, they are written about in general.
7  There may be in the textbooks as well.  I've never
8  really looked at them, to be quite honest.
9      I assume there is something in here about
10  these things, but most times you will pick them up in
11  the journals and conferences.  That's generally what
12  we do.  Whether or not I've seen those specific
13  articles or not in my, you know, years of reading
14  journals, I can't really tell you.  I mean you read
15  things, you remember a certain percentage.  The rest,
16  I don't know where that goes.
17    Q.   Okay.  What does the term "standard of care"
18  mean to you?
19    A.   Standard of care is just -- is basically
20  what -- what the majority of surgeons really would do
21  in a given area with a particular problem or a
22  particular case.
23    Q.   And how do you know what the standard of care
24  is?
25    A.   There are no -- I mean sometimes there are

52

1  practice guidelines that you can read that may give
2  you some idea; but a lot of it, a lot of standard of
3  care, is just, again, reviewing journals, going to
4  conferences, going to AMA conferences and discussing
5  cases, and you get a sense of what the standards are.
6    Q.   Would it be fair to say that it's essentially
7  based upon your education and personal experience?
8    A.   No, not entirely.  It's based on the things
9  I just mentioned.  The journals if you consider that
10  as part of my education, then maybe.  But the
11  journals, it's based on those conferences and local
12  conferences, as well as national conferences.
13      So that -- you know, and those are the main
14  things that people rely on.
15    Q.   Okay.  Well, then what journals specifically,
16  since you indicated that you are really not aware that
17  you read any, but what journals would you recognize as
18  reasonably reliable?
19    A.   Journal of American College of Surgeons,
20  American Journal of Surgery, Journal of Vascular
21  Surgery.  Those are the three main journals that I
22  peruse, go over.
23    Q.   But you couldn't --
24    A.   Annals of Surgery is another one.
25    Q.   Okay.  But you don't actually recall that you

53

1  specifically read anything in particular on the
2  complications associated with PD catheter placement or
3  their manifestations?
4    A.   I couldn't give you time and date or if I
5  have or haven't, to be honest.  You know it's very
6  difficult, to be quite honest, to identify where --
7  where one's knowledge of certain things comes from.
8  Just you accrue it over time.
9    Q.   Okay.  And the same with respect to
10  reasonably reliable sources of the manifestations of
11  ileus after procedures?
12    A.   Correct.
13    Q.   Okay.  Or the treatment of ileus?
14    A.   Correct.
15    Q.   Or the manifestation of a small bowel
16  obstruction of a non-mechanical nature?  Partial small
17  bowel obstruction, I guess I should say.
18    A.   Correct.
19    Q.   About whom are you going to be testifying
20  concerning the standard of care?
21    A.   I pretty much focused on the residents who
22  saw the patient after the procedure, and Dr. Lu.
23    Q.   And what residents, from your review of the
24  chart.
25    A.   They listed the names.  I don't -- I didn't

14 (Pages 50 to 53)

**54**

1 really write down the names. Dr. Duff, Dr. Duft I
2 think was one; and I didn't really focus and write
3 down the specific names, but they are noted on the
4 nursing notes. I couldn't read a lot of the
5 signatures.
6    Q.  And I take it you are not going to be
7 testifying that Dr. Johnson deviated from the standard
8 of care?
9    A.  I'm not going to be testifying about him.
10    Q.  Okay.
11    A.  I think this was a surgical issue.
12    Q.  Tell me what an ileus is?
13    A.  Well, an ileus -- there's -- the bowels stop
14 functioning for one of two reasons in general.  One is
15 that they are, as you suggested a couple of minutes
16 ago mechanically obstructed, in which case nothing can
17 get through because there is a mechanical obstruction.
18    Or two, ileus refers to almost a paralysis of
19 the intestines where the bowels have -- there is no
20 mechanical blockage, but oftentimes a reaction to some
21 type of local process or something going on, either
22 medication or inflammatory process such as
23 peritonitis, the bowels will be stunned, paralytic,
24 they will stop functioning.
25    And the -- often sometimes some of the

**56**

1 because they don't know, or an ileus.
2    But as physicians you try to say is this a
3 mechanical obstruction or is this a picture of an
4 ileus, is this really an ileus.
5    Q.  But a nonmechanical obstruction would be an
6 ileus; right?
7    A.  Yes, correct.
8    Q.  Is abdominal distension consistent with an
9 ileus?
10    A.  Yes.
11    Q.  Is abdominal pain consistent with an ileus?
12    A.  Not so much.
13    Q.  Have you ever seen it recorded in the
14 literature that abdominal pain has been reported as a
15 symptom of an ileus?
16    A.  You can have some abdominal pain with an
17 ileus.
18    Q.  Okay.  Abdominal guarding is a symptom of an
19 ileus; is it not?
20    A.  Usually the abdomen is relatively soft, but
21 distended.  The guarding is not a usual finding for an
22 ileus.
23    Q.  Okay.  Is nausea and vomiting a symptom of
24 ileus?
25    A.  It can be, sure.

**55**

1 abdominal findings and some of the x-ray findings are
2 quite similar to an actual mechanical obstruction.
3    Q.  What are some of the causes of an ileus?
4    A.  I just alluded to some of them; but
5 medications are sometimes a cause, sometimes
6 electrolyte imbalance, some type of -- one of the most
7 common things is an inflammatory process of some sort.
8    Q.  How about anesthesia?
9    A.  Anesthesia can.  Not as -- not as often,
10 really, and it also depends on the duration of the
11 case.
12    Q.  Does surgery itself sometimes just cause an
13 ileus?
14    A.  It can.
15    Q.  Okay.  Does a twisted intestine cause an
16 ileus?
17    A.  Well, that's more of a mechanical
18 obstruction.
19    Q.  Is sometimes the term "small bowel
20 obstruction" in the sense of a nonmechanical
21 obstruction used interchangeably with "ileus"?
22    A.  The only way it's used interchangeably is
23 oftentimes on the abdominal x-ray they will say
24 "possible small bowel obstruction," and they don't
25 really delineate whether that's a real obstruction,

**57**

1    Q.  Are decreased or no bowel sounds a symptom of
2 an ileus?
3    A.  Yes.
4    Q.  On an x-rays would you expect that dilated
5 loops of gas-filled bowel would be consistent with an
6 ileus?
7    A.  Say it again.
8    Q.  Dilated loops of gas-filled bowel be
9 consistent with an ileus?
10    A.  Yes.
11    Q.  Air fluid levels consistent with an ileus?
12    A.  Yes.
13    Q.  Would you expect any other --
14    MS. PRESTON: Strike that.
15    Q.  Are there any other potential signs or
16 symptoms of an ileus?
17    A.  You know, lack of bowel movements, lack of
18 flatus, abdominal distension; something we call
19 tympani, which is when you tap on the belly, it sounds
20 like you are hitting a drum.
21    Q.  Okay.
22    A.  Tapping on a drum.
23    Q.  Are you more likely to experience an ileus or
24 a partial nonmechanical small bowel obstruction after
25 abdominal procedures if you have had prior abdominal

15 (Pages 54 to 57)

58

1    procedures and have significant adhesions?
2        A. I don't know the answer to that.
3        Q. Okay. What is the treatment for an ileus?
4        A. It's NG2 decompression, and expectant
5    waiting.
6        Q. Okay. Observation and monitoring?
7        A. Okay.
8        Q. I mean is that what you mean by expectant
9    waiting?
10       A. That's -- Yes.
11       Q. Okay. And if an individual has significant
12   adhesions in the abdomen from prior surgery, would you
13   expect if there is an ileus after an abdominal
14   procedure, that the ileus would take longer to
15   resolve?
16       A. It might, but now you are talking about two
17   things, you are talking about adhesions causing a
18   mechanical obstruction, and an ileus. You are talking
19   about, you know, perhaps a combination of the two? Is
20   that what you are saying? I'm not sure what you are
21   asking.
22       Q. I'm just asking whether if a person has
23   significant adhesions from prior abdominal surgery --
24       A. Right.
25       Q. -- and they develop an ileus after an

59

1    abdominal procedure, another abdominal procedure,
2    whether it would likely take the ileus longer to
3    resolve?
4        A. I don't know the answer to that.
5        Q. Okay. Would it be accurate to say that
6    clinical improvement of the extent of dilatation of
7    the bowel as seen on x-ray and clinical improvement of
8    the patient in terms of less pain, less distention,
9    soft abdomen, would that be consistent with the
10   resolving ileus?
11       A. Yes.
12       Q. Is an ileus a known complication from a
13   placement of a PD catheter?
14       A. You know, PD catheters are done through an
15   incision that's very, very small, and the incision in
16   the abdominal wall is also very small. Quite
17   honestly, and I've done as I mentioned to you 150, 200
18   of these, I don't think I've ever seen an ileus after
19   placement of a PD catheter. It would give me pause if
20   I did.
21       Q. Do you even know whether it's been reported
22   as a potential complication following a placement of a
23   PD catheter?
24       A. It would not surprise me if it's been
25   reported.

60

1        Q. Okay. I take it then you don't know what the
2    incidence of its occurrence is associated with
3    placement of a PD catheter?
4        A. I don't -- can't give you a percentage and --
5    nor can I quote a single journal article that might
6    suggest a certain percentage, but I would -- I would
7    surmise that the percentage is quite low.
8        Q. Okay. Injury to the bowel after placement of
9    a PD catheter is a known complication; is it not?
10       A. Correct.
11       Q. And do you know what the incidence of it is
12   reported in the literature?
13       A. Again, same answer. It's going to be a
14   small percentage. I can't give you the percentage.
15       Q. Okay. And do you agree that injury to the
16   bowel can occur after or during the placement of a
17   peritoneal dialysis catheter even though the standards
18   of care have been met in placement of the catheter?
19       A. I do.
20       Q. Okay. And what are the manifestations that
21   you would expect to see over the course from the time
22   the catheter is being placed over the course of time,
23   if a bowel is perforated?
24       A. Pretty much what she presented with,
25   significant abdominal pain, significant abdominal

61

1    tenderness, guarding, pain that is only partially
2    relieved by narcotics and then comes back again. The
3    finding of significant free air on abdominal x-rays.
4    And then some of the sequelae that one can get like
5    abscesses and like that.
6        Q. Free air you would expect to see, would you
7    not, after the placement of a PD catheter?
8        A. I would not expect to see a lot of free air
9    after the placement of a PD catheter. Again, you are
10   making a small hole and you are just putting it in.
11   And I would -- it would -- again, it would give me
12   pause to see significant free air after a PD catheter
13   placement.
14       Q. Well, let's ask it this way.
15          You are putting a catheter into the abdomen,
16   and you can introduce air as you are introducing the
17   catheter; correct?
18       A. Yes, but again the emphasis is on significant
19   free air. You should not see significant free air.
20       Q. How do you differentiate between free air,
21   that which you could see with the placement of an
22   appropriately placed catheter, as opposed to free air
23   that might be expected to be seen if there was an
24   injury?
25       A. You would have to look at an abdominal x-ray

16 (Pages 58 to 61)

82

1    A.  "Failure of the residents to recognize
2  peritonitis, severe abdominal pain after P.D.," which
3  means P.D. catheter, "entertain proper differential;
4  failure to communicate these findings to Dr. Lu;
5  failure by all physicians subsequent to that initial
6  night to entertain the possibility of a perforation;
7  failure of Dr. Lu if, quote-unquote, if aware of
8  appendectomy to take proper precautions to avoid bowel
9  injury."
10       And I wrote down, "question mark,
11  laparoscopy, question mark, direct catheter to the
12  left side."
13    Q.  The bottom question mark, it says, "question
14  mark, direct catheter to left side"?
15    A.  "Direct catheter to left," yeah.
16    Q.  The first deviation, you say "failure of
17  physicians to obtain proper history." And when are
18  you directing this failure to?
19    A.  Preoperative history.
20    Q.  Okay. And what preoperative history are you
21  claiming specifically was inadequate?
22    A.  The previous history of an appendectomy.
23    Q.  Okay. If you ask a question directly, "Have
24  you had prior surgeries --"
25    A.  Right.

83

1    Q.  -- you expect the patient to tell you if they
2  had had surgery on their abdomen four months before?
3    A.  Yes.
4    Q.  Okay. If the patient doesn't tell you that
5  in response to your questions, the physicians have
6  complied with the standard of care; have they not?
7    A.  Correct.
8    Q.  Okay. The record that you have read --
9    A.  But just as an aside, I was confused then by
10  the fact that Dr. Lu in her operative note on the 20th
11  of September recognized that the patient had adhesions
12  from previous surgery.
13    Q.  Okay. That's because she was looking in the
14  abdomen and saw adhesions; right?
15    A.  She noted. She said -- she said "adhesions
16  from her prior abdominal surgeries."
17    Q.  Okay.
18    A.  So that was surgeries, not surgery. And the
19  only abdominal surgery that was noted was the -- the
20  hysterectomy, so I don't know where she got the
21  plural.
22    Q.  Okay. She had -- you wouldn't consider
23  abdominal surgery the placement of a catheter?
24    A.  No.
25    Q.  Okay. If the physician has --

84

1    A.  Not in that short period of time.
2    Q.  If the physician asked the question "have you
3  had prior abdominal surgery," the physician conforms
4  to the standard of care in obtaining, in attempting to
5  obtain a proper history; right?
6    A.  Correct.
7    Q.  Okay. And you have read in the record, have
8  you not, that the physicians, in fact, asked that
9  question?
10    A.  Correct.
11    Q.  Okay. So --
12    A.  Well, I don't know what question they asked;
13  but I read the question where they obtained the
14  history of a hysterectomy. That's all I have. I
15  don't know what question they asked to solicit that.
16    Q.  Okay. If the record reflects hypothetically
17  that the question is -- prior surgery is the question
18  that's printed in the record, preoperative evaluation
19  --
20    A.  Right.
21    Q.  -- and there is no report of --
22       MS. PRESTON: Strike that.
23    Q.  If that's the question that's written in the
24  record, then you would conclude based upon the record
25  that the physicians obtained a proper history;

85

1  correct?
2    A.  Correct.
3    Q.  Okay. And then you say "failure to recognize
4  peritonitis, severe abdominal pain, PDs" -- what's the
5  arrow? What's after the arrow?
6    A.  "Entertain proper differential."
7    Q.  Okay. When do you believe the diagnosis of
8  peritonitis should have been recognized?
9    A.  I think they should have entertained that and
10  recognized it and pursued it the night of surgery.
11    Q.  Okay. Based upon the complaint of pain?
12    A.  Right. The amount of pain that she was
13  having and the abdominal pain and the narcotic
14  requirement after placement of a P.D. catheter was
15  just way out of line.
16    Q.  Okay. And anything other than the amount of
17  pain that one would conclude there was --
18    A.  Well, she had pain and tenderness and a firm
19  abdomen. So a firm abdomen implies guarding.
20    Q.  Okay.
21    A.  The firm abdomen, pain, tenderness; those
22  are -- those are peritoneal findings until, you know,
23  ruled out, basically. And after this occurs -- right
24  after surgery it has to be in a differential, have I
25  injured the bowel here?

22 (Pages 82 to 85)

EXHIBIT 10



**GEORGETOWN UNIVERSITY HOSPITAL**
3800 Reservoir Road, NW
Washington, DC 20007

Georgetown
University
Hospital
*MedStar Health*

**CONSENT FOR SURGERY,
ANESTHETICS, AND
OTHER MEDICAL
SERVICES**

5050848  BRUTON ,ROBIN D
LU, AMY D         BAP  F- 39
2600 VALLEY WA HYATTSVILL MD
08/19/04
DOB

Date **8/19/04**   Time **1230**   ☐ A.M.   ☑ P.M.

1. I authorize the performance upon **Myself**
   _____
   (MYSELF OR NAME OF PATIENT)

   of a procedure known as **PD Catheter Placement**
   _____
   (TITLE OF PROCEDURE)

   _____

   to be performed under the direction of Dr. **Amy**    **Lu**
                                          (FIRST NAME)        (LAST NAME)

2. I acknowledge that Dr. **Amy**    **Lee**
                        (FIRST NAME)        (LAST NAME)

   has described the nature of this procedure in terms which I understand and has answered all questions I have asked about it to my satisfaction. The doctor has also explained significant complications and risks that may be associated with this procedure, including complications and risks of anesthesia. The doctor has advised me of possible alternatives to this treatment, including the possible consequences of no treatment at all, and the significant complications and risks associated with such alternatives. I understand that in the course of the procedure the doctor may determine that procedures in addition or different from this procedure may be necessary to my well being and that it would not be practical to obtain my further consent at the time. I therefore authorize the doctor to perform such procedures without further consultation with me.

3. I also consent to the administration of such anesthetics as may be considered necessary or advisable by the physician responsible for that service.

4. I acknowledge that Georgetown University Hospital is a teaching institution. For purposes of advancing medical education, I consent to the admittance of observers to the operating room and to the photographing or televising of the procedures to be performed, including appropriate portions of my body, for medical, scientific, or educational purposes, provided my identity is not revealed by the pictures or by descriptive texts accompanying them.

Signed: _____   Relation to Patient: _____

Witness to Signature: **Nancy E Smithke** _____

---

**DAY OF SURGERY:**

PROCEDURE LISTED ABOVE RE-READ AND CONFIRMED: _____
                                                              PROCEDURE PHYSICIAN

SITE MARKED: ☐ LEFT   ☐ RIGHT  ☑ N/A   _____
                                                    PROCEDURE PHYSICIAN

PATIENT IDENTITY CONFIRMED: _____   &   _____
                              CIRCULATING / PROCEDURE NURSE        ANESTHESIA CARE PROVIDER

---

MR 070.070 (8/03) (F3F)

**1:06CV01874 JDB**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ROBIN D. BRUTON    *

    *Plaintiff,*    *

v.    *    Civil Action No.:  1:06CV01874
                             JDB
    *

MEDSTAR-GEORGETOWN
MEDICAL CENTER INC., *ET AL.*    *

    *Defendants.*    *

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### DEFENDANTS' MOTION TO STRIKE, OR ALTERNATIVELY,
### OPPOSITION TO PLAINTIFF'S MOTION FOR LEAVE TO
### FILE FIRST AMENDED VERIFIED COMPLAINT

Defendants, MedStar Georgetown Medical Center, Inc., Amy Lu, M.D., and Lynt Johnson, M.D. (collectively "Defendants"), by and through undersigned counsel, hereby file this Motion to Strike, or Alternatively, Opposition to Plaintiff's Motion for Leave to File First Amended Verified Complaint, and state as follows:

### I.  STATEMENT OF FACTS

Plaintiff's Complaint was originally filed with this Court on November 2, 2006.  Plaintiff's Complaint asserted claims against The Georgetown University, MedStar Health Inc., MedStar Georgetown Medical Center, Inc., The Georgetown University Hospital, Amy Lu, M.D., Lynt Johnson, M.D., and twenty fictitious named defendants ("John Does 1-20").  Plaintiff's Complaint asserted two (2) causes of action, both sounding in negligence.  The first was a claim for medical

malpractice regarding the surgical placement of a peritoneal dialysis catheter on August 19, 2004 at MedStar Georgetown Medical Center that was alleged to have been negligently placed resulting in a perforation of Plaintiff's colon. The second cause of action was premised on negligent credentialing of Dr. Amy Lu, Dr. Lynt Johnson, and unnamed doctors, interns, residents and nurses involved in Ms. Bruton's care.

In response to Plaintiff's Complaint, Defendants filed a Motion to Dismiss. In their motion, Defendants sought dismissal of Plaintiff's Complaint because Plaintiff is a resident of Maryland and Defendant MedStar Health, Inc. is a Maryland corporation; thus the Court lacked subject matter jurisdiction under 28 U.S.C. §1332. In addition, Defendants sought dismissal of Plaintiff's negligent credentialing claims asserted against The Georgetown University, The Georgetown University Hospital, a/k/a MedStar Georgetown Medical Center, Inc. and MedStar Health, Inc. because the District of Columbia has not and would not recognize negligent credentialing or hiring as a cause of action.

On December 20, 2006, Plaintiff filed a motion to dismiss her claims against The Georgetown University, The Georgetown University Hospital and MedStar Health, Inc. As grounds for her motion, Plaintiff stated that The Georgetown University is not a proper party because it no longer has an ownership interest in MedStar Georgetown Medical Center, Inc. In addition, The Georgetown University Hospital was not a proper party because it was not an

2

actual entity.  Also, MedStar Health Inc. was not a proper party because this Court did not have jurisdiction over it in that MedStar Health Inc. and Plaintiff were both citizens of Maryland.

On December 21, 2006, this Court granted Plaintiff's motion to dismiss.  In addition, this Court denied Defendants' motion to dismiss as moot because dismissing all three entities preserved diversity jurisdiction and disposed of Plaintiff's negligent credentialing claim because it was asserted only against the dismissed defendants.

On January 30, 2007, this Court issued the first of several Scheduling Orders.  Pursuant to the January 30, 2007 Order, the parties were to, inter alia, join additional parties by April 24, 2007.

Before filing suit, presumably plaintiff had obtained her hospital records from MedStar-Georgetown Medical Center.  Those records plainly record the names of physicians who participated in the surgery (See Exhibit 1, perioperative record produced by Plaintiff to Defendants on July 10, 2007 listing Dr. Amy Lu and Dr. Crago as surgeons who performed the catheter placement) and physicians who participated in her post-operative care, including each of the doctors now attempted to be joined as Defendants.  (See Exhibit 2, progress notes and physician orders from Robin Bruton's August 19, 2004 hospital admission, produced by Plaintiff in her document production on July 10, 2007).  For example, orders of 9/2/04-9/4/04 evidence Dr. Aarti Mathur's name printed under her

3

written signature that appears numerous times in the progress notes. On the progress note of 8/23/04 Dr. Schwartz's name is printed under his signature and corresponds to an order of that date legibly referring to his name. Further, there are numerous references to Dr. Tessema's and Dr. Doff's names in the nursing notes and orders that are plainly legible.

April 24, 2007 came and went, and no additional parties were added as required by the initial Scheduling Order.

On August 1, 2007, Plaintiff filed a motion requesting that the Court's Scheduling Order be modified to allow Plaintiff to name experts and conduct discovery.[1] Plaintiff stated in her motion that Defendants consented to Plaintiff's request for an extension. Defendants, however, had not consented to the dates proposed. In response to Plaintiff's request for an extension, however, Defendants conferred with Plaintiff's counsel and the parties filed a joint request to amend the scheduling Order.

On August 17, 2007, upon consideration of the joint request to alter the Scheduling Order, the court entered an amended pretrial Scheduling Order to allow Plaintiff until September 10, 2007 to join additional parties without further leave of the Court.

---

[1] As of that date Plaintiff had not identified experts, despite the Scheduling Order deadline of May 24, 2007. Plaintiff also had made no attempt to obtain depositions of any of the Defendants or individuals whose names were identified in the chart. While Plaintiff had attempted to propound Interrogatories on June 7, 2007 and July 14 2007, she propounded three sets of interrogatories to each Defendant asking over 200 questions. Plaintiff's counsel agreed to withdraw the improper discovery and to re-propound interrogatories conforming to the Rules, but did not do so until August 30, 2007. (See Exhibit 3).

4

On September 10, 2007, while Plaintiff named her only expert, Richard Steven Nitzberg, M.D., no additional parties were added.

At the request of defense counsel, this Court held a telephone conference on October 29, 2007 occasioned by Plaintiff's failure to appear for deposition or produce her expert for deposition. Pursuant to that conference the Court Ordered Plaintiff to appear for deposition prior to November 22, 2007, and the parties to arrange for Dr. Nitzberg's deposition to occur prior to December 14, 2007. While Ms. Bruton's deposition took place, Dr. Nitzberg's deposition did not.

On December 17, 2007, the court held a status conference. At the conference, the Court declined to strike Plaintiff's expert witness as sanction for failing to produce him for deposition as ordered. At Plaintiff's request, moreover, the Court again extended the discovery schedule to permit Plaintiff the opportunity to conduct discovery Plaintiff had not undertaken over the preceding year.[2] Upon being advised that Plaintiff wished to amend her Complaint to add three new Defendants and to add causes of action for lack of informed consent and failure to diagnose, the Court directed that any Motion for Leave to Amend be filed no later than December 31, 2007. The Court's Order concluded: "absent truly exceptional circumstances there will be no deviations from this schedule."

---

[2]    After the October 29, 2007 telephone conference, defense counsel offered dates for the depositions of Dr. Lu, Dr. Johnson, and each of Defendants' expert witnesses, that could have been completed within the existing discovery schedule. (See Exhibit 4). Plaintiff never responded to the offers.

Plaintiff yet again ignored a Court ordered deadline and failed to file her Motion for Leave to Amend until the day after it was due, January 1, 2008.[3]

Plaintiff's Motion for Leave to File First Amended Verified Complaint ("Motion to Amend the Complaint") seeks to: 1) voluntarily dismiss her claims against Defendant Lynt Johnson, M.D; 2) join five individual physicians, Aimee Crago, M.D., Michael D. Doff, M.D., Tedla Tessema, M.D., Jaime Schwartz, M.D. and Aarti Mathur, M.D., as new defendants; and 3) add three additional causes of actions:[4]  (a) lack of informed consent, (b) negligent supervision and hiring, and; (c) failure to diagnose and treat.[5]

While Defendants do not oppose Plaintiff's voluntary dismissal of Lynt Johnson, M.D., the appropriate means by which his dismissal should be

---

[3] Plaintiff's counsel represented in the Certificate of Service that the Motion to Amend the Complaint was served on 12/31/08, however, according to the court docket and the time stamped copy to undersigned counsel the Motion to Amend the Complaint was not filed or served until 11:45 a.m. on 1/1/08. (See Exhibit 5)

[4] Plaintiff failed to redline the amended Complaint as instructed by the Court. Defendants, however, compared the original Complaint with the amended Complaint (totaling over 77 combined pages) and to the best of their ability attempted to document Plaintiff's amendments/alterations.

[5] Plaintiff's Motion to Amend the Complaint states that she seeks to add only two causes of action:  Failure to diagnose and lack of informed consent.  However, upon careful analysis of Plaintiff's Amended Complaint it appears that Plaintiff is attempting to add three new causes of action.  The third cause of action is a Negligent Credentialing claim asserted against MedStar-Georgetown Medical Center, Inc.  It appears that Plaintiff's Counsel may have simply worked off of her original Complaint in drafting the amended Complaint.  In doing so, Plaintiff my have accidentally failed to remove those causes of action that were dismissed from the original complaint.  Nevertheless, Defendants will address Plaintiff's Negligent Credentialing claim as if Plaintiff is attempting to re-assert it now.

6

accomplished is by stipulation under F.R.C.P. 41(a).[6]  Defendants do oppose, however, the attempt to add five new defendants and to add three new causes of action at this late stage of the proceeding.    The amendments should be denied under Fed. F.R.C.P. 15(a)(2) and 15(c)(1) because any amendment would be futile, would unduly prejudice the existing and new defendants and was filed after undue delay.

In light of the above, and as more fully discussed below, Defendants respectfully request this Court Strike Plaintiff's Motion to Amend the Complaint, or Alternatively, deny Plaintiff's Motion to Amend the Complaint.

## II.  ARGUMENT

### A.    Plaintiff's Motion to Amend the Complaint Should be Stricken as Untimely Filed.

Plaintiff filed her Motion for Leave to File First Amendment Verified Complaint ("Motion to Amend the Complaint") on January 1, 2008 at 11:45 a.m. (See Exhibit 5).  This Court, however, had ordered that Plaintiff file her Motion "no later than 12/31/07." As Plaintiff's Motion was untimely it should be stricken.

---

[6] Plaintiff's sole expert witness declined to render any opinion at deposition that Dr. Johnson breached the standard of care.  Immediately after his deposition, therefore, Defendant submitted a stipulation to Plaintiff's counsel pursuant to F.R.C.P. 41(a) requesting that Dr. Johnson be dismissed with prejudice.  Counsel has declined to sign it.

7

**B.    Should the Court Consider the Plaintiff's Motion to Amend the Complaint, the Motion Should be Denied Pursuant to Fed. R. Civ. Proc. 15.**

**1.    Standard of Review**

Under F.R.C.P. 15(a)(2), leave to amend should be freely granted unless the Court finds "undue delay, bad faith or dilatory motive ..., undue prejudice to the opposing party ... [or] futility of amendment." Foman v. Davis, 371 U.S. 178, 182 (1962); see also James Madison Ltd. by Hecht v. Ludwig, 82 F.3d 1085, 1099 (D.C. Cir.1996) (upholding denial of motion to amend a complaint because it would have been futile), cert. denied, 519 U.S. 1077 (1997); Robertson v. White, 111 F.R.D. 607, 609 (W.D. Ark. 1986) (denying the plaintiff's motion to amend the complaint for undue delay); Williams v. Little Rock Municipal Water Works, 21 F.3d 218, 224-26 (8th Cir. 1994) (denying plaintiff's motion to amend the complaint to join new defendants and new allegations for undue delay and where plaintiff was dilatory throughout pendency of action and presented no justification for delays); Frank v. U.S. West, Inc., 3 F.3d 1357, 1366 (10th Cir. 1993) (denying plaintiff's leave to amend to add defendant when the motion was untimely, and plaintiff knew or should have known long before that date of the possible defendant). Plaintiff's proposed amendments violate each of the above proscriptions.

8

2.    **The Motion to Amend to Add Five New Defendants Should be Denied.**

a.    <u>**Joining New Defendants Is Futile.**</u>

First, the addition of five additional physicians, all of whom were employees of MedStar-Georgetown Medical Center at the time of the events,[7] would be completely futile because Plaintiff admitted these individuals did not breach standards of care or cause injury.

On November 28, 2007, Requests for Admissions were propounded to Plaintiff requesting that she admit that "no agent employee, servant of MedStar-Georgetown Medical Center breached the standard of care." Ms. Bruton also was asked to admit that "no alleged breach of the standard of care by an agent, servant or employee of MedStar-Georgetown caused damage to Robin Bruton." (<u>See</u> Exhibit 7, Request for Admissions propounded). Plaintiff never responded to the requests, and, therefore, pursuant to Fed. R Civ. Proc. 36, the request for admissions are deemed admitted. The matters admitted, moreover, are "conclusively established" and have binding effect, unless the court on Motion permits withdrawal or amendment. As of the filing of this Opposition, Plaintiff has made no motion to amend her admissions. The requests are, therefore, deemed admitted and Defendants have the right to rely on their binding effect. <u>See</u> <u>Rain Bolt v. Johnson</u>, 669 F.2d 767, 768 (D.C. Cir. 1981); <u>Liuck v. Gray Bar Electric Company</u>, 473 F.2d 1360, 1362 (8th Cir. 1973); <u>Jackson v. Riley Stoker</u>

---

[7] <u>See</u> MedStar-Georgetown's Answer to Interrogatory No. 2 and 5 (Exhibit 6).

9

Corporation, 57 F.R.D. 120, 121 (E.D. Pa. 1972); As there is no basis to establish

the elements of a medical malpractice claim or claim for lack of informed consent

against these Defendants, they would be subject to dismissal if joined. Any

amendment, therefore, is futile.

Second, the Plaintiff's attempt to join the additional physicians is futile

because the statute of limitations had expired with regard to all claims against the

new Defendants no later than September 20, 2007, over three months prior to the

filing of the Motion for Leave to Amend. By that date, three years had elapsed

from the time that Plaintiff knew or should have known of her causes of action,

having learned on September 20, 2004 that her colon had been perforated by

placement of the peritoneal dialysis catheter a month before, and having

undergone surgery to repair the injury. See Hardi v. Mezzanotte, 818 A.2d 974,

981 (D.C. 2003)(Plaintiff knew or should have known that her failure to diagnose

cause of action accrued when her surgeon discovered that the Plaintiff's condition

was diverticulitis, not a gynecological condition, and informed her of this

condition). In seeking to add the additional five physicians as Defendants,

Plaintiff does not dispute that the statute of limitations had already expired before

the filing of her motion.[8] Rather, she argues that the proposed amendment relates

---

[8] Nor could Plaintiff dispute this fact. One need only look at the allegations in her originally filed
Complaint which unequivocally demonstrate that she was placed on inquiry notice of her claims
when she learned that a hole had been placed in her colon necessitating reparative surgery.
Plaintiff asserted in her initial Complaint that after the peritoneal dialysis catheter placement, she
suffered continuously from severe pain, depression and mental anguish the entire three weeks she
was admitted and hospitalized at Defendant hospital. (Para. 33). Indeed, Ms. Bruton was

10

back to the date of the filing of the original Complaint pursuant to F.R.C.P. 15(c).

Rule 15, however, does not save the amendment from the bar of limitations.

Plaintiff's amendment to join new defendants, or in the alternative, substitute real parties for fictitious defendants, does not relate back to the original Complaint unless all of the requirements of Federal Rule of Civil Procedure ("F.R.C.P.") 15(c) are met. See Alexander v. Beech Aircraft Corp., 952 F.2d 1215, 1226-27 (10th Cir.1991); see also Juzwin v. Asbestos Corp., Ltd., 900 F.2d 686, 690 n. 4 (3d Cir. 1990), cert. denied, 498 U.S. 896, 111 S.Ct. 246, 112 L.Ed.2d 204 (1990).

F.R.C.P 15 (c)(1) only allows an amendment to a pleading to relate back to the date of the original pleading when:

> *(A) the law that provides the applicable statute of limitations allows relation back;*
>
> *(B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out--or attempted to be set out--in the original pleading; or*

---

unequivocal that the three week illness necessitating her hospitalization after the placement of the catheter was completely unexpected and about which she allegedly continually asked for explanation without satisfactory response until learning of the hole in her bowel. (See Exhibit 8, Plaintiff's deposition, at 90-109). Two days after her discharge, she was informed by Defendant Lu that there was a "communication" between the catheter and Plaintiff's bowel and that Plaintiff "would need to have surgery as soon as possible." (para. 37). Plaintiff alleged in paragraph 40, that she was "mortified, angry and confused by Defendant Lu's informed diagnosis and statement" and asked "How did it happen? It was supposed to be a simple routine, in and out 45 minute procedure. I was supposed to be home before rush hour, and able to use my catheter in two weeks." (para. 41). Further, she alleged that she was "leery about going back to Defendant hospital to let them perform another operation." (para. 43). At deposition, Plaintiff asserted she was not told that there was any risk involved in the catheter placement, much less told that a hole could be placed in her colon. (See Exhibit 8, Robin Bruton deposition at 84). She was advised after the second surgery on September 20, 2004 that the hole in her colon had been repaired, and part of her colon had been taken out as well as the catheter. (See Exhibit 8 at 114).

11

> *(C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint [within 120 days of filing the original complaint], the party to be brought in by amendment:*
>
> *(i) received such notice of the action that it will not be prejudiced in defending on the merits; <u>and</u>*
>
> *(ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.*

<u>See</u> F.R.C.P. 15 (c).  The instant case does not satisfy subsection (c)(1)(A) or subsection (c)(1)(C) of the Rule.

      i.     <u>The applicable statute of limitations does not allow relation back.</u>

There can be no dispute that the statute of limitations applicable to this action and to the proposed amendment is the statute of limitations applicable to civil actions in the District of Columbia.  This statute does not allow relation back. The statute requires that Plaintiff's causes of action be filed within three (3) years from the date Plaintiff either knew, or should have known, of a cause of action. <u>See</u> DC ST § 12-301(8); <u>Canterbury v. Spence</u>, 464 F.2d 772, 793, 150 U.S.App.D.C. 263 (C.A. D.C. 1972).

Therefore, because the statute of limitation does not provide for a more lenient relation back, Plaintiff must satisfy F.R.C..P 15 (c)(1)(C).

ii.    Plaintiff's amendment does not relate back because the additional
       physicians did not receive notice of Plaintiff's claims within 120
       days of the date Plaintiff filed her Complaint.

Rule 15(c)(1)(C) requires a new party receive notice within the time prescribed by Rule 4(M) of service of the Summons and Complaint or within one hundred twenty (120) days after filing of the Complaint.    In this case the Complaint was filed November 2, 2006, requiring requisite notice by March 2, 2007.  None of the New Defendants received notice (actual or constructive) about this claim within the requisite time.   Further, Plaintiff's assertion that the new Defendants were "on notice" of the claim because she assumes they have cooperated in the defense of the case is factually unsupported.

Indeed, Dr. Doff and Dr. Tessema of the New Defendants have been gone from MedStar-Georgetown since 2005 and undersigned counsel does not even know where they are located.  No contact has yet been made with Dr. Schwartz. Dr. Mathur was contacted in response to Plaintiff's Motion.[9]  Dr. Crago was not contacted by counsel until August 2007.  Moreover, since Plaintiff herself asserts in her motion that she only discovered a basis for her new claims in the thirty (30) days prior to her proposed amendment, one wonders how or why these doctors would have received notice of the claims now sought to be brought.

However, even assuming for the sake of argument that these additional defendants had notice of Plaintiff's claim, it is of no moment, because Plaintiff did

---

[9] Dr. Mathur is a resident of Maryland, as is Plaintiff.  Adding her to the case will destroy diversity of citizenship, rendering the case dismissible, yet another reason the amendment is futile.  Frank v. U.S. West, Inc., 3 F.3d 1357, 1366 (10th Cir. 1993).

13

not commit a "mistake" concerning a proper party's identity that would allow relation back.

      iii.    <u>Plaintiff did not commit a "mistake" in failing to join the additional physicians</u>.

Plaintiff's failure to discover the specific identity of the John Doe defendants or names of the new defendants is not a "mistake" as defined under F.R.C.P. 15 (c)(1)(C). As such, Plaintiff's amendment will not relate back to the filing of the original Complaint. Cases from this Circuit conclude a "mistake" regarding an individual's identity occurs under the Rule where there is a complete lack of knowledge of the existence of a party or of events giving rise to the need for joinder or a misnomer or misidentification of a party already before the Court. See <u>Rendall-Speranza v. Nassim</u>, 107 F.3d 913, 918 (D.C. Cir. 1997); <u>In re Greater Southeast Community Hosp. Corp. I</u>, 341 B.R. 91 (Bankr. D.C. 2006). Similarly, other Circuits have found mistake and allowed relation back where a Plaintiff is unable to discover the identity of a party because the opposing party has purposefully withheld the information, See <u>Byrd v. Abate</u>, 964 F.Supp. 140, 146 (S.D.N.Y. 1997)(before the statute of limitations ran, the attorney representing a mentally ill inmate repeatedly requested information necessary to identify proper parties that was uniquely within the knowledge of defense counsel who did not comply with these requests until after limitations had run) or the Plaintiff would have named a proper party but for a mistake of law. See <u>Donald v. Cook County Sheriff's Department</u>, 95 F.3d 548, 557 (7th Cir. 1996)(<i>pro se</i> prisoner who sued

14

Sheriff's Department under the mistaken belief that by doing so he was suing the individual deputies who injured him was allowed to join individual deputies after the statute of limitations had run).

Plaintiff's failure to determine the specific identities of the "John Doe" Defendants, however, does not constitute a mistake permitting relation back. Here, as in all "John Doe" cases, the Plaintiff knew of the existence of alleged tortfeasors prior to the running of the statute of limitations but not the specific party who should be sued. As stated by the Court of Appeals for the District of Columbia, "[i]n the adversarial system of litigation the plaintiff is responsible for determining who is liable for her injury and for doing so before the statute of limitations run out." Rendall-Speranza v. Nassim, supra, 107 F.3d at 919. She may not invoke Rule 15(c) to avoid the consequences of failing to investigate and determine the specific names of the "John Doe" she knows to exist, e.g., Jacobsem v. Osborne, 133 F.3d 315, 320-21 (5th Cir. 1998)(substitution of John Doe defendants does not relate back); Barrow v. Weatherfield's Police Department, 66 F.3d 466, 469 (2nd Cir. 1995)(failure of Plaintiff to identify individual "John Doe" Defendants when Plaintiff knows that such Defendants must be named, cannot be characterized as a mistake); Worthington v. Wilson, 8 F.3d 1253, 1257 (7th Cir. 1993)(failure to identify John Doe not a mistake under Rule 15(c)); Wood v. Worachek, 618 F.2d 1225, 1230 (7th Cir. 1980)(failure to identify John Doe not mistake). As stated in Greater Southeast Community Hospital Corp., I, supra, 341

B.R. at 103 n.13 articulating why failure to identify "John Doe" defendants does not constitute mistake, "the Plaintiff understood the need to ascertain the perpetrator's identities and...simply lost the race against time by failing to do so before the statute of limitations expired."

Plainly here, Plaintiff knew of the existence of parties who may have been proper Defendants in the initial Complaint filed, yet failed to conduct the necessary investigation to determine their specific identities prior to the expiration of the statute of limitations. In addition, Plaintiff was not precluded from identifying the proper parties to this action. Defendants never obstructed the Plaintiff's access to information. Indeed, Defendant was not the keeper of unique knowledge. Plaintiff and Defendant both had access to Plaintiff's medical records, and Plaintiff could have asked Defendants to help identify providers in those records at any time or have conducted discovery of MedStar-Georgetown Medical Center prior to the expiration of limitations to determine it. She did not.

Further, Plaintiff is not arguing that she would have named the additional physicians but for a mistake in the law, nor is she arguing that subsequent events, which she could in no way have known, arose that precluded her from naming the proper parties.

In light of the above, Plaintiff cannot join the new defendants because all of the specifications of F.R.C.P. 15(c) have not been met. Therefore, Plaintiff's attempts to join the New Defendants to this action are futile because the

16

amendment will not relate back to the original Complaint. Accordingly, if joined, these defendants would be entitled to a dismissal of all the Plaintiff's claims. See Rendall-Speranza v. Nassim, 107 F.3d 913, 918 (D.C. Cir.1997) (since the statute of limitations has run on Plaintiff's claims, any new defendants are entitled to repose).

### b. **Joining New Defendants To This Action Is The Result Of Undue Delay.**

Plaintiff asserts that "as the result of reviewing discovery and conducting an extensive investigation Plaintiff has recently (within the last 30 days)" discovered that Defendants are liable under new causes of action ... and that new defendants should be added. Further, Plaintiff asserts that she "filed this motion within two months of being provided information during discovery." (See Motion to Amend the Complaint ¶¶ 3 & 4; see also Plaintiff's Memorandum in Support of her Motion to Amend the Complaint p. 8).

Plaintiff's assertions are half-truths intended to mislead the court into believing that Defendants somehow precluded Plaintiff from discovering who treated Ms. Bruton – Nothing could be further from the truth.

First, presumably Plaintiff had the medical records before filing her Complaint in which the names of the New Defendants are plainly written. Certainly, Plaintiff was required to exercise due diligence to investigate her claims to determine who were the physicians who performed her surgery and rendered post-operative care. At any time during the pendency of the case, Plaintiff could

17

have asked Defendant Hospital to identify the names of providers listed in the record. She did not. Plaintiff did not even attempt to propound discovery until August 30, 2007, nine months after filing her claim (and nearly four months after Defendants propounded discovery). Also, unlike Plaintiff, Defendants answered her discovery shortly after it was received. As part of their response, Defendants included a detailed list of all those who treated Ms. Bruton, as well as a proffer to help identify any specific healthcare provider listed in Plaintiff's medical records upon request. In fact, Defendant MedStar-Georgetown Medical Center, Inc.'s responses to Plaintiff's interrogatories identified each of the New Defendants on October 4, 2007. Plainly, Plaintiff knew or should have known the identity of the New Defendants long before the Motion to Amend was filed, but took no steps to add these Defendants when she herself acknowledges she knew of the additional causes of action in January or February 2007. (See Memorandum in Support of Motion to Amend at 5).

In Williams v. Little Rock Municipal Water Works, the trial court did not abuse its discretion in denying plaintiff's motion to amend the complaint to join new defendants and new allegations where plaintiff sought amendment fourteen months after filing the original complaint, six days after the discovery cutoff, less than three weeks before trial and where the case had been extended on two occasions and discovery had been continued on one occasions. Also, plaintiff offered no valid explanation for failure to seek amendment earlier, and plaintiff

18

was dilatory throughout pendency of the action and presented no justification for the delay. <u>Williams v. Little Rock Municipal Water Works</u>, 21 F.3d 218, 224-25 (8th Cir. 1994); <u>see also</u> <u>Frank v. U.S. West, Inc.</u>, 3 F.3d 1357, 1366 (10th Cir. 1993) (federal court did not abuse its discretion in denying plaintiff's leave to amend to add defendant when the motion was untimely, and plaintiff knew or should have known long before that date of the possible defendant).

Similar to <u>Williams</u> and <u>Frank</u>, Plaintiff knew or should have known of the New Defendants and joined them earlier. Indeed, Plaintiff had almost a year to join new defendants. Plaintiff, however, waited until after both she and her only expert had been deposed before attempting to join them. Moreover, the deadline to join new parties had been twice extended to accommodate Plaintiff. In fact, the Court's latest deadline to join additional parties was set for September 10, 2007 – ten days before the statute of limitations expired. Accordingly, Plaintiff cannot in good faith argue that her failure to join the New Defendants was an oversight or excusable neglect.

### c. <u>Joining New Defendants Is Prejudicial.</u>

Plaintiff's argument that the new parties will not be prejudiced because Defendants' counsel will likely be the new parties' counsel in this action is without merit. If joined, the New Defendants would be prejudiced because they were unable to participate in this action from its inception. The New Defendants will stand accused of professional malpractice; their reputations and careers will

19

be impugned. Yet, they were unable to participate in the discovery process, from its inception including consulting with counsel concerning selection of witnesses, making decisions concerning tactical issues, offering their advice to shape the conduct and development of the case, propounding discovery and attending depositions. Further, it has been over three years since the events, causing their, and other witnesses' memories to have faded. Indeed, witnesses who might have been able to corroborate their compliance with standard of care may no longer be available.[10]

Moreover, Plaintiff's expert did not even identify or name all of these new parties during his deposition[11] in which he outlined all his opinions regarding the alleged breaches in the standard of care. As such, most of the New Defendants do not know how or in what manner they allegedly breached the standard of care. Accordingly, to allow Plaintiff to join the New Defendants now would be substantially prejudicial, as well as further prolong discovery and the final adjudication of this case.

---

[10]  Indeed the locations of Dr. Doff and Dr. Tessema are currently unknown, having left the employ of MedStar-Georgetown several years ago.

[11] Dr. Nitzberg named only Dr. Doff as having breached standards of care for failing to entertain the diagnosis of a perforated bowel the night of surgery. (See Exhibit 9, deposition of Dr. Nitzberg, at pp. 53-54; 85). While he claimed he could not read the name of any other physician, even though Dr. Schwartz, Dr. Tessema and Dr. Mathur's names are clearly legible in the chart, his opinions were limited to those who treated Ms. Bruton the night after surgery. Id. at 85.

### 3. The Motion to Add New Causes of Actions Should Be Denied.

In addition to joining the New Defendants, Plaintiff attempts to add three new causes of action: 1) Informed Consent claim (See Proposed Amended Complaint ¶¶ 25, 114-119); 2) Negligent Credentialing (See Proposed Amended Complaint ¶¶ 91, 97, 98, 99, 100, 101, & 102); and 3) Failure to Diagnose (See Proposed Amended Complaint ¶¶ 35, 81, and 103-113).

Here, Plaintiff's attempts to add new causes of action should be precluded because these amendments too are futile and substantially prejudicial to the new and existing Defendants. Further, Plaintiff's failure to amend the Complaint is the result of undue delay.

### a. **Plaintiff's attempt to add a cause of action for Informed Consent is futile.**

Plaintiff's motion to add a lack of informed consent count should be denied because she cannot succeed on this claim. First, Plaintiff lacks expert testimony to support her claim. Second, under the law of the District, Ms. Bruton was given informed consent as a matter of law.

To recover on a claim of lack of informed consent against a physician, a plaintiff must prove: (1) that there was an undisclosed risk that was material; (2) that the risk materialized causing injury; and (3) that plaintiff would not have consented to the procedure if she had been informed of the risk. Hill v. Medlantic Health Care Group, 933 A.2d 314, 329-30 (D.C. 2007). A material risk, for purposes of an informed consent claim against a physician, is a risk which a

21

reasonable person would consider significant in deciding whether to undergo a particular medical treatment. Id. at 330.

Expert testimony is not necessary on all elements of a claim for lack of informed consent; however, expert testimony is required to establish the nature of the risks inherent in a particular treatment, the probabilities of therapeutic success, the frequency of the occurrence of particular risks, the nature of available alternatives to treatment and whether or not disclosure of particular risks would be detrimental to a patient. Id.

Here, when asked, Plaintiff's expert was not able to provide any information that would support Plaintiff's Informed Consent claim. Specifically, Dr. Nitzberg did not know the incidence of bowel injury or pelvic abscess associated with the placement of a peritoneal catheter. (Exhibit 9, Deposition of Dr. Nitzberg, at pp. 18; 48; 60). Accordingly, Plaintiff cannot successfully assert a claim for informed consent because she lacks expert testimony to establish a critical aspect of whether the risks encountered could be considered material.

In addition, Plaintiff's Informed Consent claim is futile because Plaintiff signed a consent form that acknowledged she rendered her informed consent. (See Exhibit 10, August 19, 2004 Consent Form). In signing the consent form, Plaintiff acknowledged that Dr. Lu informed her of the nature of the procedure, the significant complications and risks associated with the procedure, the possible alternatives to the treatment, including no treatment at all, as well as the

22

significant complications and risks associated with such alternatives. Therefore, because the consent form signed by Plaintiff adequately disclosed the nature of the treatment, the associated risks and benefits, as well as alternative treatments Plaintiff's Informed Consent claim is futile. See  Hill v. Medlantic Health Care Group, 933 A.2d 314, 330 (D.C. 2007) (stating that "at a minimum, a physician must disclose the nature of the condition, the nature of the proposed treatment, any alternate treatment procedures, and the nature and degree of risks and benefits inherent in undergoing and in abstaining from the proposed treatment."); see also Canterbury v. Spence,  464 F.2d 772, 788 (U.S. App. D.C. 1972).

In Hill, the plaintiff contended that he was not given sufficient information to choose an internal fixation versus external fixation procedure because he was not informed that there was a greater risk of infection with an internal fixation. The trial court concluded that informed consent had been established as a matter of law and there was no issue for the jury because Mr. Hill signed a consent form that was nearly identical to the form signed by Ms. Bruton here.  In relevant part, the consent form provided: "I have explained to the patient ... the nature of his/her condition, the nature of the operation or procedure to be done, the nature and the degree of risks and benefits associated with undergoing and in abstaining from the operation or procedure, alternatives to the operation or procedure to be performed, and the nature and degree of risks and benefits associated with each of those alternatives."  Hill v. Medlantic Health Care, supra, 933 A.2d at 331 n.15.

23

On appeal, the trial court's entry of judgment was affirmed. In addition, the appellate court noted that Mr. Hill's signature and hand-written modification to the form were strong evidence that Mr. Hill rendered his informed consent. See id. at 331 citing, Graff v. Malawer, 592 A.2d 1038, 1041 (D.C.1991) (finding judgment as a matter of law appropriate "because the testimonial and documentary evidence in the record, particularly the consent form that bore what he admitted was his signature, is so overwhelmingly contrary to [appellant's] position [that he lacked informed consent.]").

Here, the consent for signed by Plaintiff is nearly identical to the form in Hill. Further, similar to Hill, Plaintiff signature on the consent form is strong evidence that she rendered her informed consent. In addition, the fact that Plaintiff was a former radiation technician with a master's degree in health education and public health is strong evidence that she knew what she was signing and understood it. (See Exhibit 8, Plaintiff's Deposition, p. 9-12)

### b. **Plaintiff's attempt to add a Negligent Credentialing claim is futile, prejudicial and the result of undue delay.**

Plaintiff's Motion to Amend the Complaint re-alleges her Negligent Credentialing claim from the original Complaint. This count was the subject of Defendants' previously filed Motion to Dismiss. Ultimately, the court ruled that Defendants' Motion to Dismiss was moot because Plaintiff essentially dismissed this cause of action.

It would be futile to permit leave to allow Plaintiff to assert Count II, Negligent Credentialing and Hiring, because Plaintiff's only expert rendered no opinions that MedStar-Georgetown negligently hired or credentialed any physician. Indeed, in supplemental Answers to Interrogatories just provided by Plaintiff on January 7, 2008, she does not set forth any claim against MedStar-Georgetown based on negligent credentialing or hiring. (See Exhibit 11, Answer to Interrogatory No. 23). Given the complete absence of information in her discovery responses to support this claim, defendant submits there is no good faith basis to seek the amendment.

Plaintiff's Negligent Credentialing Claim is also futile because the District of Columbia does not recognize this cause of action. The District of Columbia's courts have never issued an opinion establishing, sanctioning, or acknowledging a claim for negligent credentialing. Further, not a single statute can be cited that establishes the vitality of such a claim.

Absent judicial or legislative precedent, it is beyond the province of this Court to establish a new cause of action in the District of Columbia. See Day and Zimmermann, Inc. v. Challoner, 423 U.S. 3, 4, 96 S.Ct. 167, 168, 46 L.Ed.2d 3 (1975) (As the Supreme Court has made clear, "[a] federal court in a diversity case is not free to engraft onto those state rules exceptions or modifications that may commend themselves to the federal court, but which have not commended themselves to the State in which the federal court sits."); see also Cantwell v.

University of Massachusetts, 551 F.2d 879, 880 (1st Cir.1977) (noting that federal courts take the law of the appropriate jurisdiction as they find it, and leave it undisturbed).

Therefore, there is no basis for this Court to even consider Plaintiff's negligent credentialing claim.

Furthermore, the District of Columbia would not recognize a negligent credentialing claim because public policy, embodied by statute, requires that facts concerning how or why a physician is credentialed or hired remain confidential, not discoverable and not admissible at trial. The peer review process enables hospitals and physicians to evaluate, discuss and improve upon their treatment of patients without fear or threat of litigation. See Report of the Committee on Consumer and Regulatory Affairs on Bill 9-355, The Health Care Peer Review Act of 1992 (October 27, 1992) (The committee report accompanying the act declared that the act was intended "to expand, strengthen and clarify the immunity and confidentiality provisions" of the existing peer review statute and to enhance "the willingness of both health care providers and consumers to participate in the work of peer review entities."). Id. note 6, at 2.

To further the peer review process, the District of Columbia Counsel enacted § 44-801 et seq. Section 44-801 et seq. exists solely to promote candid and meaningful discussion between health care providers by protecting medical peer

review discussions and materials from disclosure. See D.C. Code §44-805(a).

Section 44-805(a) provides in relevant part:

> (1) the files, records, findings, opinions, recommendations, evaluations and reports of a *peer review body*, information provided to or obtained by a *peer review body*, the identity of persons providing information to a *peer review body*, and reports or information provided pursuant to Section 44-802 or federal District of Columbia law shall be confidential and shall neither be discoverable nor admissible into evidence and any civil, criminal, legislative or administrative proceedings.

See D.C. Code §44-805(a) (emphasis added).[12]

Under the above statute, the peer review committee's files, records, findings, opinions and evaluations are deemed confidential, not discoverable and not admissible in a court of law or administrative proceeding. Here, in order for Plaintiff to establish her case in chief, it is essential that she has access to the Health Care Providers' credentialing files, and its evaluation in making credentialing decisions and that these files and evaluations be admissible into evidence. Absent the credentialing files or evaluations, Plaintiff cannot prove that the credentialing committee was negligent in its decision. Similarly, the Health Care Providers would also need to disclose these files in order to adequately defend their decisions. If the

---

[12] A "peer review body" is "a committee, board, hearing panel or officer ... of a health-care facility or agency, group practice or health care professional association that engages in peer review. See D.C. Code §44-801. Peer review includes, but is not limited to, the "grant, delineation, renewal, denial, modification, limitation, or suspension of clinical privileges to provide health-care services at a health-care facility or agency..." See id. Therefore, a medical peer review committee or credentialing committee is a peer review body, and is files are deemed privilege and confidential. Id.

credentialing materials can be discovered and if courts were to start judging the peer review process, the public policy behind a peer review would be completely frustrated. Any future discussions between physicians and hospitals regarding patient care would be guarded, and legal consequences would hover over every word.

This result was clearly contemplated and rejected when the City Council enacted § 44-801 *et seq*. The Council determined that the need for open discussion and critique within the medical community far outweighs the need for civil litigants to have access to credentialing information, notwithstanding a claim that such material is relevant to a plaintiff's claim. These confidentiality provisions, therefore, preclude potential plaintiffs from bringing a claim of negligent credentialing.

Here, Plaintiff's Proposed Negligent Credentialing claim is in direct conflict with the District of Columbia's public policy of promoting the peer review process, a process that the District of Columbia has deemed crucial in providing competent medical care to its citizens. Therefore, this Court should not recognize a claim for negligent credentialing. Because Plaintiff fails to state a cause of action recognized in the District of Columbia, the Motion for Leave to include such an action must be denied.

Finally, allowing Plaintiff to reassert this cause of action now is prejudicial because it was once dismissed, and Defendant has been allowed absolutely no discovery on the subject. Defendant would need to propound new written

discovery to determine what documents, facts or witnesses support Plaintiff's claim.  Assuming there is some factual basis to make this claim, numerous depositions would need to be taken and new experts retained by Defendants. Plainly, to allow Plaintiff to add this cause of action now will only greatly prolong the adjudication of this matter that would have been completed by now, but for Plaintiff's delay.

### c.  Plaintiff's attempt to add a cause of action for Failure to Diagnose is futile, untimely, prejudicial and the result of undue delay.

Plaintiff's attempt to add a cause of action for Failure to Diagnose is futile because Plaintiff, in failing to respond to Defendants' Requests for Admissions, admitted that the Defendants did not breach the standard of care or cause injury. (See Exhibit 7).

Further, all of Plaintiff's amendments are untimely and prejudicial.  She asserts she informed defense counsel of her new claims in January and February 2007 in an attempt to prove notice to the newly added Defendants (an assertion that is just not true), but claims she did not discover her new causes of action until thirty (30) days before filing her Motion.  It cannot be both.  In his deposition of December 28, 2007, Dr. Nitzberg testified that standards of care were breached by failing to diagnose the perforation.  Yet, he was designated as a witness on September 10, 2007, and the claim was not asserted until over three months later. Had the Complaint been amended earlier, Defendants would have had opportunity to defend against these claims by propounding more focused written discovery and

29

preparing more adequately for Plaintiff's deposition, as well as that of her expert witness.

Plaintiff's delay in adding these causes of action is in no way excusable neglect. Plaintiff's assertion that these new causes of action "suddenly appeared" after intense investigation might be true. However, it is not the Defendant's fault that Plaintiff waited so long to fully investigate her claim.

In <u>Robertson v. White</u>, 111 F.R.D. 607 (D.C. Ark. 1986) the court did not abuse its discretion in denying the plaintiff's motion to amend the complaint which sought to add new causes of action. The court determined that the plaintiff could have discovered the cause of action at least six months before filing the motion, and that plaintiff delayed filing the motion for more than one month after becoming aware that the cause of action in order to sandbag defendants at depositions.

Here, Plaintiff admits she knew of these claims since January 1, 2007. (<u>See</u> Memorandum of Points and Authorities in Support of Plaintiff's Motion for Leave to File First Amended Verified Complaint p. 5). Yet, Plaintiff waited an entire year before asserting these claims. In addition, Plaintiff waited until both she and her only expert had been deposed and approximately two months before the close of discovery before she filed her Motion to Amend the Complaint, Plaintiff's attempt to add this new cause of action at this stage in the litigation runs afoul to the general spirit of the federal rules and liberal amendment policy of Federal Rule

30

of Civil Procedure 15 (c), which are designed to avoid the "old sporting theory of

justice." See Florida Evergreen Foliage v. E.I. DuPont de Nemours & Co., 470

F.3d 1036, 1042 (11th Cir. 2006).

## CONCLUSION

Defendants respectfully request this Court to Strike Plaintiff's Motion for

Leave to File a First Amended Complaint, or in the alternative, that Plaintiff's

Motion for Leave to File a First Amended Verified Complaint be denied.

Respectfully submitted,

Susan T. Preston (Bar #419950)
Craig S. Brodsky (Bar #454924)
Goodell, DeVries, Leech & Dann, LLP
One South Street, 20th Floor
Baltimore, Maryland  21202
(410) 783-4000

Attorneys for the Defendants

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 14th day of January, 2008, a copy of the

aforegoing Motion to Strike and Opposition to Plaintiff's Motion for Leave to File

First Amended Verified Complaint, Request for Hearing, and proposed Order,

31

were sent via email (sfcargle.esq@qmail.com) and first class mail, postage prepaid

to:

Spencer S. Cargle, Esquire
Cargle & Associates
566 Edison Drive
E. Windsor, New Jersey  08520

_____
Susan T. Preston (Bar No.:  419950)

4817-6845-6450

32

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ROBIN D. BRUTON | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No.: 1:06CV01874 JDB |
| | * | |
| MEDSTAR-GEORGETOWN MEDICAL CENTER INC., *ET AL*. | * | |
| Defendants. | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## REQUEST FOR HEARING

Defendants respectfully request a hearing on their Motion to Strike and

Opposition to Plaintiff's Motion for Leave to File First Amended Verified

Complaint.

Respectfully submitted,

Susan T. Preston, Esquire (Bar# 419950)
Goodell, DeVries, Leech & Dann, LLP
One South Street, 20th Floor
Baltimore, Maryland 21202
(410) 783-4000

Attorneys for Defendants

4817-6845-6450

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ROBIN D. BRUTON                              *

    *Plaintiff,*                          *

v.                                           *        Civil Action No.:  1:06CV01874
                                                                  JDB
                                             *

MEDSTAR-GEORGETOWN
MEDICAL CENTER INC., *ET AL.*                 *

    *Defendants.*                         *

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### ORDER

Upon consideration of Plaintiff's Motion for Leave to File First Amended

Verified Complaint and having considered the opposition and reply thereto, and

any oral argument thereon, it is this ____ day of _____, 2008

ORDERED that Plaintiff's Motion is hereby DENIED.

                                     _____

                                     The Honorable John D. Bates
                                     Judge, United States District Court for
                                     the District of Columbia

cc:    All Counsel

4817-6845-6450

_Bruton. v. MedStar-Georgetown Medical Center, Inc., et al._
Civil Action No.:  1:06CV01874

## EXHIBIT LIST
(Defendants' Motion to Strike and Opposition
to Plaintiff's Motion to Amend)

| No. | DESCRIPTION |
|-----|-------------|
| 1 | Perioperative record produced by Plaintiff to Defendants on July 10, 2007 listing Dr. Amy Lu and Dr. Crago as surgeons who performed the catheter placement. |
| 2 | Progress notes and physician orders from Robin Bruton's August 19, 2004 hospital admission, produced by Plaintiff in her document production on July 10, 2007. |
| 3 | Re-propounded Interrogatories to Defendants by Plaintiff of August 30, 2007. |
| 4 | Correspondence of November 6, 2007 from Defense Counsel offering deposition dates for Dr. Lu, Dr. Johnson and defense experts. |
| 5 | Electronic notification of Plaintiff's Motion for Leave to File First Amendment Verified Complaint ("Motion to Amend the Complaint") filed on January 1, 2008 at 11:45 a.m. |
| 6 | MedStar-Georgetown's Answer to Interrogatory Nos. 2 and 5. |
| 7 | Request for Admissions propounded to Plaintiff by Defendants. |
| 8 | Plaintiff's Deposition at 9-12; 48; 53-54; 84-85; 90-109; 114. |
| 9 | Deposition of Dr. Nitzberg at 18; 48; 53-54; 60-61. |
| 10 | August 19, 2004 Consent Form. |
| 11 | Plaintiff's Supplemental Answer to Interrogatory No. 23, filed January 8, 2008. |
|  |  |

4844-7614-2338