EXHIBIT 1

# EXHIBIT 1

TRANSMISSION VERIFICATION REPORT

```
                                    TIME  : 01/01/2008 13:46
                                    NAME  : FEDEX KINKOS
                                    FAX   : 7322499315
                                    TEL   : 7322499222
                                    SER.# : 000H6J438604
```

```
        DATE,TIME             01/01  13:46
        FAX NO./NAME          12023543433
        DURATION              00:00:45
        PAGE(S)               03
        RESULT               OK
        MODE                 STANDARD
                             ECM
```

**FedEx Kinko's** ℠
Office and Print Center

## Fax Cover Sheet

212 Route 18 N.  East Brunswick, NJ 08816  Phone: (732) 249-9222  Fax: (732) 249-9315

Date JAN 1 2008

Number of pages 3 (including cover page)

## To:

Name HON. JOHN D. BATES

Company U.S. DISTRICT COURT

Telephone _____

Fax 202. 354. 3433

## From:

Name SPENCER F. CARGLE, ESQ.

Company _____

Telephone 646.234.8251

Comments _____

7 90363 00711 1  Fax - Local Send
7 90363 00714 2  Fax - Domestic Send
7 90363 01476 8  DOMESTIC Send Addl Pages
7 90363 00720 3  Fax - International Send

fedexkinkos.com  1.800.GoFedEx  1.800.463.3339

© 2006 FedEx Kinko's Office and Print Services, Inc. All rights reserved. Products, services and hours vary by location. fm05.165  1.06

22705

# CARGLE & ASSOCIATES
### ATTORNEYS AT LAW
67 WALL STREET, 22ND FLOOR
NEW YORK, NY 10005

TELEPHONE: (646)-234-6251

SPENCER F. CARGLE, ESQ.                                    WASHINGTON, DC OFFICE:

PERSONAL & CONFIDENTIAL

**VIA FACSIMILE**

January 1, 2008

The Honorable John D. Bates
United States District Court Judge
U.S. District Court for the District of Columbia
E. Barrett Prettyman U.S. Courthouse
333 Constitution Avenue, Northwest
Washington, DC  20001

Re:    **Robin D. Bruton v. MedStar Georgetown Hospital Center, Inc., et al.**  Case  No:  06
CV 1874

Dear Hon. John D. Bates:

I am the attorney for the plaintiff in the above referenced case before your court. In your Order dated 12/17/2007, the plaintiff's was permitted to file a Motion for Leave to Amend Verified Complaint, due by December 31, 2007. I made every effort to comply with your Order, however due to technology problems; I was only able to file Plaintiff's Motion for Leave to Amend Verified Complaint and proposed Plaintiff's Amended Verified Complaint today January 1, 2008.

My Adobe Pro software crashed yesterday evening. I tried to utilize Adobe's online service of creating PDF documents, but the documents would not be ready for download for approximately 11 hours. Then I attempted to go to a Kinko's but they were all closed by 8:00 pm yesterday, due to the Holiday.

As such, for the reason of not having the capability to create a pdf document for ECF filing, I was unable to comply with your Order. Kinko's was open today, so I was able to convert the documents into pdf format and file Plaintiff's Motion for Leave To Amend Verified Complaint, and proposed Plaintiff's Amended Verified Complaint via ECF system.

I am respectfully asking this Court to accept the late filing of the Plaintiff's Motion for Leave to Amend Verified Complaint, and proposed Plaintiff's Amended Verified Complaint.

Respectfully submitted,

Spencer Frederic Cargle, Esq.

**Judge John D. Bates**
**General Information**

The Honorable John D. Bates
United States District Court Judge
U.S. District Court for the District of Columbia
E. Barrett Prettyman U.S. Courthouse
333 Constitution Avenue, Northwest
Washington, DC  20001
(202) 354-3430 (telephone)
(202) 354-3433 (fax)

**Law Clerks:**          Chris Lynch
                         (202)  354-3435

                         Liana Wolf
                         (202)  354-3432

**Career Law Clerk :**

Cecilia E. Kim
                         (202)  354-3431

**Case status information:**

- Check PACER or the Clerk's Office public computers
- Memorandum Opinions may be found in the Court Opinions section of
this website and on legal databases

**Court's Calendar:**

- Check the Court Schedules section of this website

# EXHIBIT 2

Gmail  Calendar  Documents  Photos  Groups  Web  more ▾  **sfcargle.esq@gmail.com** | Settings | Help |
Sign out



craig

[ Search Mail ]  [ Search the Web ]    Show search opti
Create a filter

**Compose Mail**

**Inbox (33)**
Starred ☆
Chats ♀
Sent Mail
**Drafts (15)**
All Mail
Spam (27)
Trash

**Contacts**

▶ ● SF Cargle

Search, add, or invite

▼ Labels
[Imap]/Deleted Items
[Imap]/Drafts
**Deleted Items (1)**
Sent Items
        Edit labels

▶ Invite a friend

McCormick & O'Brien LLP - www.mcoblaw.com - Representing the Financial Services Inc 

« Back to Search results    [ Report Spam ]  [ Delete ]  More actions

‹ Newer 56 of 94 Older ›

### Case # 06CV01874 Bruton v. MedStar

☆  from ● SF Cargle <sfcargle.esq@gmail.com›  hide details 5/16/07  🖉  ↩ Reply
    to   Craig Brodsky <csb@gdldlaw.com›
   date  May 16, 2007 4:28 PM
subject  Case # 06CV01874 Bruton v. MedStar
mailed-by  gmail.com

Good Afternoon!

Attached is a true copy of Plaintiff's Responses to Defendant's Interrogatories. Please
give me call upon receipt. Alot of the information requested has not been
obtained. However, we will supplement upon receipt of the information requested. I wi
send a true hard copy via first class mail this week. Lets talk about restricting the
amount of prior medical history you will need for your investigation.

Regards,

Spencer F. Cargle, Esq.

Spencer F. Cargle, Esq.
Cargle & Associates
Attorneys at Law
67 Wall Street, 22nd Floor
New York, New York 10005

————————————————

Telephone No. 212.709.8045
Cell Phone No. 646.234.6251
Direct Fax No. 609.371.0585

This e-mail and any files transmitted with it are confidential and may be
subject to the attorney-client privilege. Use or disclosure of this e-mail or
any such files by anyone other than a designated addressee is unauthorized. If
you are not an intended recipient, please notify the sender by e-mail and delete
this e-mail without making a copy.

📄 **Case # 06CV01874 Plaintiff's Responses to Defendant's Interrogatories.pdf**
    704K View as HTML Download

↩ Reply  ➡ Forward

☆ ● SF Cargle to caruba    show details 7/30/07  🖉  ↩ Reply

Gmail   Calendar   Documents   Photos   Groups   Web   more ▾   sfcargle.esq@gmail.com | Settings | Help |
Sign out



craig

| Search Mail |   | Search the Web |   Show search opti
Create a filter

Forbes.com: Most popular stories - **Can The Mac Attack Continue?**   Web Clip   < >

**Compose Mail**

**Inbox (33)**
**Starred** ☆
Chats ♡
Sent Mail
**Drafts (15)**
All Mail
Spam (27)
Trash

**Contacts**

▶ ● SF Cargle

Search, add, or invite

▼ Labels
[Imap]/Deleted Items
[Imap]/Drafts
**Deleted Items (1)**
Sent Items
          Edit labels

▶ Invite a friend

« Back to Search results   | Report Spam |   | Delete |   More actions       ■

‹ **Newer** 62 of 94 **Older** ›

# Bruton v. MedStar-Georgetown Medical Center, Inc.

☆  from  ● SF Cargle <sfcargle.esq@gmail.com>  hide details 7/17/07  ↰ Reply
     to   Craig Brodsky <csb@gdldlaw.com>
     cc  ● sfcargle.esq@gmail.com
   date   Jul 17, 2007 3:32 PM
subject   Bruton v. MedStar-Georgetown Medical Center, Inc.
mailed-by  gmail.com

Good Afternoon!

Thank you for offering to do the Consent Motion, pursuant to the United States
District Court for the District of Coliumbia local rules. It would be greatly appreciated
if your firm could change the Stipulation into a Consent Motion. Please send a draft
for final approval. Thank you for consenting to the amended Scheduling Order.

In reference to 7, 9, 11, I thought we were trying to settle this matter. However it is
quite clear you plan on proceeding to trial.  The Scheduling Order is definitely in the
Defendants favor. I only agreed to this because I thought we agreed to settle before
trial, after your evaluation. If you are not in agreement with 7, 9 and part of 11 then
we agree to remove.

Per the Scheduling Order, we agree the 45 day clause should be inserted in the
Consent Motion.

I propose your interrogatories are due when my interrogatories are due, August 20,
2007. I am unaware of rules in the Federal Rules of Civil Procedure that indicate
Plaintiff's must answer Defendants Interrogatories before Defendants will answer
Plaintiffs Interrogatories. I appreciate the extra time you have allowed the Plaintiff to
answer Defendants Interrogatories.

The depositions for the Plaintiff will have to be scheduled when her health issues
become more tolerant to sit through an deposition. I will let you know. I need to
schedule your client for depositions. Please advise when they are available. We also
need the names of all employees agents, doctors, nurses and other medical
personnel who were in the operating rooms for both surgical procedure performed on
my client. These individuals will also need to be scheduled for depositions.

You have suggested a demand package. I will submit a demand package as
requested.

Regards,

**Compose Mail**

**Inbox (33)**
Starred ☆
Chats ♀
Sent Mail
**Drafts (15)**
All Mail
Spam (27)
Trash

**Contacts**

▶ ● SF Cargle

Search, add, or invite

▼ Labels
[Imap]/Deleted Items
[Imap]/Drafts
**Deleted Items (1)**
Sent Items
　　　Edit labels

▶ Invite a friend

--
Spencer F. Cargle, Esq.
Cargle & Associates
Attorneys at Law
67 Wall Street, 22nd Floor
New York, New York 10005
_____

Telephone No. 212.709.8045
Cell Phone No. 646.234.6251
Direct Fax No. 609.371.0585

This e-mail and any files transmitted with it are confidential and may be
subject to the attorney-client privilege. Use or disclosure of this e-mail or
any such files by anyone other than a designated addressee is unauthorized. If
you are not an intended recipient, please notify the sender by e-mail and delete
this e-mail without making a copy.

↩ Reply   ↩ Reply to all   ➡ Forward

« **Back to Search results**   [ Report Spam ]   [ Delete ]   More actions   ■

‹ **Newer** 62 of **94 Older** ›

Search your mail quicker than ever. **Download the Google
Toolbar**, now with Gmail search.   Learn more

**You are currently using 619 MB (9%) of your 6341 MB.**
Gmail view: **standard with chat** | standard without chat | basic HTML
Learn more

©2007 Google - Terms of Use - Privacy Policy - Program Policies -
Google Home

Gmail   Calendar   Documents   Photos   Groups   Web   more ▾   sfcargle.esq@gmail.com | Settings | Help | Sign out



craig

[ Search Mail ]   [ Search the Web ]

Show search opti
Create a filter

Wired: Top Stories - **Push Polling in South Carolina -- Who's It Really Helping?** ‹ › 

« **Back to Search results**   [ Report Spam ]   [ Delete ]   More actions

‹ **Newer** 61 of 94 Older ›

## Bruton v. MedStar Georgetown

☆ from  **Susan Preston** <stp@gdldlaw.com>  hide details 7/17/07  ↰ Reply
to ● sfcargle.esq@gmail.com
cc  Craig Brodsky <csb@gdldlaw.com>
date  Jul 17, 2007 6:42 PM
subject  Bruton v. MedStar Georgetown
mailed-by  gdldlaw.com

Dear Mr. Cargle:   Please confirm that Mrs. Bruton's deposition is going forward next Tuesday, July 24th as noted.  If not, I need a firm date on which it can go forward.

Regards,

Susan Preston

*Susan T. Preston, Esquire*
Goodell, DeVries, Leech & Dann, LLP
One South Street, 19th Floor
Baltimore, Maryland  21202
(410) 783-4025
(410) 783-4040 (F)


IMPORTANT CONFIDENTIALITY NOTICE
This message from the law firm of Goodell, DeVries, Leech & Dann, LLP contains information that may be privileged, confidential, and protected from disclosure under applicable law.  If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited.

If you have received this communication in error, please reply to the sender that you have received the message in error and delete the message, or notify us immediately at our telephone number: (410)783-4000


↰ Reply   ↰ Reply to all   → Forward   Invite Susan to Gmail

**Gmail** Calendar Documents Photos Groups Web more ▾  sfcargle.esq@gmail.com | Settings | Help | Sign out



craig

[ Search Mail ]  [ Search the Web ]   Show search opti
Create a filter

**Compose Mail**

**Inbox (33)**
**Starred** ☆
Chats ♡
Sent Mail
**Drafts (15)**
**All Mail**
**Spam (27)**
Trash

CNN.com Recently Published/Updated - **World markets plunge on US fears** ◄ 1 ► 

« Back to Search results   [ Report Spam ]  [ Delete ]  More actions
‹ **Newer** 57 of 94 **Older** ›

**Bruton**

☆  from  **Craig Brodsky** <csb@gdldlaw.com>  hide details 7/27/07  ↰ Reply
to ● SF Cargle <sfcargle.esq@gmail.com>
cc  Susan Preston <stp@gdldlaw.com>,
Ace McBride <azm@gdldlaw.com>
date  Jul 27, 2007 10:42 AM
subject  Bruton
mailed-by  gdldlaw.com

**Contacts**

▶ ● SF Cargle

Search, add, or invite

▼ Labels
[Imap]/Deleted Items
[Imap]/Drafts
**Deleted Items (1)**
Sent Items
            Edit labels

▶ Invite a friend

Spencer:

Thank you for sending the documents. I received them today. I still have not
received your Motion regarding the scheduling order, so I cannot tell you my
position on it. Further, please be sure to get me all information regarding
medical bills and a date for Ms. Bruton's deposition, and then proceed as
discussed between you, me and Susan.


Craig

Craig S. Brodsky, Esquire
Goodell, DeVries, Leech & Dann, LLP
One South Street
20th Floor
Baltimore, MD 21202
410-783-4000
410-783-4014 (direct)
1-888-229-4354 (toll free)
410-783-4040 (fax)
csb@gdldlaw.com

-----------------------------------------------------------

IMPORTANT CONFIDENTIALITY NOTICE
This message from the law firm of Goodell, DeVries, Leech & Dann, LLP
contains information that may be privileged, confidential,
and protected from disclosure under applicable law. If the
reader of this message is not the intended recipient or the
employee or agent responsible for delivering the message to
the intended recipient, you are hereby notified that any
dissemination, distribution, or copying of this communication
is strictly prohibited.

If you have received this communication in error, please
reply to the sender that you have received the message in
error and delete the message, or notify us immediately at
our telephone number: (410)783-4000.

**Gmail**  Calendar  Documents  Photos  Groups  Web  more ▾  **sfcargle.esq@gmail.com** | Settings | Help | Sign out



craig          [ Search Mail ]    [ Search the Web ]    Show search opti
                                                        Create a filter

**Compose Mail**

Inbox (33)          New BlackBerry® Curve™ - www.BlackBerryCurve.com - SmallSPortable,Stylish. Spans 
Starred ☆
Chats ♀              « Back to Search results    [ Report Spam ]  [ Delete ]   More actions
Sent Mail
Drafts (15)                                                          ‹ Newer 55 of 94 Older ›
All Mail
Spam (27)            **Bruton**                                      🗗 New window
Trash
                    ☆  **Craig Brodsky** show details 7/31/07  ↩ Reply   🖶 Print all
**Contacts**
                    Spencer:                                        🗁 Collapse all
▶ ● SF Cargle
                    I still have not received from you the Motion   ⊞ Forward all
  Search, add, or invite   regarding the Scheduling Order that you were going
                    to send me before you filed it so I could advise you  ⚡ Turn off highlighting
▼ Labels            of our position.  I also need for you to get us a date
  [Imap]/Deleted Items   on which we can depose Ms. Bruton.          Would you like to...
  [Imap]/Drafts
  **Deleted Items (1)**                                              🗺 Map this
  Sent Items        Thanks.                                            67 Wall Street
          Edit labels                                                  New York, New York
                    Craig.
▶ Invite a friend                                                   Sponsored Link
                    Craig S. Brodsky, Esquire
                    Goodell, DeVries, Leech & Dann, LLP             Representing the Financial
                    One South Street                                Industry & Securities Profe
                    20th Floor                                      www.mcoblaw.com
                    Baltimore, MD  21202
                    410-783-4000                                    Auto Accidents, Criminal L
                    410-783-4014 (direct)                           Proudly Serving Klamath F
                    1-888-229-4354 (toll free)                      RatliffandRatliff.com
                    410-783-4040 (fax)
                    csb@gdldlaw.com                                 Top law firm for appeals.
                                                                    Tycko & Zavareei LLP
                    _____        www.tzlegal.com
                    IMPORTANT CONFIDENTIALITY NOTICE
                    This message from the law firm of Goodell, DeVries,   Thinking of Blowing the WI
                    Leech & Dann, LLP                               It's Up To You - Qui Tam L
                    contains information that may be privileged,    www.AshcraftAndGerel.co
                    confidential,
                    and protected from disclosure under applicable law.   Secure & Confidential. Bac
                    If the                                          OK. Call 1-866-574-CASH
                    reader of this message is not the intended recipient   www.SonicCash.com
                    or the
                    employee or agent responsible for delivering the   Emergency Payday Loans
                    message to                                      Fax! No Credit Checks, Ev
                    the intended recipient, you are hereby notified that   Approved
                    any                                             www.1-Hour-Cash-Advanc
                    dissemination, distribution, or copying of this
                    communication                                   Nationally recognized attor
                    is strictly prohibited.                         author of Security Clearand
                                                                    kcnlaw.com
                    If you have received this communication in error,

**Compose Mail**

**Inbox (33)**
**Starred** ☆
Chats ♡
Sent Mail
**Drafts (15)**
All Mail
**Spam (27)**
Trash

**Contacts**

▶ ● SF Cargle

Search, add, or invite

▼ Labels
[Imap]/Deleted Items
[Imap]/Drafts
**Deleted Items (1)**
Sent Items
        Edit labels

▶ Invite a friend

please
reply to the sender that you have received the message in
error and delete the message, or notify us immediately at
our telephone number: (410)783-4000.

↩ Reply   ↩ Reply to all   → Forward   Invite Craig to Gmail

☆ ● **SF Cargle** to Craig   show details 7/31/07   📎 ↩ Reply

Good Afternoon,

Craig

Attached is a Draft of the Motion. Please note my expert is requesting 30 days because of their current schedule. That moves the date to August 30, 2007 as opposed to August 20, 2007. I will fax over the Medical Releases tomorrow at the latest. If you have changes or concerns just send it in an email, I will make the necessary changes, send the Draft back for final approval. I will then convert the Draft to a PDF, and send the Draft for a final approval in a PDF and then file today.

Regards

- Show quoted text -
--
Spencer F. Cargle, Esq.
Cargle & Associates
Attorneys at Law
67 Wall Street, 22nd Floor
New York, New York 10005
_____

Telephone No. 212.709.8045
Cell Phone No. 646.234.6251
Direct Fax No. 609.371.0585

This e-mail and any files transmitted with it are confidential and may be
subject to the attorney-client privilege. Use or disclosure of this e-mail or
any such files by anyone other than a designated addressee is unauthorized. If
you are not an intended recipient, please notify the sender by e-mail and delete
this e-mail without making a copy.

📄 **06-CV-1874 Draft Motion.doc**
    70K View as HTML Open as a Google document
    Download

↩ Reply   ↩ Reply to all   → Forward

**More about...**
Civil Law Suits »
Supreme Court »
Civil Rights Attorneys
Entertainment Law At
Appellate Law »
Appeals »
Court of Appeals »
Chicago State Civil La

        Related P

EU parliament preside
Afghan student to be s
EUPolitix.com - 6 hou
Parliament's presiden
in an effort to spare th

Carnegie Science Ctr
Admission Today
KDKA - 3 hours ago
The information you p
used only to send the

Internet Law Attorney:
Online Copyright & Tr
Top Internet Law Atto
Law, Internet Litigation
kronenbergerlaw.com

Internet and Online Pr
and Business Guide .
Lawcatalog is America
Media's online catalog
www.lawcatalog.com

More related pages »

About thes



craig          [ Search Mail ]  [ Search the Web ]    Show search opti
                                                       Create a filter

**Compose Mail**

**Inbox (33)**
**Starred** ☆
Chats ⚲
Sent Mail
**Drafts (15)**
**All Mail**
**Spam (27)**
Trash

**Contacts**

▶ ● SF Cargle

 Search, add, or invite

▾ **Labels**
[Imap]/Deleted Items
[Imap]/Drafts
**Deleted Items (1)**
Sent Items
        Edit labels

▶ Invite a friend

The BlackBerry® Device - www.BlackBerry.com/YourChoice - Brains & Beauty  Spons Is…

« Back to Search results   [ Report Spam ]  [ Delete ]   More actions    ▾    ■

                                                    ‹ **Newer** 53 of 94 **Older** ›

### Bruton

☆  from    **Craig Brodsky** <csb@gdldlaw.com>  hide details 8/1/07  ↰ Reply
    to  ● sfcargle.esq@gmail.com
    cc    Susan Preston <stp@gdldlaw.com>
    date    Aug 1, 2007 6:13 PM
    subject    Bruton
    mailed-by    gdldlaw.com

Spencer: I tried to call you back to finish our discussion to see how best to
resolve the issue of Ms. Bruton's deposition and the scheduling order. At this
point, my client remains committed only to the terms outlined in Ms. Preston's
letter to you. Therefore, I suggest that you refile the motion and I will file a
response with the Court consistent with Ms. Preston's letter. Please feel free to
call Susan or me if you wish to discuss this further. Craig
Sent from my Blackberry. Craig Brodsky

↰ Reply   ↰ Reply to all   → Forward   Invite Craig to Gmail

« **Back to Search results**   [ Report Spam ]  [ Delete ]   More actions    ▾    

                                                    ‹ **Newer** 53 of 94 **Older** ›

Use **Google Desktop** to access your Gmail messages even
when you're offline.

**You are currently using 619 MB (9%) of your 6341 MB.**

Gmail view: **standard with chat** | standard without chat | basic HTML
                        Learn more

# EXHIBIT 3

90

1  if you put peritonitis on your differential, you
2  cannot simply watch those patients.   You have to do
3  something else.
4       And now the "something else" may be to get an
5  abdominal x-ray, and if you didn't see any free air
6  you would say, well, bowel perforation, you know,
7  maybe we can watch a little bit, but let's recheck the
8  x-ray in a couple of hours or whatever.  But you would
9  have seen the free air in this patient.
10      And then you would have said, you know, this
11 is on my differential.  Now I've got free air, maybe
12 it's from introduction of the catheter, but how do I
13 know it's not a bowel perforation?  And she has really
14 got a lot of pain, a lot of tenderness, more than I
15 expect after something like this.  You know, I hate to
16 do this, but I've got to put a laparoscope in you now,
17 you know, a couple of hours, whenever they were
18 notified.
19      Basically you do the x-ray and then you go.
20 If you think you have a bowel perforation, if you
21 entertain that and you should have, then until proven
22 otherwise, you have to do something.  You can't -- you
23 don't have the luxury of saying, let's see how this
24 develops, because you may develop into a dead patient.
25      Q.  Peritonitis means -- an "itis" means

91

1  inflammation or infection; doesn't it?
2       A.  It means inflammation of the peritoneum.  It
3  doesn't have to mean infections.   There are other
4  forms of peritonitis.
5       Q.  If an x-ray is consistent with the amount of
6  free air that you might see after a peritoneal
7  dialysis catheter is inserted, let's consider
8  hypothetically it is considered to be consistent with
9  that, would you agree with me that one would not place
10 a laparoscope in to see if the bowel was perforated?
11      A.  No, it's the other way.  A negative would
12 have helped you.  If you have free air, you still are
13 left with: Is it from the catheter or is it from a
14 perforation.  You are still left with that if
15 perforation is in your differential, which it didn't
16 appear to be here.  But if it's in your differential,
17 then you would agree with that.
18      If there is no free air, you would say you
19 expect to see free air, you should maybe watch a
20 little longer.  That wouldn't have happened here.  You
21 would have seen free air and you said I still want to
22 rule it out, and you have to put in a laparoscope.
23      Q.  Okay.
24      A.  You can't do nothing.  You can't just say
25 when you make differentials you can't pick the most

92

1  expedient one or the one that may save the patient
2  perhaps from another operation, if the only way to
3  really determine whether or not you have something
4  serious that could be life threatening is with the
5  laparoscope or something -- or another surgery, you
6  are obligated.  You are absolutely obligated.
7       Q.  Okay.  If one perforated the bowel in the
8  placement of a P.D. catheter, would you not expect to
9  see evidence of bowel contents in the aspiration of
10 fluid from the bowel at the time the catheter is
11 placed?
12      A.  No, because remember this went through and
13 through, so it wasn't sitting in the lumen of the
14 bowel.  It just went through and through, and it was
15 probably, you know, the hole -- and this is why she
16 did okay and walled this off -- the hole in the bowel
17 was probably the size of the catheter, maybe a little
18 bit bigger because of rubbing, so a little bit of
19 stuff could leak out, but you wouldn't have the bowel
20 contents or the succus entericus, whatever you want to
21 call it, you know, out in the belly.
22      If you did, then she would have been sick and
23 she would not have walled things off and she probably
24 would have died if they sat on it as long as they sat
25 on it.  She just had -- she had enough of a leak to

93

1  drop bacteria and have a bacteria a little bit seep
2  out.  But the catheter was through and through.  It
3  wasn't sitting in the lumen of the bowel.  So you
4  would not necessarily have seen any bowel contents
5  come out.
6       Q.  Okay.
7       A.  And plus in the cecum, the bowel is
8  oftentimes solid at that point.  It doesn't have to
9  be.  It can be liquid, but it can be solid at that
10 point as well.  And it -- or maybe not even solid, but
11 thick enough that it would not come through a P.D.
12 catheter, the hole in a P.D. catheter, which are maybe
13 a millimeter in size as best.  No, so you cannot use
14 that as a determination as to whether or not you are
15 in the bowel in answer to your question, long-winded.
16      Q.  The first thing you said was because in this
17 case, the catheter went through and through.  You
18 wouldn't expect to see anything --
19      A.  Well, I said there's a couple of things.
20 One is it's through and through, so it may not.  The
21 other is the holes in these catheters, there are
22 multiple holes in these catheters, and the holes in
23 the catheter, you know, may not allow you to suck out
24 the bowel contents, which in this case are pretty
25 thick.  Or can be pretty thick or it could just be

24 (Pages 90 to 93)

94

1  that, you know, she moved her bowels earlier in the
2  day and it just happened that in that area, there is
3  no stool in that area. Your bowel is not necessarily
4  filled with stool. You evacuate the stool, that's why
5  you have bowel movements; so you don't necessarily
6  have stool in the area where it went through, so you
7  may or may not see stool come out.
8      Q.  Okay.  Would you expect there to have been a
9  foul odor at least during the course of the placement
10 of the catheter?
11     A.  I don't know that.  I really don't.
12         You have a mask on; you are irrigating this
13 thing out.  Who knows.
14     Q.  Okay.
15     A.  Probably not.
16     Q.  Okay.  If the catheter was through and
17 through at the time, would you not expect that to have
18 been evident on the x-ray itself or on the CAT scan?
19     A.  I don't know.  I mean they -- they seemed
20 to -- I really don't know of the, first of all, I
21 didn't see the CAT scan; and, two, I just don't -- you
22 know, I think they never really recognized it.
23         I don't think it -- look.  She clearly had a
24 perforation.  There is no -- I think there is no
25 question about that.  So I don't think that she

95

1  developed this pelvic abscess and all these other
2  things for some other reason and then subsequent to
3  that, all that, wiggled her way through the bowel into
4  the bowel.
5      I mean the catheter caused the perforation.
6  So, you know, the only way to hook this whole picture
7  up together is that the catheter went through and went
8  through at the time of the placement, because of the
9  adhesions she had from her previous surgery, which can
10 happen.  I don't deny that this is something that can
11 happen.  You have to be careful about doing it with
12 someone who has adhesions, but it can happen.
13     But knowing that it can happen, you have to
14 be very cognizant of that and put it in your
15 differential when someone presents like this.  So the
16 fact that they did or did not see it on the CAT scan
17 is really not helpful here.
18     Q.  You understand when you are evaluating a case
19 for determining what are the standards of care, you
20 are obligated to look not with the benefit of
21 retrospection?
22     A.  I understand.
23     Q.  A retrospectoscope is a very handy tool, is
24 it not, for physicians to evaluate in retrospect and
25 put it altogether when you can't do it in prospect;

96

1  right?
2      A.  Very much so.
3      Q.  And you will agree with me it is much easier
4  for us today looking back then it would be standing in
5  those shoes looking forward?
6      A.  I would agree.
7      Q.  You would agree that reasonable physicians
8  looking at the same set of facts can come to the
9  different conclusions at the time they are seeing a
10 patient, and then be proven in retrospect to disagree
11 and have a different conclusion; right?
12     A.  In general, you are asking me?
13     Q.  Yes.
14     A.  Yes.
15     Q.  And certainly the standard of care
16 encompasses different ways of going about a treatment
17 of a patient; does it not?
18     A.  Correct.
19     Q.  And physicians can disagree about what the
20 proper treatment and proper diagnosis is without
21 either one being in violation of the standard of care;
22 right?
23     A.  Correct.  But there are certain diagnoses you
24 have to -- you have to make and have to entertain in
25 certain situations.  Otherwise you are going to end up

97

1  with a dead patient.
2      Q.  You will certainly agree it is a lot easier
3  for you to conclude that there is peritonitis knowing
4  that there is a bowel perforation that went with the
5  catheter going through and through and not knowing
6  that at the time; right?
7      A.  Definitely.
8      Q.  Okay.  The last criticism that you have, you
9  say "failure of Dr. Lu if aware of "appy" to take
10 proper precautions to avoid bowel injury."
11     You would agree with me that if Dr. Lu is not
12 given the history of the patient having had an
13 appendectomy, that she and the residents at the time
14 of the -- at the time of the P.D. catheter being
15 placed conformed with the standard of care in the
16 performance of the P.D. catheter?
17     A.  There are two issues there.  Number one, when
18 you are prepping the patient, you would probably would
19 see the laparoscopic scars.  Now, I have not examined
20 Mrs. Bruton, so I don't know if they were there or
21 not.  But you probably would just in prepping the
22 abdomen, you are going to see these laparoscopic scars
23 in most cases.  Not always, but in most cases.  Number
24 one.
25     Number 2 is in my reading of the records and

25 (Pages 94 to 97)

# EXHIBIT 4

78

1 abscess at any one particular time is not really that
2 helpful.
3 Q. Okay.
4 A. That happens again in appendicitis. You will
5 see -- you will see an inflammatory process in an
6 area, and then over time if you let it go, let it go,
7 let it go, an abscess will develop.
8 Q. Okay. Did you see any report on any x-ray
9 study that was done through the time that she had her
10 second operation of an abscess having been present at
11 the site of the catheter where the transversed bowel
12 was?
13 A. Well, they didn't even know that the bowel
14 was transversed at that point, so I don't know how
15 they can say that. You know, there was an abscess in
16 the pelvic region, and again what happens oftentimes
17 in these cases is that you will perforate the bowel,
18 you may seal around the perforation and that may not
19 have an abscess there, but at the time you perforate
20 the bowel bacteria and stool contents drop into the
21 belly, they oftentimes will go to the most dependent
22 portion, which in this case is the pelvis, and you
23 will develop a pelvic abscess. Whereas the area where
24 actually the catheter is may actually be sealed off
25 and may not develop an abscess.

79

1 She may or may not develop an abscess right
2 around it, but it is clearly the source of the abscess
3 elsewhere in the body. It's just that that didn't
4 react with an abscess, that just reacted with walling
5 off, the abscess was a correct result of that
6 perforation.
7 Q. You can develop an abscess, can you not,
8 without having perforated the bowel after a placement
9 of a PD catheter?
10 A. I guess you could. You could place -- it
11 could be from -- yes, you could, yeah.
12 Q. And would you agree with me that if there was
13 an abscess caused by a perforation of the bowel, that
14 you would expect to see multiple bacteria, as is
15 present or as are present in the bowel?
16 A. You could see -- you can see multiple
17 bacteria. Sometimes one just seems to dominate, but
18 you would oftentimes see, you know, many different
19 types of bacteria, sure.
20 Q. Because that's usually present in the bowel,
21 many different kinds of bacteria?
22 A. But there are many, many different kinds of
23 bacteria, and sometimes you only see two or three or
24 one. Sometimes you only get one.
25 Q. And do you know what the incidence of a

80

1 pelvic abscess is after the placement of the PD
2 catheter?
3 A. I couldn't give you that number.
4 Q. Okay. And can we agree that its occurrence
5 does not represent a departure from the standard of
6 care?
7 A. Correct.
8 Q. Okay. And the treatment for pelvic abscess
9 is antibiotics and drainage?
10 A. Correct.
11 Q. Okay.
12 A. But also in the setting of a PD catheter,
13 since you asked that question, you have to sometimes
14 quite often remove the foreign body, which in this
15 case is the PD catheter as well.
16 Q. Okay. You don't necessarily have to remove
17 it if you don't think it's implicated in the abscess
18 itself?
19 A. Correct.
20 Q. Okay.
21 A. But you have to ask yourself, how else did it
22 get there?
23 Q. Okay. Can one introduce bacteria into the
24 pelvis by placement of the catheter?
25 A. You could. You wouldn't expect bowel flora,

81

1 though.
2 Q. All right. You mentioned that you were going
3 to testify concerning the deviations from the standard
4 of care by Dr. Lu?
5 A. Right, and the residents, correct.
6 Q. Let's concentrate on Dr. Lu first.
7 (A recess is taken.)
8 Q. Let's go back to Exhibit 3, and if you can
9 read slowly what you have not read from this document
10 that indicate the departures that you identified?
11 A. I started on this exhibit, it starts on the
12 right-hand side and goes to the left. So I'll just
13 read one, two, and then what should be three. So.
14 Q. -- yes, I see what you are saying.
15 A. And it's -- part of it's been cut off.
16 So failure by the physicians to obtain a
17 proper history, that is of the previous appendectomy;
18 failure of the residents to recognize peritonitis in
19 the setting of severe abdominal pain after a P.D.
20 catheter, i.e. I felt that they should have
21 recognized -- I'm expanding on what I read here.
22 Do you want me to just read or do you want me
23 to --
24 Q. Why don't you just read it, and then we'll go
25 over it.

21 (Pages 78 to 81)

---

**82**

1  A. "Failure of the residents to recognize
2  peritonitis, severe abdominal pain after P.D.," which
3  means P.D. catheter, "entertain proper differential;
4  failure to communicate these findings to Dr. Lu;
5  failure by all physicians subsequent to that initial
6  night to entertain the possibility of a perforation;
7  failure of Dr. Lu if, quote-unquote, if aware of
8  appendectomy to take proper precautions to avoid bowel
9  injury."
10     And I wrote down, "question mark,
11 laparoscopy, question mark, direct catheter to the
12 left side."
13     Q. The bottom question mark, it says, "question
14 mark, direct catheter to left side"?
15     A. "Direct catheter to left," yeah.
16     Q. The first deviation, you say "failure of
17 physicians to obtain proper history." And when are
18 you directing this failure to?
19     A. Preoperative history.
20     Q. Okay. And what preoperative history are you
21 claiming specifically was inadequate?
22     A. The previous history of an appendectomy.
23     Q. Okay. If you ask a question directly, "Have
24 you had prior surgeries --"
25     A. Right.

---

**8**

1  A. Not in that short period of time.
2  Q. If the physician asked the question "have you
3  had prior abdominal surgery," the physician conforms
4  to the standard of care in obtaining, in attempting to
5  obtain a proper history; right?
6  A. Correct.
7  Q. Okay. And you have read in the record, have
8  you not, that the physicians, in fact, asked that
9  question?
10     A. Correct.
11     Q. Okay. So --
12     A. Well, I don't know what question they asked;
13 but I read the question where they obtained the
14 history of a hysterectomy. That's all I have. I
15 don't know what question they asked to solicit that.
16     Q. Okay. If the record reflects hypothetically
17 that the question is -- prior surgery is the question
18 that's printed in the record, preoperative evaluation
19 --
20     A. Right.
21     Q. -- and there is no report of --
22     MS. PRESTON: Strike that.
23     Q. If that's the question that's written in the
24 record, then you would conclude based upon the record
25 that the physicians obtained a proper history;

---

**83**

1  Q. -- you expect the patient to tell you if they
2  had had surgery on their abdomen four months before?
3  A. Yes.
4  Q. Okay. If the patient doesn't tell you that
5  in response to your questions, the physicians have
6  complied with the standard of care; have they not?
7  A. Correct.
8  Q. Okay. The record that you have read --
9  A. But just as an aside, I was confused then by
10 the fact that Dr. Lu in her operative note on the 20th
11 of September recognized that the patient had adhesions
12 from previous surgery.
13     Q. Okay. That's because she was looking in the
14 abdomen and saw adhesions; right?
15     A. She noted. She said -- she said "adhesions
16 from her prior abdominal surgeries."
17     Q. Okay.
18     A. So that was surgeries, not surgery. And the
19 only abdominal surgery that was noted was the -- the
20 hysterectomy, so I don't know where she got the
21 plural.
22     Q. Okay. She had -- you wouldn't consider
23 abdominal surgery the placement of a catheter?
24     A. No.
25     Q. Okay. If the physician has --

---

**85**

1  correct?
2  A. Correct.
3  Q. Okay. And then you say "failure to recognize
4  peritonitis, severe abdominal pain, PDs" -- what's the
5  arrow? What's after the arrow?
6  A. "Entertain proper differential."
7  Q. Okay. When do you believe the diagnosis of
8  peritonitis should have been recognized?
9  A. I think they should have entertained that and
10 recognized it and pursued it the night of surgery.
11     Q. Okay. Based upon the complaint of pain?
12     A. Right. The amount of pain that she was
13 having and the abdominal pain and the narcotic
14 requirement after placement of a P.D. catheter was
15 just way out of line.
16     Q. Okay. And anything other than the amount of
17 pain that one would conclude there was --
18     A. Well, she had pain and tenderness and a firm
19 abdomen. So a firm abdomen implies guarding.
20     Q. Okay.
21     A. The firm abdomen, pain, tenderness; those
22 are -- those are peritoneal findings until, you know,
23 ruled out, basically. And after this occurs -- right
24 after surgery it has to be in a differential, have I
25 injured the bowel here?

---

22 (Pages 82 to 85)

86

1    Q. Okay. What else would be in the differential?
2    A. It could be post operative pain; but again
3    this degree of findings, the firm abdomen, the severe
4    pain, it's way out of line just for -- after a P.D.
5    catheter. I placed a couple of hundred of these and
6    it's really way out of line.
7    Q. Anything else that would be on the
8    differential diagnosis other than the postoperative
9    pain or injury to the bowel?
10    A. What else would be on the differential?
11    Q. Uh-huh.
12    A. Those would be my first two thoughts.
13    Q. Okay.
14    A. Normal incisional pain and tenderness.
15    That's generally what you think of after an operation
16    like this.
17    Q. Okay. Okay.
18    A. Have I done something or is this the usual
19    finding? That's what you basically have to go through
20    in your head.
21    Q. Okay.
22    A. An ileus doesn't develop like that. It takes
23    time to develop.
24    Q. And then your next, it's not lifted as -- it
25    says "failure to communicate to Dr. Lu."

87

1    A. Right. In other words, when she was
2    having -- I didn't see notes from Dr. Lu. I made the
3    assumption rightly or wrongly that she probably did
4    the procedure and went home or wherever she had to go.
5    And yet this patient was having significant problems
6    immediately post-op in terms of pain and abdominal
7    findings, and I thought there was a failure upon
8    the -- from the residents on their part not to
9    communicate these findings to Dr. Lu.
10    Q. Okay. Had they communicated them, what would
11    you -- well, let me ask it this way: When were they
12    required to have communicated them?
13    A. I think they needed to communicate them that
14    night.
15    Q. Okay. At what point that night?
16    A. As soon as they were called. You usually
17    don't get called after a P.D. catheter placement.
18    It's just very unusual. They don't have that kind of
19    pain and tenderness.
20    So as soon as they were called and they went
21    and evaluated her, they needed to call the surgeon
22    that did the procedure and say, you know, she's not
23    acting like a P.D. catheter placement, she is having
24    more findings then we would expect after P.D. catheter
25    placement. You know, "did something untoward happen,

88

1    could you have injured the bowel;" these kinds of
2    questions have to be asked and answered.
3    Q. Okay. And then what would have happened had
4    Dr. Lu been called?
5    A. Well, it turns out nothing, because she had
6    the same scenario the next day and did not pursue this
7    in any fashion that would indicate that that was on
8    her differential.
9    Q. Okay. What should have happened, in your
10    opinion?
11    A. I think that with these peritoneal findings
12    the night of surgery, that again it should have been
13    on their differential that this patient has -- you may
14    have injured the bowel and at the very -- very least,
15    you do an abdominal x-ray that night. If you see a
16    lot of free air, which she would have had most likely,
17    then you put a laparoscope in and see whether or not
18    you have injured the bowel. It's a very quick, simple
19    thing to do.
20    Because the downside of not diagnosing that
21    could -- could even be death. She got lucky. She
22    walled it off.
23    Q. Okay. And so the third thing you mentioned
24    is -- I'm trying to read my handwriting again -- your
25    handwriting -- failure to -- "failure of subsequent

89

1    physicians to entertain possibility of perforation."
2    A. Right. So the next day Dr. Lu comes in or,
3    you know, all the physicians are talking about this,
4    renal consult, everyone is sort of saying abdominal
5    pain and tenderness, and yet no one says -- no one
6    entertains the possibility that this may be a
7    perforation from the catheter.
8    Q. Okay.
9    A. And I think that was a deviation.
10    Q. Okay. And are you intending to express
11    opinions about the renal consultations?
12    A. No, I just note -- I don't think the renal
13    guy's responsible for determining that, but I think
14    it's interesting and notable that the renal
15    consultation notes that this patient has significant
16    pain and tenderness even on his examination. On, you
17    know -- I think it's quite notable.
18    Q. Okay. Let me ask it this way: At what
19    point -- what's the latest point I guess that you
20    believe one could in conformance with the standard of
21    care observe the patient to determine if there's
22    clinical improvement, as opposed to putting a
23    laparoscope in the patient?
24    A. Again, I think if you are dealing with
25    someone who has -- who you put on your differential,

23 (Pages 86 to 89)

90

1  if you put peritonitis on your differential, you
2  cannot simply watch those patients.  You have to do
3  something else.
4       And now the "something else" may be to get an
5  abdominal x-ray, and if you didn't see any free air
6  you would say, well, bowel perforation, you know,
7  maybe we can watch a little bit, but let's recheck the
8  x-ray in a couple of hours or whatever.  But you would
9  have seen the free air in this patient.
10      And then you would have said, you know, this
11 is on my differential.  Now I've got free air, maybe
12 it's from introduction of the catheter, but how do I
13 know it's not a bowel perforation?  And she has really
14 got a lot of pain, a lot of tenderness, more than I
15 expect after something like this.  You know, I hate to
16 do this, but I've got to put a laparoscope in you now,
17 you know, a couple of hours, whenever they were
18 notified.
19      Basically you do the x-ray and then you go.
20 If you think you have a bowel perforation, if you
21 entertain that and you should have, then until proven
22 otherwise, you have to do something.  You can't -- you
23 don't have the luxury of saying, let's see how this
24 develops, because you may develop into a dead patient.
25      Q.  Peritonitis means -- an "itis" means

91

1  inflammation or infection; doesn't it?
2       A.  It means inflammation of the peritoneum.  It
3  doesn't have to mean infections.  There are other
4  forms of peritonitis.
5       Q.  If an x-ray is consistent with the amount of
6  free air that you might see after a peritoneal
7  dialysis catheter is inserted, let's consider
8  hypothetically it is considered to be consistent with
9  that, would you agree with me that one would not place
10 a laparoscope in to see if the bowel was perforated?
11      A.  No, it's the other way.  A negative would
12 have helped you.  If you have free air, you still are
13 left with: Is it from the catheter or is it from a
14 perforation.  You are still left with that if
15 perforation is in your differential, which it didn't
16 appear to be here.  But if it's in your differential,
17 then you would agree with that.
18      If there is no free air, you would say you
19 expect to see free air, you should maybe watch a
20 little longer.  That wouldn't have happened here.  You
21 would have seen free air and you said I still want to
22 rule it out, and you have to put in a laparoscope.
23      Q.  Okay.
24      A.  You can't do nothing.  You can't just say
25 when you make differentials you can't pick the most

92

1  expedient one or the one that may save the patient
2  perhaps from another operation, if the only way to
3  really determine whether or not you have something
4  serious that could be life threatening is with the
5  laparoscope or something -- another surgery, you
6  are obligated.  You are absolutely obligated.
7       Q.  Okay.  If one perforated the bowel in the
8  placement of a P.D. catheter, would you not expect to
9  see evidence of bowel contents in the aspiration of
10 fluid from the bowel at the time the catheter is
11 placed?
12      A.  No, because remember this went through and
13 through, so it wasn't sitting in the lumen of the
14 bowel.  It just went through and through, and it was
15 probably, you know, the hole -- and this is why she
16 did okay and walled this off -- the hole in the bowel
17 was probably the size of the catheter, maybe a little
18 bit bigger because of rubbing, so a little bit of
19 stuff could leak out, but you wouldn't have the bowel
20 contents or the succus entericus, whatever you want to
21 call it, you know, out in the belly.
22      If you did, then she would have been sick and
23 she would not have walled things off and she probably
24 would have died if they sat on it as long as they sat
25 on it.  She just had -- she had enough of a leak to

93

1  drop bacteria and have a bacteria a little bit seep
2  out.  But the catheter was through and through.  It
3  wasn't sitting in the lumen of the bowel.  So you
4  would not necessarily have seen any bowel contents
5  come out.
6       Q.  Okay.
7       A.  And plus in the cecum, the bowel is
8  oftentimes solid at that point.  It doesn't have to
9  be.  It can be liquid, but it can be solid at that
10 point as well.  And it -- maybe not even solid, but
11 thick enough that it would not come through a P.D.
12 catheter, the hole in a P.D. catheter, which are maybe
13 a millimeter in size as best.  No, so you cannot use
14 that as a determination as to whether or not you are
15 in the bowel in answer to your question, long-winded.
16      Q.  The first thing you said was because in this
17 case, the catheter went through and through.  You
18 wouldn't expect to see anything --
19      A.  Well, I said there's a couple of things.
20 One is it's through and through, so it may not.  The
21 other is there are these catheters, there are
22 multiple holes in these catheters, and the holes in
23 the catheter, you know, may not allow you to suck out
24 the bowel contents, which in this case are pretty
25 thick.  Or can be pretty thick or it could just be

24 (Pages 90 to 93)

**92**

tient
ay to
ething
he
y, you

he
xpect to
on of
s

gh and
he
d it was
hy she
bowel
a little
of
he bowel
ou want to

ck and
probably
ey sat
k to

**93**

eep
h. It
you
ontents

to

id, but
a P.D.
maybe
t use
ou are
winded.
this
You

The

in
uck out
y

---

**94**

1  that, you know, she moved her bowels earlier in the
2  day and it just happened that in that area, there is
3  no stool in that area. Your bowel is not necessarily
4  filled with stool. You evacuate the stool, that's why
5  you have bowel movements; so you don't necessarily
6  have stool in the area where it went through, so you
7  may or may not see stool come out.
8      Q.  Okay.  Would you expect there to have been a
9  foul odor at least during the course of the placement
10  of the catheter?
11      A.  I don't know that. I really don't.
12      You have a mask on; you are irrigating this
13  thing out. Who knows.
14      Q.  Okay.
15      A.  Probably not.
16      Q.  Okay.  If the catheter was through and
17  through at the time, would you not expect that to have
18  been evident on the x-ray itself or on the CAT scan?
19      A.  I don't know.  I mean they -- they seemed
20  to -- I really don't know of the, first of all, I
21  didn't see the CAT scan; and, two, I just don't -- you
22  know, I think they never really recognized it.
23      I don't think it -- look.  She clearly had a
24  perforation.  There is no -- I think there is no
25  question about that.  So I don't think that she

**95**

1  developed this pelvic abscess and all these other
2  things for some other reason and then subsequent to
3  that, all that, wiggled her way through the bowel into
4  the bowel.
5      I mean the catheter caused the perforation.
6  So, you know, the only way to hook this whole picture
7  up together is that the catheter went through and went
8  through at the time of the placement, because of the
9  adhesions she had from her previous surgery, which can
10  happen. I don't deny that this is something that can
11  happen. You have to be careful about doing it with
12  someone who has adhesions, but it can happen.
13      But knowing that it can happen, you have to
14  be very cognizant of that and put it in your
15  differential when someone presents like this. So the
16  fact that they did or did not see it on the CAT scan
17  is really not helpful here.
18      Q.  You understand when you are evaluating a case
19  for determining what are the standards of care, you
20  are obligated to look not with the benefit of
21  retrospection?
22      A.  I understand.
23      Q.  A retrospectoscope is a very handy tool, is
24  it not, for physicians to evaluate in retrospect and
25  put it altogether when you can't do it in prospect;

**96**

1  right?
2      A.  Very much so.
3      Q.  And you will agree with me it is much easier
4  for us today looking back then it would be standing in
5  those shoes looking forward?
6      A.  I would agree.
7      Q.  You would agree that reasonable physicians
8  looking at the same set of facts can come to the
9  different conclusions at the time they are seeing a
10  patient, and then be proven in retrospect to disagree
11  and have a different conclusion; right?
12      A.  In general, you are asking me?
13      Q.  Yes.
14      A.  Yes.
15      Q.  And certainly the standard of care
16  encompasses different ways of going about a treatment
17  of a patient; does it not?
18      A.  Correct.
19      Q.  And physicians can disagree about what the
20  proper treatment and proper diagnosis is without
21  either one being in violation of the standard of care;
22  right?
23      A.  Correct.  But there are certain diagnoses you
24  have to -- you have to make and have to entertain in
25  certain situations.  Otherwise you are going to end up

**97**

1  with a dead patient.
2      Q.  You will certainly agree it is a lot easier
3  for you to conclude that there is peritonitis knowing
4  that there is a bowel perforation that went with the
5  catheter going through and through and not knowing
6  that at the time; right?
7      A.  Definitely.
8      Q.  Okay.  The last criticism that you have, you
9  say "failure of Dr. Lu if aware of "appy" to take
10  proper precautions to avoid bowel injury."
11      You would agree with me that if Dr. Lu is not
12  given the history of the patient having had an
13  appendectomy, that she and the residents at the time
14  of the -- at the time of the P.D. catheter being
15  placed conformed with the standard of care in the
16  performance of the P.D. catheter?
17      A.  There are two issues there.  Number one, when
18  you are prepping the patient, you would probably would
19  see the laparoscopic scars.  Now, I have not examined
20  Mrs. Bruton, so I don't know if they were there or
21  not.  But you probably would just in prepping the
22  abdomen, you are going to see these laparoscopic scars
23  in most cases.  Not always, but in most cases.  Number
24  one.
25      Number 2 is in my reading of the records and

98

1  that's all I have here, in my reading of the records,
2  Dr. Lu does acknowledge that the patient had previous
3  abdominal surgeries, plural, surgeries. So I -- you
4  know, I don't know if she meant that appendectomy is
5  one of those surgeries, but in that the only one
6  recorded is hysterectomy and the only other one she
7  had was an appendectomy, I have to assume from the
8  reading of the records at least that that's the other
9  surgery that she is referring to.
10      And that being the case, in the answer to
11  your question, if she is in some way aware that the
12  patient has had a previous abdominal surgery, if she
13  is aware of it, then I think she has to take
14  precautions to avoid injury to the bowel such as
15  either placing the catheter laparoscopically or when
16  you place it as an open procedure, if you choose to do
17  it that way, then making sure that you direct the
18  catheter to the left side of the abdomen.
19      Q.  You are using her statement at the time of
20  the second surgery as evidence for what she knew at
21  the time of the first surgery?
22      A.  Yes.
23      Q.  Okay.
24      A.  Again, as I say examining the abdomen, and
25  seeing that there are scars on the abdomen from the

99

1  previous laparoscopic surgery. Any time you make an
2  incision, there are scars.
3      Q.  Would you expect there to be scars from a
4  hysterectomy?
5      A.  It depends if it was done vaginally or
6  abdominally. I think hers was done abdominally.
7      Q.  So you expect to see a scar from that?
8      A.  You would expect to see it, but the vaginal
9  scar -- the hysterectomy scar can be a lower midline
10  scar, like what's called a Pfannenstiel incision, and
11  that would be low down.  If it's an up and down
12  scar -- I don't know what she had that, but if it's an
13  up and down scar, then I would say you really have to
14  be careful about putting these things in
15  laparoscopically.
16      I can't imagine -- I'm giving Dr. Lu the
17  benefit of the doubt that she did not put this
18  catheter in the patient who had a lower midline scar,
19  because that would scream out to any physician that
20  this patient may have multiple adhesions and you could
21  easily injure the bowel in that situation.
22      Again, I don't know what kind of surgery -- I
23  don't know what kind of incision she had.
24      Q.  Is it your testimony that a reasonably
25  competent surgeon should conclude that if a patient

100

1  has had a laparoscopic appendectomy, that they have
2  adhesions?
3      A.  No. You would just have to be aware that
4  there could be adhesions, and therefore you have to
5  say, A, I'm either going to place this
6  laparoscopically so I can make sure I don't injure the
7  bowel; or B, if I am going to place it as an open
8  procedure, then I make sure because I know there could
9  be adhesions --
10      (A discussion is held off the record.)
11      A.  She asked me I believe would I expect them to
12  have adhesions and my answer was you have to at least
13  consider that there are adhesions.  You may not --
14  there may not be adhesions, but you have to take that
15  into consideration when you are placing the catheter
16  and either A, place it laparoscopically so you can
17  have direct visualization and make sure you don't
18  place it through the bowel; and B direct it in such a
19  fashion that you stay away from an area that there
20  might be adhesions.
21      I don't know if that answered the question,
22  maybe I changed it.
23      Q.  No.  I'm thinking about what you said.  So
24  why directing it to the left would that direct it away
25  from the area where there might be adhesions because

101

1  the appendectomy is on the right?
2      A.  Correct.
3      Q.  Okay.  Where do you understand the
4  perforation in this case was?
5      A.  In the cecum.
6      Q.  Okay.
7      A.  Which is where the appendix comes off.
8      Q.  Would you agree with the statement that a
9  patient can have aberrant anatomy independent of
10  adhesions that result in a perforation with all
11  standard of care having been met?
12      A.  Yes.
13      Q.  And if the bowel is not where it ordinarily
14  would lie, then you more likely will encounter a
15  perforation even though you have conformed to the
16  standard of care in placement of it; right?
17      A.  Well, as I said to you, yes, that is -- yes,
18  that is the case.  But you know we are physicians and
19  we operate on patients and we take care of patients
20  with previous surgeries, and that's not quite what's
21  going on here.
22      You have a situation where the patient did
23  have surgery. So it's not necessarily aberrantly
24  located. It makes sense that the patient would have
25  adhesions from that appendectomy in the right lower

26 (Pages 98 to 101)

102

1 quadrant, and the bowel would not be aberrant in a
2 sense it would be naturally perhaps up there because
3 of the previous surgery it is adhered to the abdominal
4 wall or whatever, and make it more likely to be
5 injured.
6     This is not an aberrant case here, this is
7 previous surgeries causing adhesions and placing the
8 catheter in that direction where there were -- there
9 was adherent bowel that subsequently got injured.
10    Q.  The bowel at the cecum is not the transverse
11 colon; correct? Or is it?
12    A.  Correct, it's not.
13    Q.  Okay.  And on what basis do you conclude that
14 the perforation was at the cecum?
15    A.  Two bases.  One is the -- if the -- if the
16 bowel had been traversed where the CAT scan suggested
17 it had been, which is the transverse colon, then they
18 would have taken out the transverse colon with their
19 resection.  They didn't.  They took out the cecum,
20 which is where the catheter actually was.
21    The CAT scan mid read it or whatever; the
22 person who read it, read it wrong.  They took out the
23 cecum where the catheter was traversing and, in fact,
24 on the pathology specimen there are two holes in the
25 cecum that they identified, one at eight centimeters

103

1 and one at 22 centimeters from the ileal resection
2 margin.  So that's what I base it on.
3    Q.  Okay.  Okay.  Getting back to your criticism
4 of the performance of the procedure, if Dr. Lu took an
5 appropriate history and asked the question, "Have you
6 had prior surgery" and the patient did not identify
7 having had an appendectomy, can we agree that she
8 conformed to the standard of care in how she did the
9 surgery?
10    MR. CARGLE: Objection.  Dr. Nitzberg referred
11 to these as deviations and not criticisms, not
12 criticisms.  So please rephrase.
13    Q.  I think my question was if Dr. Lu obtained a
14 history that was within the standard of care by asking
15 the question "Have you had prior abdominal surgery"
16 and the patient did not report that she had had an
17 appendectomy, can we agree that Dr. Lu conformed to
18 the standard of care in how she performed the surgery?
19    A.  There are two things I need to comment here.
20 One is it is not clear from the records that Dr. Lu
21 took the history, because it is a resident that took
22 the history from what I gather looking at the records,
23 Number 1.
24    Number 2, you still are stuck with the fact
25 that when you prep the abdomen you see laparoscopic

104

1 scars, and you have to ask yourself, where do those
2 scars come from and what do they mean.  And then yes,
3 in answer to your question more specifically, if she
4 took the history and the patient said, you know, did
5 not tell her about appendectomy, she has conformed to
6 the standard of care in terms of taking a history and
7 proceeding ahead.
8    Q.  And in performance of the surgery?
9    A.  Correct.
10    Q.  Okay.  If they had inserted a laparoscope the
11 evening of or the next day, what, if anything, would
12 you have expected that would have revealed?
13    A.  That the catheter was going through the
14 cecum.
15    Q.  Okay.  And what would then have happened?
16    A.  Well, you asked me two -- two different
17 times.
18    Q.  I don't think I got beyond what would have
19 happened once they put the laparoscope in.
20    A.  No, you asked me the evening of or the next
21 day, you asked me.  Those are two different times.
22 They may -- it may engender two different types of
23 surgery.  It depends on what they found.
24    Q.  Okay.  What would happen that night?
25    A.  That night they probably would have taken the

105

1 catheter out and probably made a limited incision and
2 closed the hole in the cecum without taking out the
3 rest of the colon.  The next day it really depends on
4 the amount of soilage and the amount of inflammation.
5    The next day may already be too late.  They
6 may have been stuck still doing an ileocecectomy.
7    Q.  Okay.  And could you tell me the point at
8 which one would need to have done an ileocecectomy?
9    A.  Ileocecectomy.
10    Q.  Whatever.
11    A.  This is a ballpark figure.  I would figure
12 after a certain period of time there probably would be
13 too much inflammation and spoilage, it might be ten to
14 12 hours after the initial procedure.
15    Q.  Okay.
16    A.  So you have a limited time in terms of -- in
17 terms of changing the type of surgery you would
18 possibly be able to do.
19    Q.  Can we agree that reasonable physicians could
20 disagree with you and conclude that resection of the
21 bowel would be the appropriate thing to do, no matter
22 when diagnosed?
23    A.  Some people would do that.
24    Q.  Okay.
25    A.  Some people would do that; but some people --

27 (Pages 102 to 105)

106

1  a lot much people would say we got it early, things
2  are clear here, there is no soilage, you know, it's
3  only been a few hours, you know, the trauma literature
4  is -- you know, it's all over the trauma literature
5  that you can close these things in a -- if you catch
6  it early enough, so you could easily have done the
7  former as opposed to the latter.
8      Q.  Okay.  But that would be on the preference of
9  the surgeon; would it not?
10     A.  Yeah.  You can do it, yeah, sure.
11     Q.  So you couldn't say with reasonable medical
12 probability that in this case she would not have had a
13 resection of the colon, since that would have been an
14 appropriate approach and thing to have done in
15 response to have perforated the colon?
16     A.  If the surgeon was concerned in any way at
17 the time of the procedure to repair the injury and it
18 had been done in a short period of time, you know, a
19 few hours after the injury and he was concerned at all
20 an ileocecectomy would have been one of the options,
21 yes.
22     Q.  Okay.  And how long would one be in the
23 hospital after a resection of the colon?
24     A.  Just depends on how quickly your
25 postoperative ileus resolves, but it could be anywhere

108

1      A.  Again, you have to close both sides.
2      Q.  Okay.
3      A.  I don't think the "through," the second
4  "through," makes that much of a difference.
5      Q.  Are you more likely to have --
6      A.  These are small holes.  These are the holes
7  -- the P.D. catheter is four millimeters, maybe five
8  millimeters.  I mean it's a very small hole, and you
9  just have to be able to imbricate -- close it and
10 imbricate a lot of what's called the sera-muscular
11 layer, which is pretty easy.
12     Q.  Are you less likely to -- let me ask it this
13 way:  Are you more likely to have a failure of an
14 attempt to close the holes after -- if you have a
15 perforation on each side than you just have an injury
16 or a nick to one side?
17     A.  I don't know that.  I mean here's the thing:
18 You have -- you have caused an iatrogenic injury by
19 doing -- putting the catheter through the bowel.  And
20 the thinking oftentimes, most times, is that, you
21 know, we already have to go back in and do another
22 operation, you know, we don't want to -- you know, if
23 we take out a colon that's a pretty big procedure, and
24 if we can do something relatively simple that is safe
25 and effective, we should try to do that to try to

107

1  between four -- three to six to seven days, something
2  like that.
3      Q.  Okay.
4      A.  In general.
5      Q.  Okay.
6      A.  Sometimes patients take weeks, but...
7      Q.  Do you know what the rate of having to
8  perform a resection of the colon is after having
9  attempted to repair it without a colon resection?
10 After a perforation?
11     A.  Are you talking about a perforation that is
12 an inflammatory perforation or a perforation caused by
13 some kind of traumatic injury?
14     Q.  Let's assume there is a perforation caused by
15 the placement of a P.D. catheter.
16     A.  You are talking about some kind of foreign
17 body or something causing it?
18     Q.  Right, right.
19     A.  The literature really is mostly with
20 colonoscopies, and that's where we usually injury the
21 bowel in an early setting and those, oftentimes we
22 just close those if it's picked up in a few hours
23 time, you know, probably within five, six hours you
24 would probably close it.
25     Q.  With a through and through perforation?

109

1  prevent her from having her colon out.
2      You can't always do it, it is somewhat of a
3  judgement call I would point out, but you at least
4  have to go that through your head.
5      Q.  Are you less likely to have success if it is
6  embroiled in adhesions?
7      A.  No.  If it is embroiled in the inflammatory
8  process.  The adhesions themselves, you just take down
9  the adhesions.  If they are old adhesions, that's not a
10 problem.  An inflammatory process is different.
11     Q.  Okay.  I take it that you do not hold
12 yourself out as an expert in irritable bowel syndrome
13 and gastroenterology syndromes?
14     A.  I don't take -- I'm not an irritable bowel
15 syndrome expert.
16     Q.  Okay.  You don't treat people for that?
17     A.  I treat patients after -- after bowel
18 resections a lot.  I see them back.
19     Q.  Do you treat patients for irritable bowel
20 syndrome?
21     A.  I do not.
22     Q.  Okay.  Would you agree with me that irritable
23 bowel syndrome is not caused by resection of a colon?
24     A.  Yeah, that should be -- correct.
25     Q.  Any other deviations from the standard of

28 (Pages 106 to 109)

**110**

1 care that you identified, having reviewed the records?
2    A.  Those were the major deviations that I have
3 listed.
4    Q.  Well, when you say major, I need to know, are
5 there any others that you are going to come into court
6 to talk about?
7    A.  Not unless there is new information that
8 comes to light.  Those are the deviations that I saw
9 from reading the records at this time.
10    Q.  Okay.  Okay.  Are you going to testify about
11 Mrs. Bruton's present condition and any conditions she
12 suffers from currently as having been caused by having
13 had her bowel resected or the perforation?
14    A.  The only comment I can make about that is,
15 you know, I can just go by what is in the records.  I
16 can comment about what has been said in the records.
17 I have not examined the patient.
18        You know, if I examined her I could have a
19 better understanding of these complaints, so I can't
20 tell you yes or no if I'm going to change my opinion.
21 If I don't examine her and all I have is this, I can
22 comment on those symptoms, yes.  When you say
23 testify --
24    Q.  Let me ask it this way.  You have seen that
25 Dr. Brown, who is her gastroenterologist, diagnosed

**111**

1 irritable bowel syndrome?  You have seen that?
2    A.  Right, yes.
3    Q.  And I will represent to you she has seen a
4 second gastroenterologist, who has also diagnosed
5 irritable bowel syndrome.
6    A.  Correct.
7    Q.  And put her on a probiotic.
8    A.  Right.
9    Q.  Can we agree with reasonable medical
10 probability her complaints that have been diagnosed as
11 having been caused by irritable bowel syndrome were
12 not proximately caused by any of the events in 2004?
13        MR. CARGLE:  Objection.  You are asking the
14 witness to speak on about Dr. Frank.  I think
15 that's unfair.
16    Q.  You can answer.
17        MR. CARGLE:  No, no, you can't.  You can only
18 speak on Dr. Frank because that's --
19        MS. PRESTON:  I asked him to accept that as a
20 hypothetical fact.
21        MR. CARGLE:  Now you are clarifying.  Okay.
22    A.  Okay.  But you are asking me to do I think --
23 can you repeat the question?
24    Q.  Yes.  Can we agree that irritable bowel
25 syndrome is not approximately caused by a perforation

**112**

1 of the bowel and subsequent pelvic abscess and
2 resection of the bowel?
3    A.  Okay.  So now you are asking me -- because a
4 minute ago you said I'm not an expert on irritable
5 bowel, and now you are asking me to give an opinion --
6    Q.  Can we agree you are not able to render that
7 opinion?  Is that fair?
8    A.  What I can say to you is that I am aware of
9 certain signs and symptoms that can occur after bowel
10 resection.  Whether or not they are from the bowel
11 resection or irritable bowel, I don't know how anyone
12 can tell you what they are, to be honest.  I don't
13 know the answer to that.
14    Q.  Okay.
15    A.  If that helps you.
16    Q.  Are you going to testify that Mrs. Bruton has
17 any sequela from her resection of her bowel that you
18 have seen in the records?
19    A.  Well, I understand she has a hernia.  That
20 could be from -- I don't know where the hernia is, so
21 I can't tell you, but I understand she has a hernia.
22 That could be a sequela of the operation she had to
23 resect her bowel.  So that's one possibility.
24    Q.  Okay.
25    A.  She has -- she has pain and discomfort.  Is

**113**

1 it from the irritable bowel?  I have no idea.  Is it
2 from the bowel resection?  You can get pain and
3 discomfort after bowel resection and difficulty with
4 diarrhea, which I see she has because you lose the
5 ileocecal valve when you remove the distal ileum and
6 cecum, you lose the ileocecal valve.
7        So that is sort of a stopgap, if you will, in
8 terms of the fluid that comes from the small
9 intestine, so now you are seeing a lot more fluid in
10 the large intestine at a faster rate, that can cause
11 some diarrhea.  Is it causing Mrs. Bruton's diarrhea?
12 I have no idea.
13    Q.  So you wouldn't be able to express an opinion
14 to a reasonable degree of medical probability that the
15 complaints that she has as recorded in the record were
16 caused by the events of 2004 at Medstar-Georgetown
17 Medical?
18    A.  Well, I just mentioned two, the resection and
19 I just mentioned the hernia.
20    Q.  Excuse me.
21    A.  All I could say in that situation is:  Bowel
22 resection can lead to diarrhea and pain.  Is it
23 causing hers?  I have no idea.  That's what I can say.
24    Q.  Okay.  And --
25    A.  In other words, just to be more complete.

29 (Pages 110 to 113)